```
            UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF GEORGIA
                 ATLANTA DIVISION


ELIAS E. ONIHA,
     Plaintiff,
                              CIVIL ACTION FILE
     vs.                      1:19-cv-5272-LMM-JCF
DELTA AIRLINES, INC.,
     Defendant.
~~~~~~~~~~~~~~~~~~~~~
```

```
              REMOTE DEPOSITION OF
              ELIAS EFFUORIA ONIHA
```

```
              August 27, 2020
                 9:30 a.m.
```

```
      (All attendees appeared remotely via
              teleconferencing.)
```

```
      Elizabeth R. Hollingsworth, CCR B-1319
```

Page 2

```
 1                  APPEARANCES OF COUNSEL

 2    On behalf of the Plaintiff:

 3    REGINA S. MOLDEN, Esquire
      Molden & Associates
 4             Peachtree Center Harris Tower
               233 Peachtree Street, NE
 5             Suite 1245
               Atlanta, Georgia 30303
 6             404.324.4500
               rmolden@moldenlaw.com
 7
      On behalf of the Defendant:
 8
      BENJAMIN A. STONE, Esquire
 9    Munger & Stone, LLP
               999 Peachtree Street, NE
10             Suite 2850
               Atlanta, Georgia 30309
11             404.815.1884
               ben.stone@mungerandstone.com
12
      ANDREA L. BOWMAN, Esquire
13    Delta Air Lines, Inc.
               Law Department
14             Suite 981
               PO Box 20574
15             Atlanta, Georgia 30320
               404.715.3586
16             andrea.bowman@delta.com

17

18

19

20

21

22

23

24

25
```

Page 3

1                    INDEX TO EXAMINATIONS

2      WITNESS:  ELIAS EFFUORIA ONIHA

3      EXAMINATION                                   PAGE

4      Cross-Examination by Mr. Stone                   5
       Direct Examination by Ms. Molden              243
5      Recross-Examination by Mr. Stone              263

6                          - - -

7                      INDEX TO EXHIBITS

8      DEFENDANT    DESCRIPTION                      PAGE

9      Exhibit 1    Plaintiff Elias Oniha's           11
                    Response to Defendant's
10                  First Continuing
                    Interrogatories
11
       Exhibit  2   Resumé of Elias Oniha            24
12
       Exhibit  3   Application for Employment        35
13
       Exhibit  4   Delta Completed Training         71
14
       Exhibit  5   (Not identified)
15
       Exhibit  6   AOSSP Sensitive Security         79
16                  Information

17     Exhibit  7   Performance Profile              90

18     Exhibit  8   Statement prepared by            93
                    Elias Effuoria Oniha
19
       Exhibit  9   Authorized Signatory BORN       126
20                  Notification

21     Exhibit 10   (Not identified)

22     Exhibit 11   Statement prepared by           130
                    Elias Effuoria Oniha
23                  dated 6-14-2019

24     Exhibit 12   Employee checkpoint postings    146

25     (Continued on next page)

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                              August 27, 2020

Page 4

 1                      INDEX TO EXHIBITS

 2     DEFENDANT    DESCRIPTION                      PAGE

 3     Exhibit 13   Document indicating badge          152
                    swipes by Mr. Oniha
 4
       Exhibit 14   (Not identified)
 5
       Exhibit 15   (Not identified)
 6
       Exhibit 16   Statement prepared by             179
 7                  Elias Effuoria Oniha

 8     Exhibit 17   Handwritten statement             182
                    prepared by Elias Effuoria
 9                  Oniha dated 7-2-2019

10     Exhibit 18   Statement prepared by             185
                    Elias Effuoria Oniha
11                  dated 7-2-2019

12     Exhibit 19   Letter prepared by Elias          189
                    Effuoria Oniha dated 7-13-2019
13
       Exhibit 20   (Not identified)
14
       Exhibit 21   Letter to Director HR             197
15                  Equal Opportunity &
                    Compliance Delta Air Lines
16                  from Elias Oniha from
                    dated 7-22-2019
17
       Exhibit 22   Timeline on appeal               200
18
       Exhibit 23   Letter to Elias Oniha from        204
19                  Delta, Jim Brimberry,
                    dated 8-7-2019
20
       Exhibit 24   Charge of Discrimination          208
21
       Exhibit 25   Charge of Discrimination          212
22
       (REPORTER'S NOTE:  The original exhibits described
23     above were attached to the original transcript.)

24     (End of Index)

25

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                   August 27, 2020

Page 5

```
 1              Deposition of Elias Effuoria Oniha
 2                       August 27, 2020
 3              THE COURT REPORTER:  Is everyone in
 4    agreement to taking this deposition remotely and
 5    that the witness is being sworn remotely?
 6              MR. STONE:  Yes.
 7              MS. MOLDEN:  Yes.
 8                   ELIAS EFFUORIA ONIHA,
 9         being first duly sworn, was examined and
10         testified as follows:
11                   CROSS-EXAMINATION
12    BY MR. STONE:
13         Q    Okay.  Mr. Oniha, why don't you go
14    ahead and state your full name for the record for
15    me.
16         A    My full name is Elias Effuoria Oniha.
17         Q    All right.  Mr. Oniha, have you ever
18    given a deposition before?
19         A    No, sir.
20         Q    All right.  I take it that you
21    understand basically how this works.  That is, I'm
22    going to ask you during the course of the day
23    today a series of questions that you are --
24              You've just taken an oath and that
25    you've sworn to tell the truth.  Do you understand
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 6

```
 1   that?

 2       A     Yes, sir.

 3       Q     Okay.  Do you understand there are

 4   penalties including criminal penalties that can be

 5   associated with providing false testimony?

 6       A     Yes, sir.

 7       Q     All right.  Mr. Oniha, we're going to

 8   have to take it slow today.  You always have to

 9   take it a little bit slow during the course of a

10   deposition but particularly so today because we're

11   by video, and so there's a little bit of lag.  And

12   so we'll have to make sure that I finish my

13   question and then give you an opportunity to

14   answer and make sure you finish your answer before

15   I ask the next question.  Are you with me on that?

16       A     Yes.

17       Q     All right.  It is possible today that

18   I'll, of course, ask you a question that you don't

19   understand.  If you don't understand any of my

20   questions, sir, ask me to clarify and I'll do so

21   before you give your answer.  Okay?

22       A     Okay, sir.

23       Q     All right.  And if you answer the

24   question, I'm going to assume you understand the

25   question, of course.  Are you with me?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                              August 27, 2020

Page 7

```
 1        A     Yes, sir.
 2        Q     All right.  You're doing a great job,
 3   but it's particularly important because we're
 4   doing this by video that you give oral answers --
 5   that is, that you say yes or no and don't shake
 6   your head or say uh-huh or huh-uh -- so Libby can
 7   take down everything that you've said today.  All
 8   right?
 9        A     Yes, sir.
10        Q     All right.  Mr. Oniha, I always ask at
11   the beginning of a deposition like this:  Is there
12   any reason that your ability to testify truthfully
13   is in any way impaired?
14        A     No, sir.
15        Q     All right.  Are you currently on any
16   medication or drugs that might affect either your
17   memory or your ability to testify truthfully
18   today?
19        A     No, sir.
20        Q     All right.  Are you on any medication
21   or drugs at all right now?
22        A     No, sir.
23        Q     All right.  Have you had any alcohol in
24   the last 24 hours?
25        A     No, sir.  I don't drink.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 8

```
 1      Q      You don't drink.  Well, that makes it
 2  easier.
 3             Mr. Oniha, did you do anything to get
 4  ready to give testimony today?
 5             For example, did you look at any
 6  documents or speak with anybody to refresh your
 7  recollection or prepare you for this deposition?
 8      A      Yes, sir.  I spoke with my attorney
 9  yesterday for --
10      Q      All right.  Stop for me.  It's going to
11  be very important that I make it clear that I'm
12  not asking you to disclose any communications that
13  you've had with your attorney.
14             That is, the fact that you spoke to
15  your attorney you can certainly tell me, but don't
16  tell me what your attorney said to you or what you
17  said to your attorney.  Are you with me?
18      A      Yes, sir.
19      Q      All right.  You spoke with your
20  attorney yesterday; yes?
21      A      Yes, sir.
22      Q      All right.  And for how long did you
23  speak with her?
24      A      One hour.
25      Q      One hour.
```

Elizabeth Gallo
COURT REPORTING, LLC

Page 9

```
 1                   And this was Ms. Molden; correct?

 2       A      Yes, sir.

 3       Q      Was there anybody on the phone other

 4    than Ms. Molden?

 5       A      No.  It was just us.

 6       Q      I assume it was by phone; is that

 7    correct?

 8       A      Say that again?

 9       Q      Sure.

10              You were speaking by phone with

11    Ms. Molden; correct?

12       A      Yes, sir.

13       Q      All right.  Did you look at any

14    documents to get ready for the deposition today?

15       A      I just refresh my memory of the

16    incident that happened at 2019, you know,

17    June 14th.  Yes.

18       Q      You refreshed your memory as to what

19    happened on June 14th?  Is that what you said?

20       A      Yes.

21       Q      All right.  Did you look at any

22    documents to refresh your memory?

23       A      I just looked at the reports that you

24    guys -- that I sent to you guys.

25       Q      Say that again.  I'm sorry.  I didn't
```

Page 10

1   understand.

2        A     I looked at the reports that I sent to

3   my attorney that is sent to you guys.

4        Q     You looked at your report?  Is that the

5   word you used?

6        A     Yes.

7        Q     All right.  And what report is that?

8   Tell me -- can you describe it in more detail for

9   me?

10       A     That was the incident report that --

11  you know, that I wrote during that incident on the

12  14th of June, 2019.

13       Q     All right.  We'll look at some

14  documents in a minute, and we'll see which one

15  you're talking about.

16             Other than your incident report that

17  you just described, did you look at any other

18  documents to refresh your recollection?

19       A     No.

20       Q     Did you look at any other documents to

21  get ready for this deposition?

22       A     No, sir.

23       Q     All right.  Just that one document?

24       A     Yes.

25       Q     All right.  Mr. Oniha, just to confirm

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 11

1    a couple of things, you've never filed for

2    bankruptcy; is that correct?

3         A     No, sir.

4         Q     Have you ever filed for divorce?

5         A     No, sir.

6         Q     Have you ever been sued for divorce?

7         A     No, sir.

8         Q     All right.  Have you ever been arrested

9    for any crimes?

10        A     No, sir.

11        (Whereupon a document was identified

12        as Defendant's Exhibit 1.)

13        Q     Mr. Oniha, I'm showing you what's about

14   to be marked as Exhibit No. 1 for purposes of this

15   deposition.

16              Do you recognize this document, sir?

17        A     Yes, sir.

18        Q     All right.  And you recognize this as

19   your responses to Delta's interrogatories that

20   they served in this case; is that correct?

21        A     Yes, sir.

22        Q     All right.  I notice at the bottom,

23   there's no signature by you, no verification, no

24   statement that these are truthful.

25              So I'm going to ask you if everything

Page 12

1    in here is truthful and accurate, all of your

2    responses?

3              MS. MOLDEN:  Object to the form.

4        Q    (By Mr. Stone)  You can go ahead and

5    answer, Mr. Oniha.

6        A    Yes, sir, it's true.  Everything here

7    is true.  Yeah.

8        Q    Everything is truthful.

9              When was the last time you reviewed

10   this document?

11       A    When it was originally served.

12       Q    Okay.  So you have not reviewed it

13   since these responses were filed?

14       A    No, I don't.  I haven't.

15       Q    All right.  Take a very quick look at

16   it, Mr. Oniha.  Review it again quickly, and let

17   me know if anything has changed in response to any

18   of these questions.  Take the time you need.

19              Just to remind you, Mr. Oniha, the

20   question is:  Is everything in there still

21   accurate?

22       A    Yes.

23       Q    All right.

24       A    That is true, sir.

25       Q    All right.  Mr. Oniha, you're aware

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                      August 27, 2020

Page 13

1    that Delta in this lawsuit also served on you a

2    request for documents; yes?

3        A      Yes, sir.

4        Q      All right.  And have you produced, for

5    example -- well, strike that.

6               Have you given to your attorneys all of

7    your communications that you have in your

8    possession between you and Delta?

9        A      Yes.  Everything that I had I have

10   given them to my attorney.  Yes.

11       Q      All right.  Mr. Oniha, when you were

12   served with the request for production of

13   documents that Delta served, tell me what you did

14   to look for responsive documents, the steps you

15   took to find the documents that you gave to your

16   attorney.

17       A      I just took the natural steps, you

18   know, by going through the ones that was within my

19   possession.  I sent it to my lawyer.

20               Then the one that I have to, you know,

21   maybe call the third-party, like the bank

22   statement, you know, I have to call the bank and

23   request a canceled check.

24               So most of it was in my possession, and

25   now, you know, I forwarded it to my lawyer.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 14

```
 1        Q       I'm with you.
 2                Where did you look for the documents
 3     that -- not the bank documents.  I know you called
 4     the bank.  But the documents that were within your
 5     possession, where did you look for those
 6     documents?  Where were they kept?
 7        A       In my file.  In my folder.
 8        Q       So you have a folder, a Delta folder?
 9     Is that what you're telling me?
10        A       I have my personal folder where I keep
11     my information.
12        Q       Say that sentence again.  I'm sorry.
13        A       I have a folder where I kept all my
14     information.
15        Q       I hear you.
16        A       Okay.
17        Q       All right.  And where was that folder
18     kept?  Was it in your house?
19        A       Yes.
20        Q       All right.  Was it just one folder or
21     multiple folders?
22        A       One folder.
23        Q       All right.  Do you also own a computer?
24        A       Yes, sir.
25        Q       All right.  Is that the computer that
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 15

1     you're on right now?

2          A     Yes, sir.

3          Q     **How long have you owned that computer?**

4          A     I've had it about over a year now.

5          Q     **Over a year?**

6          A     Yes, sir.

7          Q     **Okay.  Did you own a computer before**

8     **this computer?**

9          A     No.  I never did.  No.

10         Q     **This is the first computer you've ever**

11    **owned?**

12         A     I've had a laptop -- I mean, a desktop,

13    and, you know, that was actually it.  And, you

14    know, I just got that.

15         Q     **I apologize.  Say that sentence again.**

16    **I didn't understand.**

17         A     We had a family desktop, you know.

18    Then we just got rid of it.

19         Q     **You had a family desktop.  I'm sorry.**

20    **I still didn't understand you.  Say it again.**

21         A     Okay.  We had a desktop.  The desktop

22    was over six or seven years and was older, and it

23    was not running as fast as you would think.  And

24    it was just giving us little problems, and we got

25    rid of it.

Page 16

1        Q      I still didn't understand the sentence.

2   Say it slowly, please.

3        A      Okay.  We had the lap -- sir, I said,

4   we had a desktop that was over six years old, and

5   it was not running fast.

6        Q      Okay.

7        A      It was giving us a lot of, you know,

8   problems, and we decide to get rid of it.

9        Q      All right.  When did you get rid of it?

10       A      About three years ago.

11       Q      Three years ago?

12       A      Yes, sir.

13       Q      So we're in 2020.  So you would have

14   gotten rid of it in 2017; correct?

15       A      Yes.

16       Q      All right.  Between the time that you

17   got rid of that desktop in 2017 and the time you

18   got your computer that you're on within the last

19   year, did you own any computer?

20       A      No, I did not.

21       Q      All right.  So there was a period of

22   about two years where you owned no computer

23   whatsoever?  Roughly 2018 and 2019; is that

24   correct?

25       A      That is correct, sir.

Page 17

1      Q      Okay.  No laptop?  No desktop?  No

2   computer whatsoever?

3      A      No, I didn't.

4      Q      Okay.  Was there anybody in your family

5   who owned a computer during that period of time?

6      A      Yes.  My kids, yeah, they have a

7   laptop.

8      Q      Your kids owned a laptop computer?

9      A      Yes.  They are college students.

10      Q      They're college students.  Okay.

11             Where was that laptop computer kept in

12   2018 and 2019 during this period of time where you

13   owned no computer?

14      A      They have possession of them because

15   they're in school.  They have to use the laptop.

16   So they have possession of it.

17      Q      Okay.  It's not in your house?

18      A      No.

19      Q      Was there any computer in your house in

20   2018 or 2000 --

21             Between the time you got rid of the

22   slow-running computer you described a moment ago

23   in 2017 and the time you bought this computer, was

24   there any computer that was maintained in your

25   house?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                August 27, 2020

Page 18

```
 1        A     No.   There was no -- we didn't have no
 2   desktop except an individual laptop that my
 3   college students have.
 4        Q     Okay.  But that was not kept in your
 5   house.  That was kept at school; right?
 6        A     No.  No, sir.
 7        Q     You're agreeing with me?
 8        A     Yes, sir.
 9        Q     All right.  Did you ever use that
10   laptop computer owned by your college student
11   child?
12        A     No, sir, I did not.
13        Q     Okay.  All right.  If you needed a
14   computer between the time you got rid of the old
15   slowly running machine and the time you got your
16   current machine, what computer would you use?
17              MS. MOLDEN:  Object to the form.
18        A     Most of the time when I would use a
19   computer, I was at work or I went to the public
20   library and used it.
21        Q     (By Mr. Stone)  Okay.  So work or the
22   public library?
23        A     Yeah.  Work and public library, yes.
24        Q     All right.  What public library would
25   you go to to use a computer?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha
August 27, 2020

Page 19

```
 1       A       Rockdale County, Conyers library.
 2   Conyers.
 3       Q       Conyers library?
 4       A       Yes.
 5       Q       And what road is it on?
 6       A       It's on Green Street.
 7       Q       Green?
 8       A       Yes.  Street.
 9       Q       All right.  Okay.  On the current
10   computer that you own, are there any documents
11   related to Delta?
12       A       The email, you know, that I sent to my
13   attorney.  I know that one.
14       Q       All right.  An email you to sent to
15   your attorney.
16               Is this the same email that you were
17   referring to a moment ago that you reviewed in
18   connection with preparing for your deposition?
19       A       Yes, sir.
20       Q       All right.  Other than that one
21   document, are there any other documents relating
22   to Delta?
23       A       Yes.
24       Q       Yes?
25       A       Yes, sir.
```

Page 20

1        Q        What else is on your computer relating

2    to Delta other than that one email?

3        A        The letter of -- of course, the

4    statement that I wrote on the 14th of June.  The

5    letter with which -- that I use in appealing my

6    separation for employment.  And, of course, the

7    individual letters that I wrote to the managers

8    and -- you know, and the directors.

9        Q        All right.  So all of those documents

10   are on the computer you're on right now; correct?

11       A        Yes.  I have -- you have them.  Yes.

12       Q        All right.  So you owned that computer

13   at the time that you were leaving Delta; is that

14   correct?

15       A        No.  I had it before -- before I was

16   there.  You know, before I was separated from

17   Delta.

18       Q        Okay.  How long?  Did you have it at

19   the time -- we're going to talk about a couple

20   events in a minute.

21            But did you have it at the time of the

22   incident where you went through the gates and

23   there was the lunch disagreement?

24       A        Yes.  Yes, I had it.

25       Q        Okay.  So you've had that computer

Page 21

1   since the time that you were at Delta and had the

2   issues with the security?

3       A      Yes.

4       Q      All right.  And all of the statements

5   that you prepared and provided to Delta, were

6   those all done on this computer?

7       A      Yes, sir.

8       Q      All right.  And they're all still

9   there?  You've not moved them or changed them in

10  any way?  You've not deleted them?

11      A      No.  I did not delete them.

12      Q      All right.  So the originals of all

13  those statements are still on your computer?

14      A      They were, sir.

15      Q      Yes, you're agreeing with me?

16      A      Yes.  I said, yes, sir.

17      Q      Okay.  All right.  Mr. Oniha, do you --

18  one second here.

19             All right.  Mr. Oniha, have you ever

20  gone by any name other than Elias Oniha?

21      A      Yes, sir.  As I stated in the

22  statement, my name is Elias Effuoria Oniha.

23      Q      Okay.  Effuoria is your middle name; is

24  that correct?

25      A      Yes.

Page 22

```
1        Q      Okay.  And is it spelled

2   E-u-f-f-o-n-i-a?

3        A      No, sir.  It's spelled --

4        Q      Can you spell it for me?

5        A      You spell E-f-f-u-o-r-i-a.

6        Q      Spell it one more time, please.

7   E-f-f --

8        A      -- u-o-r-i-a.

9        Q      Okay.

10       A      And that's how it reads on my driver's

11  license, and that's how it is on my diplomas.

12       Q      All right.  Are you on any social

13  media, for example, Facebook or Instagram?

14       A      No, sir, I'm not.

15       Q      Have you ever been on any social media?

16  Have you ever had an account on social media?

17       A      No, I didn't.

18       Q      No?

19       A      No, sir.

20       Q      Okay.  And you still reside at

21  2011 Channing Drive in Conyers?

22       A      That's correct, sir.

23       Q      All right.  And are you currently

24  married?

25       A      Yes, sir.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 23

1      Q      All right.  What is your wife's name,
2   please?

3      A      Elizabeth.

4      Q      Oniha?

5      A      Yes.  Yes, sir.

6      Q      All right.  And when did you marry her?

7      A      We married April 25th, 1998.

8      Q      All right.  And you've never been
9   separated or divorced from her I take it?

10      A      No.  No.  No.

11      Q      And I know you have at least one child.
12   How many children do you have?

13      A      We have five children.

14      Q      Five.  All right.

15             And what is the age of the oldest and
16   the age of the youngest?

17      A      The oldest is 22, and the youngest is
18   nine.

19      Q      All right.  Do the children who are
20   under 18 reside with you?

21      A      Yes.  Except my first two that are in
22   college, you know.  One is in University of
23   Central Florida, and the other one is in UGA,
24   Athens.  Then my last three are in high school,
25   middle school, and, of course, elementary school.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 24

1       Q       Got it.  Got it.

2               And do I correctly understand you have

3    a degree from the University of Maryland?

4       A       That is correct, sir.

5       Q       All right.  And what was your major?

6       A       My major was accounting and minor was

7    business.

8       Q       All right.  And what year did you

9    graduate from Maryland?

10      A       2003.

11      Q       Okay.  And you also have an MBA,

12   Master's in Business Administration?

13      A       That's correct, sir.

14      Q       Okay.  You got that in 2006?

15      A       Yes.

16      Q       All right.  And where did you get that

17   from?

18      A       I got that from the Hood College in

19   Frederick, Maryland.

20              (Technical difficulty, and proceedings were

21              in recess, 10:02 a.m. to 10:20 a.m.)

22              (Whereupon a document was identified

23              as Defendant's Exhibit 2.)

24      Q       (By Mr. Stone)  Exhibit No. 2 -- can

25   you see it -- which is your resumé that you

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Page 25

1    produced in this litigation --

2         A     Yes, sir.

3         Q     All right.  Mr. Oniha, let me ask you,

4    first of all, this is a resumé that you produced

5    in this case?

6         A     Okay.

7         Q     Yes?

8         A     Yes, sir.

9         Q     All right.  And, Mr. Oniha, when did

10   you prepare this resumé?

11        A     This resumé was prepared way back.

12        Q     Tell me what you mean by "way back."

13   Was it before this year?

14        A     That was in -- I thought that was 2010.

15        Q     All right.  And what was the purpose?

16   Why did you prepare this resumé?

17        A     I prepared this resumé, you know, to

18   give me an opportunity to, you know, move up with

19   the company.

20        Q     You prepared it while you were at

21   Delta?

22        A     Yes.

23        Q     Got it.

24              All right.  And so let me go through

25   very quickly.  It looks like you have listed on

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

```
 1    page 1 of Exhibit No. 2 -- and it's a page that

 2    has the number 36 at the bottom -- do you see

 3    that -- as a Bates stamp number?

 4         A    Number 36?

 5         Q    Yes.

 6              So for each of the exhibits we're going

 7    to look at today, Mr. Oniha, you're going to see

 8    usually at the bottom right-hand corner a stamp

 9    that has a word and a number.  And this one on

10    Exhibit No.  2 at the bottom right-hand corner of

11    the first page says Oniha 000036.  Do you see

12    that?

13         A    Hold on a second.  Let me scroll.  I'm

14    scrolling up right now.

15         Q    You've got it?

16         A    Hold on.

17              Oh, you're saying -- what was your

18    question again?  You're talking about --

19         Q    So you're looking at Exhibit No. 2;

20    yes?

21         A    Okay.

22         Q    Okay.  And I want to talk to you about

23    the first page of Exhibit No. 2.  Okay?  It's a

24    multipage exhibit.  Do you see that it's several

25    pages?  Three pages long?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 27

```
 1        A       Yes.  It has my last name, and it has
 2   it black.
 3        Q       Yes.
 4        A       Yeah.
 5        Q       And I wanted you to be aware -- because
 6   we may refer to them from time to time -- on the
 7   bottom of the first page -- scroll to the bottom
 8   of the first page.  On the bottom right-hand
 9   corner, there's a little page number.  Do you see
10   it?  Right there.
11        A       Okay.  Oniha 000036?
12        Q       Yes.
13        A       Okay.  I see it.
14        Q       Okay.  So that's called a Bates stamp
15   number.  So if I use that word at some point
16   during the rest of this deposition, you'll
17   understand what I mean.  Those little page numbers
18   are called Bates stamp numbers.  All right?
19        A       It's called what?  Say that again.
20        Q       Bates, B-a-t-e-s.  Bates stamp.
21        A       Oh, Bates stamp.  Okay.  All right.
22        Q       So just if I use that phrase -- I'll
23   try not to, but if I use it, you'll know what I
24   mean.  All right?
25        A       Okay.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 28

1        Q      All right.  On the first page of

2    Exhibit No. 2, the one that we're looking at right

3    now, it says you were -- it's got your work

4    experience, and it says you were a customer

5    service agent for Delta; correct?

6        A      Yes, sir.

7        Q      All right.  And it says from

8    January 2010 to the present.  So whenever you

9    would have prepared this resumé?

10       A      That's correct, sir.

11       Q      All right.  And it looks like before

12   you worked for Delta in January of 2010, you were

13   an operations manager at J&J Global Freights.  And

14   I'm looking now at page 2 of Exhibit 2.  Do you

15   see that?

16       A      Hold on a second.

17              Yes.  Yes.  I'm looking at it.  Yes.

18       Q      Okay.  And you list there that you were

19   there from May 2001 to December 2009; is that

20   correct?

21       A      Yes, that's correct.

22       Q      All right.  And those dates are

23   correct?

24       A      Yes.

25       Q      All right.  And tell me just briefly

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 29

1    what you did at J&J Global Freights.  What was

2    your job?

3         A     Basically as operations -- hold on.

4    Let me see.  Hold on.  Let me look at this.  Give

5    me just a sec.

6               Yeah.  Basically my responsibilities,

7    you know, entails making sure that procedures are

8    followed; of course, we are in compliance with,

9    you know, the federal government agencies.  I know

10   that.

11              Of course, we follow and enforce

12   security and hazardous material regulations in

13   various locations as stipulated by the company's

14   procedure.  Of course, follow and implement

15   workflow process that utilize Lean Six Sigma and

16   Theory of Constraint methodologies, and obey the

17   orders as it applies to, you know, the daily

18   operations of the company.

19        Q     What was your job title?

20        A     Operations manager.

21        Q     Okay.  Who did you report to?  Who was

22   your manager or your supervisor at J&J?

23        A     Oh, my supervisor back then -- you

24   know, I don't know if he's still there -- was

25   Dazid Johnson.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

1      Q      **Spell it for me, please.**

2      A      Dazid Johnson.

3      Q      **Spell his first and last name.**

4      A      D-a-z-i-d.

5      Q      **Yes.**

6      A      And Johnson, J-o-h-n-s-o-n.

7      Q      **All right.  And why did you leave J&J?**

8      A      I left there -- you know, they

9   relocated to Mexico.

10     Q      **Got it.**

11            **Okay.  Did you leave voluntarily, or**

12   **did they lay you off?**

13     A      No.  As soon as they knew that they

14   were going to relocate the company down to -- you

15   know, offshore, then they give some people who

16   were originally from there -- Dazid Johnson said

17   either they could follow them or to find a

18   different territory.

19            And I happened to be one of those.  You

20   know, because of family reason, I have to stick

21   around the family because we live in the

22   United States.

23     Q      **All right.  Were you offered the**

24   **opportunity to follow them?**

25     A      What was that, sir?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                August 27, 2020

Page 31

```
 1        Q     Could you have taken the job in Mexico
 2   with them?  Did they offer you one?
 3        A     Yeah, they did actually offer.  But
 4   like I say, because of my family, I couldn't
 5   just -- it wasn't just going to be an easy move
 6   to -- actually just move everybody from here down
 7   to, you know, offshore to Mexico.  So I declined
 8   the offer.
 9        Q     Got it.
10              All right.  Before J&J, you worked for
11   Trans World Airlines, TWA; am I correct?
12        A     Yes.  That was the first one.  Yes.
13        Q     All right.  And your resumé says -- I'm
14   having a hard time reading this.  Does that say
15   January 1996?
16        A     No.  That's January of '98 to middle of
17   May of 2001.  That's what it says.
18        Q     January of 1998.
19              All right.  And what was your job
20   title?  Operations manager again?
21        A     Yes, sir.
22        Q     All right.  And why did you leave TWA
23   in May of 2001?
24        A     Because they were going through
25   bankruptcy, and they had -- actually, just as the
```

1    airlines are going through right now.  You know,

2    they are just giving every employee the option

3    either to retire early or to follow.  All that

4    kind of stuff.

5              So TWA was going through that trend.

6    And they just -- they had offered, you know, every

7    employee, you know, to just take the packet and

8    just take off, whatever package.

9              And they just, you know -- and they

10   were trying to, you know, stay afloat.

11   Unfortunately, they went under.

12       Q    All right.  And before TWA, it looks

13   like your job was with Nigeria Airways; is that

14   correct?

15       A    Yeah.  That's correct, sir.

16       Q    And you were an operations manager

17   there as well; is that right?

18       A    Yes, sir.  Yes.  I was operations

19   manager, you know, yes.

20       Q    Okay.  And are those dates correct?

21   May of 1998 --

22       A    Yes.

23       Q    -- to December of 1996?

24       A    1988.  Not '98.  1988.

25       Q    I'm sorry.  1988 to December of 1996;

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 33

1    is that correct?

2        A      Yes, sir.

3        Q      All right.  And why did you leave

4    Nigeria in December of 1996, Nigeria Airways?

5        A      That was -- of course, looking at my

6    resumé over there, I was -- I was -- I was sent to

7    JFK, you know.  I went between JFK and Lagos.

8               Also, unfortunately, the airline, you

9    know, was having -- was going through rough, you

10   know, trends.  You know, just like, again, you

11   know, it's a tendency right now with the global

12   airlines going through all kinds of turmoil

13   because of this COVID-19.  So Nigeria Airways was

14   just going through, you know, a whole lot of

15   problems.

16              So they needed then to conduct a

17   massive layoff, you know.  And I was called back

18   home to Nigeria.  You know, and at the time, I had

19   already applied, you know, to start school here.

20   Of course, I went back, you know.  And I was

21   offered either to resign, or, you know, they were

22   just going to lay me off.

23              At that point, I choose to relocate to

24   the United States.  I've already, you know,

25   reached out for school and all that.  Let me just

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 34

1    take the resignation option.  And that's what I

2    did.

3        Q    So you resigned because -- did they

4    tell you you were going to be laid off if you

5    didn't resign?

6        A    Yeah.  Because at that time, as I said,

7    an intensive layoff was conducted.  And they

8    called us.  They asked us that, given what is

9    happening right now, that they are not able to

10   sustain everybody.

11           So they give us the option either we

12   resign or they would just, you know, lay us off

13   along with other employees.  So I personally --

14   because I was already in the United States and I

15   was registered for school, you know, I just choose

16   the option of resignation and, you know, I stayed.

17       Q    All right.  Were you offered a

18   separation package with Nigeria?  In other words,

19   did they pay you some money in connection with

20   your resignation?

21       A    Yes.  Of course they did.

22       Q    They did?

23       A    Yes.

24       Q    All right.  They offered you some

25   money.

Page 35

```
 1              And did you sign a release?

 2     A     Yes.  Of course I did.  Yes.  Yes.

 3     Q     Were you disciplined at all while you

 4  were at Nigeria Airways?  Did you receive any

 5  discipline?

 6     A     No.

 7     Q     No warning letters?  Nothing?

 8     A     No.  No.

 9     Q     And you were not terminated for any

10  disciplinary reasons?

11     A     No.

12     Q     All right.  We spoke of this a moment

13  ago, but you were hired by Delta in 2010; is that

14  correct?

15     A     That's correct.

16     Q     Do you remember your employment date?

17     A     It would be January 11, 2010.

18     Q     Okay.  Am I correct you remained

19  employed with Delta for about ten years; is that

20  correct?

21     A     Yes.

22     (Whereupon a document was identified

23     as Defendant's Exhibit 3.)

24     Q     All right.  Mr. Oniha, do you recognize

25  this as your employment application at Delta?
```

Page 36

```
 1        A     Yes, sir.

 2        Q     All right.  And did you fill it out

 3   accurately and truthfully?

 4        A     Yes, sir.

 5        Q     All right.  And you filled this out in

 6   2010; correct?

 7        A     No.  The application was filled out in

 8   2009, and I was hired in 2010.

 9        Q     Let me check that for a moment.

10              You're right.  This application is

11   dated 2009.  You're correct.  I apologize.  You

12   filled this out in December of 2009; is that

13   correct?

14        A     That's correct.

15        Q     And on the last page of that document,

16   which is Bates stamped 73, that's your signature

17   and date of December 16, 2009; correct?

18        A     Yeah.  That's what it says.

19        Q     All right.  Turn to the fourth page of

20   that document for just a moment.  It has a Bates

21   stamp number of 72 at the bottom.

22        A     The fourth page?

23        Q     Yes.  It would be the fourth page.

24              At the bottom, it says Bates stamp

25   No. 72.  At the top, it says "Education."
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 37

1      A      You said 72; right?

2      Q      **72, yes.  It's the fourth page of the**

3   **document.  It says "Education" at the top left.**

4      A      Okay.

5      Q      **All right.  And that's your**

6   **handwriting, correct, in those education boxes?**

7      A      Yes.

8      Q      **You filled this out; correct?**

9      A      Yes.

10     Q      **Okay.  I don't see any reference to**

11  **your MBA.  Is there a reason for that?**

12     A      Yeah.  Because the job I was applying

13  for here does not -- really, I don't think there

14  was any reason for it to have that.  So I did not

15  include it.

16     Q      **You didn't think it had any**

17  **applicability, so you decided not to include it?**

18  **Is that what you're telling me?**

19     A      Yeah.  Because the job I was doing at

20  the time does not require much education in the

21  very first place.  So there was no reason for me

22  to, you know, include that.

23     Q      **Okay.  Why did you include your college**

24  **degree from the University of Maryland then?**

25     A      Because there is a position for it.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 38

```
 1   You know, it states your high school, your GED,
 2   whatever you call it, your college or vocation or
 3   whatever.  So that's why I just put that.
 4        Q    Okay.  Any other reason?
 5        A    The reason why I did not include my MBA
 6   originally was that my -- was I go with the
 7   company as an individual, you know, to present my
 8   credentials, which was what I did.  So --
 9        Q    You didn't consider your MBA to be a
10   credential that was important to talk about?
11        A    Oh, no.  No.  It was important.
12             What I'm saying is for this -- for the
13   role that I was applying at the time, you know,
14   you don't need MBA to -- you know, to function as
15   a customer service.
16        Q    You don't need a college degree either,
17   do you, sir?
18        A    To a certain degree, you might.  But,
19   you know, for the most part, you don't need an MBA
20   to function as a customer service.
21        Q    But you don't need a college degree
22   either, and you listed that; correct?
23        A    I would not say that, sir.  I wouldn't
24   say that.
25        Q    Why not?  Wouldn't you think you need a
```



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 39

1    college degree to be a customer service agent?

2         A     I mean, of course, if you have a

3    college degree, at least you'll be able to hold

4    down a firm conversation, and you'll be able to

5    hold a constructive conversation.  So --

6         Q     That wasn't my question.

7               Do you understand that you need a

8    college degree to be a customer service agent?

9               MS. MOLDEN:  Object to the form.  He's

10   asked and -- you've asked, and he's answered the

11   question.

12              MR. STONE:  He hasn't answered it yet,

13   Regina.

14        Q     (By Mr. Stone)  You can answer it.

15        A     Sir, I did answer the question.  You

16   asked me if I don't think my MBA was -- has to be

17   presented here.  And I told you, sir, that, you

18   know, for the role that I assume, you know, it

19   didn't require an MBA.

20        Q     And it also did not require a college

21   degree, did it?

22        A     Sir, it was --

23        Q     It's a yes-or-no question, Mr. Oniha.

24        A     Okay.  No.  No.  It doesn't require for

25   a college education.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 40

1       Q     All right.  Flip over to the page --

2     the second page of the document for me, please,

3     which is Bates stamp No. 70.  And it says

4     "Employment History" at the top.

5       A     70?

6       Q     Yes.

7       A     Hold on one second.

8             Okay.  So you're talking about the one

9     that says "General Information"?

10      Q     Look at the top of page 70, please.  It

11    says "Employment History."  Do you see it?

12      A     Okay.  All right.  Okay.

13      Q     All right.  And you see there the first

14    thing you list is J&J International Freight; is

15    that correct?

16      A     Yes.

17      Q     All right.  And you list that twice.

18    Why do you list that twice?

19      A     I list that -- it probably was a typo,

20    sir.  You know, that's what I think.  I think it

21    was a typo, you know.

22      Q     I didn't understand.  Say it again,

23    please.

24      A     I said, it was typo error.  It was

25    not -- it was not intentional.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 41

1      Q      It was not intentional to list it

2  twice?

3      A      It was a typo, you know.  Because you

4  see that --

5      Q      I got it.

6      A      Okay.

7      Q      Okay.  And I note there, Mr. Oniha,

8  that you identify your job title as customer

9  service rep and not operations manager.  And that

10  you identify your duties as unloading a truck.

11            Can you tell me why that's different

12  from your resumé?

13      A      Yeah.  Okay.  Just in general, when

14  you're with that company -- when you start with a

15  company, you know, the idea is to move your way

16  up.

17            I started as a baggage handler.  Then I

18  work my way up.  And I was promoted, you know,

19  within a period of time to be -- you know, to be

20  operations manager.  Yes, I --

21            THE COURT REPORTER:  Excuse me.

22      Q      (By Mr. Stone)  Mr. Oniha, why do you

23  not indicate on your employment application that

24  you were ever an operations manager at J&J?

25      A      Why did I -- say that again, sir.

Elizabeth Gallo
COURT REPORTING, LLC

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                        August 27, 2020

Page 42

1        Q        Why did you not list on your employment
2    application that you ever served as an operations
3    manager at J&J?
4        A        Okay.  Let me restate the question.
5    You say why I did not or why I did?
6        Q        Mr. Oniha, you do not say on your
7    employment application with Delta that you ever
8    served as an operations manager; is that correct?
9        A        For J&J?
10       Q        Correct.  We're going to do the other
11   airlines -- the other employers in a minute, but
12   I'm talking about J&J now.
13       A        Because, you know, like I said, I move
14   up within the company, you know.  It's just like I
15   said, when you -- in Delta Air Lines, I come in as
16   a customer service.  So if I was given an
17   opportunity as an OSM manager, at least, you know,
18   that would be a plus for me.
19            So at least, you know, I have had my
20   resumé say OSM.  Unless, actually, you know, it
21   indicated that I was a ramp agent, nobody would
22   know that.
23       Q        Mr. Oniha, you never served as an
24   operations service manager or an operations
25   manager at J&J?  You never held that job title,

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 43

1    did you?

2         A     I did.

3         Q     You did?  And you just chose not to

4    include it?  Instead to call yourself a customer

5    service representative on your application?

6         A     Because when I applied to Delta

7    Air Lines, the job requirement only required -- I

8    mean, the requirement for the job doesn't -- you

9    don't have to be offered (inaudible) to be able

10   to, you know, function as a --

11              THE COURT REPORTER:  Excuse me.  Excuse

12   me.  Time out.  Can you hear me?

13              THE WITNESS:  Yes, ma'am.

14              THE COURT REPORTER:  Mr. Oniha, I'm

15   having a very hard time understanding you.  I need

16   for you just to slow down a little bit if you

17   could.

18              THE WITNESS:  All right.

19              THE COURT REPORTER:  Thank you.

20              THE WITNESS:  Okay.

21        Q     (By Mr. Stone)  Go ahead, Mr. Oniha.

22   You can finish your answer.

23              The question on the table was:  You

24   never served as an operations service manager at

25   J&J Global Freights?  That was never your job

1   title; correct?

2       A     It was part of -- like I said, sir, I

3   came as a baggage handler; and, of course, I moved

4   up to customer service.  And I moved up.

5       Q     When were you promoted, Mr. Oniha, to

6   operations service manager at J&J?  What was the

7   date of your promotion?

8       A     If my memory will serve me right, it

9   was within two years of my employment with the

10  company.

11      Q     Okay.  And why do you not -- tell me,

12  again, why you misstate what your job title was at

13  J&J on your application.

14            MS. MOLDEN:  Object to the form.

15      Q     (By Mr. Stone)  You can answer.

16      A     Like I said, the job that I was

17  applying for in Delta Air Lines does not require

18  the skill of an operations manger at the time.

19  Hence, I did not include it.

20      Q     So you just decided to omit that job

21  title and to give a different job title than the

22  one you held?

23            MS. MOLDEN:  Object to the form.

24      A     Sir, what I said, I came to J&J World

25  Market -- I started at J&J World Market as a



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 45

1    customer service.  That's what I started with.

2              And when I applied to Delta Air Lines

3    in 2010, I was thinking that I apply for customer

4    service.  I did not put yet, you know,

5    operations -- operations manager.

6         Q    (By Mr. Stone)  So you've misstated the

7    title for your job?

8         A    If I stated -- what?

9         Q    Mr. Oniha, was your job title

10   operations service manager at J&J?  Did you hold

11   that job title?

12        A    I didn't put that title.

13        Q    Okay.  So you misstated to Delta your

14   job title when you said customer service rep?

15   That was not your job title at J&J the whole time,

16   correct?  Is that what you're telling me?

17             MS. MOLDEN:  Object to the form.

18        Q    (By Mr. Stone)  You can answer,

19   Mr. Oniha.

20        A    Again, sir, let me go back.  I started

21   as a customer service.  And everything that I was

22   doing revolving around as operations manager.

23   That includes customer service.

24             When I came to Delta Air Lines, what

25   they have available was not operations manager.

Page 46

 1   It was customer service.  And that was what I had

 2   applied for.  So there was no reason for me to

 3   state that -- to indicate, oh, I'm operations

 4   manager now.  You know, let me put down for that.

 5   So --

 6       Q    You didn't think it was important to

 7   tell Delta your actual job title; is that correct?

 8            MS. MOLDEN:  Ben, I'd ask you to let

 9   him complete his statement first, please.

10            MR. STONE:  I thought he did.  I

11   apologize, Regina.

12       A    No.  When I went for interview there --

13   that was when I was interviewed.  They asked me a

14   bunch of questions relative to what you're asking

15   me right now.  And I stated to them that this is

16   my current title with J&J.

17            And the lady who interviewed me said,

18   do you know the job that you're applying for?

19   It's customer service.

20            I said, yes.

21            It's below what you are doing now.

22            I said, yes.  I know that.

23       Q    (By Mr. Stone)  So you told the

24   interviewer that you were an operations service

25   manager?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                           August 27, 2020

Page 47

1      A      Yes, I did.  We had a conversation

2  because of her interview.

3      Q      Okay.  And if I subpoena J&J's records,

4  it will show that you held the job title of

5  operations service manager; is that correct?

6              MS. MOLDEN:  Object to the form.

7      A      Yes.  It will show it.

8      Q      (By Mr. Stone)  All right.  Mr. Oniha,

9  you state on your application that you worked at

10  J&J from February of 1999 to November of 2009; is

11  that correct?

12      A      Yes.

13      Q      Yes?

14      A      Yes.

15      Q      Okay.  Can you tell me why you state

16  that when you testified a moment ago that you

17  worked at J&J, according to your resumé, from May

18  of 2001 to December of 2009?

19      A      Sir, when you have -- say, for example,

20  you do temporary job, for instance.  Then, of

21  course, in between your temporary and your

22  full-time employment, I don't -- you know, I came

23  in as a temporary staff.  Then afterwards, I was

24  converted to a full-time.

25      Q      When did you start working at J&J,

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 48

1   **Mr. Oniha?**

2        A     As it shows on this application right

3   here.

4        **Q        You were working there in February of**

5   **1999?**

6        A     Yes.

7        **Q        Why do you say on your resumé and why**

8   **did you testify a moment ago that you started**

9   **working there in May of 2001?**

10       A     Okay.  Sir, temporary employee --

11  temporary status does not -- I guess --

12            Okay.  What I said was I started

13  working in 2001 until I joined Delta Air Lines.

14  And the reason being was because I was

15  temporary -- I was a temporary employee before

16  becoming full time.

17       **Q        When did you start as a temporary**

18  **employee at J&J, Mr. Oniha?**

19       A     Sir, February.

20       **Q        Of 1999?**

21       A     Yes.

22       **Q        And when did you become a full-time**

23  **employee?**

24       A     I become a full-time employee 2000 --

25  December of 2010.  I mean, excuse me.  December of

Page 49

1   2000 -- 2001 was when I become full time.

**2        Q    December of 2001?**

3        A    2001 was when I become full time.

**4        Q    When in 2001?**

5        A    January -- yeah.  It would have been --
6   fifteen months was when I become full time.
7   That's the middle of 2001.

**8        Q    All right.  Was there any overlap**
**9   between your employment at J&J and your employment**
**10  at Trans World?  Did you work at both places at**
**11  the same time?**

12       A    No, I did not.  There was -- yeah.  I
13  took some time off to deal with family issues.

**14       Q    When did you take time off?**

15       A    I took time off from March of 2000 -- I
16  took March of '96 -- I took time off in March of
17  '96.  Then I came back, like, towards the end of
18  '96 to start my job again.  Yeah.

**19       Q    Okay.  But there was never any overlap?**
**20  You never worked at J&J and Trans World at the**
**21  same time?  Because that was after '96.**

22       A    It could not be possible because, you
23  know, Trans World was in New York, and, of course,
24  J&J was, you know, in Conyers.

**25       Q    I'm with you.**



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                            August 27, 2020

Page 50

1              Okay.  Let's go down and -- do you

2    still have your employment application in front of

3    you, Exhibit No. 3?

4        A    No. 3?

5        Q    Yes.

6              THE COURT REPORTER:  This is Exhibit

7    No. 3, Mr. Oniha, that you're looking at now.

8        Q    (By Mr. Stone)  Your employment

9    application, correct.

10       A    Are you talking about my employment

11   with Delta?

12       Q    Looking at Exhibit No. 3, Mr. Oniha,

13   your employment application, do you see that?

14             THE COURT REPORTER:  Mr. Oniha, there

15   is no No. 3 marked on it yet.  This is No. 3 that

16   you're looking at.

17       Q    (By Mr. Stone)  It's the same page,

18   Mr. Oniha.  It's your employment application.  It

19   has Bates stamp number 70.

20       A    Okay.

21       Q    Go to your employment history, the same

22   page we were looking at a minute ago, Mr. Oniha.

23   The top of the page that has the number 70 on the

24   bottom.  It's the second page of the exhibit.

25       A    Okay.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 51

1      Q      All right.

2      A      You're talking about the top of it?

3   Okay.

4      Q      Yes.

5      A      All right.

6      Q      And, Mr. Oniha, I want you to look at

7   the entry that says Trans World Airlines about

8   halfway down the page.  Do you see that?

9      A      Trans World?

10     Q      Yes.  Do you see it?

11     A      Okay.  All right.

12     Q      All right.  And, Mr. Oniha, what do you

13  identify as your job title there?

14     A      Again, baggage handler.

15     Q      Okay.  And was that your job title at

16  Trans World Airlines?

17     A      I started as the baggage handler, and I

18  worked my way up.

19     Q      What was your job title at the time

20  that you left Trans World Airlines?

21     A      Operations manager.

22     Q      Okay.  And you chose not to include

23  that on your resumé; is that correct?

24     A      Again, because the job that I applied

25  for in Delta Air Lines was customer service.  That

Page 52

1    was the job announcement.  So it did not require,

2    you know, that, you know --

3         Q     Okay.  And that's why you did not

4    include your actual job title at Trans World

5    Airlines; is that correct?

6               MS. MOLDEN:  Object to the form.

7         A     Maybe.

8         Q     (By Mr. Stone)  Did you say correct,

9    Mr. Oniha?  I didn't hear you.

10        A     It was not done deliberately.  Like I

11   said, I choose not to indicate it because the job

12   description that I applied for at Delta Air Lines

13   does not require the -- you know, it was not an

14   operations manager position that I applied at

15   Delta Air Lines.  So it only required that it was

16   a customer service job.

17        Q     Well, it was done deliberately,

18   Mr. Oniha; correct?  You made the decision to list

19   baggage handler rather than operations manager?

20   That was your decision; correct?

21        A     Yes, that's correct.

22        Q     All right.  And, Mr. Oniha, I see that

23   next to it, you have Trans World Airlines dates as

24   April 1993 to February of 1996; is that correct?

25        A     Yes.  Yes.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 53

1      Q      Are those the dates that you worked at

2   Trans World Airlines?

3      A      Yes.

4      Q      Okay.  Can you tell me why you

5   testified a moment ago that you were an operations

6   manager at Trans World Airlines from January of

7   1998 to May of 2001?

8      A      Again, sir, because I was promoted.

9   Okay?  And the position, you know, that I left --

10  that was the position I was when I left the

11  company.

12     Q      Mr. Oniha, you say you worked at Trans

13  World Airlines from April of 1993 to February of

14  1996 on your application; correct?

15     A      That's correct.

16     Q      Did you work at Trans World Airlines

17  any other dates?

18     A      Sir, I just explain to you, yes.

19     Q      What other dates did you work at Trans

20  World Airlines?

21     A      From 2001 until June 2011.  I'm sorry.

22  June --

23     Q      Sorry.  Say that again.

24     A      From 2001, I joined J&J World Market.

25     Q      In 2001?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 54

```
 1      A      (No response.)
 2      Q      Mr. Oniha, do you know the question?
 3      A      Yes, sir.  I heard what you said.
 4      Q      What were the dates that you worked at
 5  Trans World Airlines?  When did you start there?
 6      A      2000 -- I started there in '04 --
 7  April of '93.  I mean, April of '96.
 8      Q      Your work started there in April of
 9  1996?
10      A      Uh-huh (affirmative).
11      Q      Why do you say April of '93 on your
12  employment app?
13      A      Say that again.  Say that again, sir.
14      Q      Why do you say April of 1993 on your
15  employment application?
16      A      Look, it says '96.  So that's the date.
17  It looks like a typo.  See that all of them are on
18  the same line?  That's a typo right there.
19      Q      Mr. Oniha, looking at your employment
20  application --
21      A      Yes.  You're talking about --
22      Q      -- and I'm looking at Trans World
23  Airlines, and it says you worked there from 4 of
24  '93 to 2 of '96.  Do you see that?
25      A      That's what I'm saying.  I was there --
```

Page 55

```
 1   man, I told you -- you guys are just --
 2        Q     Mr. Oniha, it's not a complicated
 3   question.  Are those dates right or not?
 4        A     They were right, sir.
 5        Q     Did you work at Trans World Airlines
 6   any other dates other than April of '93 to
 7   February of '96?
 8        A     Yeah.
 9        Q     When else did you work at Trans World
10   Airlines?
11        A     Back in April.  I mean, back in May.
12        Q     May of what?
13        A     Of 2001.
14        Q     In 2001?
15        A     Hold on.  Let me just look at this,
16   please.
17              Okay.  All right.  What does it say?
18        Q     Do you know the question, Mr. Oniha?
19        A     Yeah.  You asked me if I worked for
20   Trans World at any of that date right there.
21        Q     I'm trying to figure out your dates of
22   employment, sir.  It's not complicated.
23              It says on your application you worked
24   there one time from April of 1993 to February of
25   1996; is that correct?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                          August 27, 2020

Page 56

1     A     Yes, that was correct.

2     Q     **Is that correct?**

3     A     That was correct.

4           And I also worked for them before I

5     joined Delta Air Lines.

6     Q     **You also worked for them what?**

7     A     I worked for them before I joined the

8     J&J World Market.  They were my job before J&J

9     World Market.

10    Q     **I know that, sir.**

11          **And I'm asking the question:  Was there**

12    **a date other than April '93 to February of '96**

13    **that you worked for them?**

14    A     No, sir.

15    Q     **No?**

16    A     No.

17    Q     **Did you say no?  I just didn't hear**

18    **you.**

19    A     I said no.

20    Q     **Okay.  You started at Trans World as a**

21    **baggage handler; correct?**

22    A     Yes.

23    Q     **All right.  And were you ever promoted?**

24    A     I was.

25    Q     **When were you promoted?**

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                      August 27, 2020

Page 57

1      A     I was promoted several months later.

2      Q     Okay.  Into what position?

3      A     First to supervisor, then to operations

4   manager.

5      Q     When were you promoted to operations

6   manager?

7      A     Hold on, sir.  Let's see.  '97.  I

8   mean -- 2-96.  It was '95.

9      Q     All right.  1995?

10     A     Yes.

11     Q     Okay.  Now, Mr. Oniha, when we were

12   looking at your resumé a moment ago, you told me

13   that you worked at Trans World from January of

14   1998 to May of 2001.  Why did you say that if the

15   dates were, in fact, April of '93 to February of

16   '96?

17     A     Okay.  Your Honor, I'm not -- I mean,

18   sorry.  I'm not trying to be, you know -- trying

19   to give you misleading information here.  I guess

20   everything about this resumé is accurate.

21     Q     Everything about the resumé is

22   accurate?

23     A     That's what I said.  Yes, sir.  Yes,

24   sir.

25     Q     Okay.  So when the resumé says you

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 58

1    worked at Trans World from January of '98 till May

2    of 2001, that's accurate?

3        A    Yes, sir.

4        Q    So when you say on your application you

5    worked there from April of '93 to February of '96,

6    that's inaccurate?

7        A    Okay.  Your Honor -- sorry.  I'm not --

8    because I did not include my temporary employment

9    throughout, you know -- and because of that --

10   that's like a seasonal employment.

11       Q    Mr. Oniha, were you ever a temporary

12   employee at Trans World?

13       A    For a few months.  Yes, sir.

14       Q    Did any of that occur -- was that

15   before 1993 or after 1996?

16       A    It was that period of time before I

17   become full time.  Just as the situation was with

18   Delta Air Lines before I become full time.

19       Q    Mr. Oniha, let me ask you a very simple

20   question.  On your application, it says you worked

21   at Trans World from '93 to '96.  On your resumé,

22   it says you worked from '98 to 2001.  Are either

23   of those correct?

24       A    Yes, sir.  They are correct, sir.  Like

25   I said, you know, they are correct.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 59

1        Q      Both of them?

2        A      Yes.  Because --

3        Q      So you worked there twice?

4        A      One time, I was there as a temporary

5    staff.  Then the second one, I was in full time.

6        Q      When were you there as a temporary,

7    Mr. Oniha?

8        A      From '93 to '96.

9        Q      You were a three-year temporary

10   employee at Trans World?  Is that your testimony

11   now?

12              MS. MOLDEN:  Object to the form.

13       A      Yes.  No.  They have --

14       Q      (By Mr. Stone)  Okay.

15       A      So even with -- hold on a second.  Let

16   me finish, sir, please.

17              With Delta Air Lines, you can choose to

18   be -- you can choose to be -- Delta Air Lines,

19   they can keep you for temporary status for

20   four years before you become a full-time.

21              It just happened in my case that I was

22   only, you know, six months before I become full

23   time with Delta Air Lines.

24              That's exactly what happened with Trans

25   World.  And from April of '93 to '96, I was a

1    temporary status.

2         Q    At Trans World?

3         A    Yes.

4         Q    And then you left?

5         A    Well, no.  I didn't -- but, of course,

6    I was transitioned to be a full-time.

7         Q    Okay.  And when did you transition to

8    be full time?  In '96?

9         A    Sir, '96 was when I was with the

10   company full time.

11        Q    Okay.  And then when did you leave

12   Trans World?

13        A    2001.

14        Q    Okay.  How is that possible since you

15   just told me a moment ago that you started at J&J

16   in February of '99, and there was no overlap?

17        A    It's possible, sir.  Because if your

18   whole family on employment and have an emergency,

19   I could have -- you know, which was exactly what

20   happened.

21             I could have, you know, said, okay.  I

22   have an emergency.  I cannot be put to honor this

23   employment right now.  Let me go and take care of

24   situation.  And that was exactly what happened.

25        Q    Say that again.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha
August 27, 2020

Page 61

1        A     I am saying, sir, that when you have

2     this condition that is beyond your control, so you

3     could always -- you know, I asked that I give time

4     to -- you know, to deal with my situation before I

5     come -- before, you know, I come back to work.

6     And I was given, you know, that latitude.

7        **Q     When did you -- I don't understand what**

8     **you're telling me, Mr. Oniha.  I asked you a**

9     **simple question --**

10       A     Well, ask it --

11       **Q     -- which is:  You just testified that**

12    **you left Trans World in 2001.  But you told me a**

13    **moment ago you started J&J in 1999, and there was**

14    **no employment overlap.  So how can that be?**

15       A     No.  I told you I had a family

16    emergency.  Was that on record?

17       **Q     In 1996, Mr. Oniha.  That has nothing**

18    **to do with this time frame.**

19       A     I told you I had a family emergency,

20    and I had to take time off.  And that was what I

21    said from the beginning.  I never lied.  And, you

22    know, same thing as I've said before is what I'm

23    saying now.

24       **Q     Mr. Oniha, can you offer any other**

25    **explanation?**

Page 62

```
 1      A    I mean, do you want me to state
 2  something that never occurred?
 3      Q    Mr. Oniha, you're under oath.  I'm
 4  asking you to tell the truth.  And so far,
 5  Mr. Oniha, you've testified to about four
 6  different versions of the truth.
 7           MS. MOLDEN:  Object to the form.
 8      A    No, I never did.  My statement has been
 9  very consistent.  I never, you know, contradict
10  what I said.
11      Q    (By Mr. Stone)  All right.  Mr. Oniha,
12  you were hired by Delta as a customer service
13  agent; correct?
14      A    That's correct, sir.
15      Q    And you remained as a customer service
16  agent during your entire employment; is that
17  correct?
18      A    That's correct, sir.
19      Q    All right.  And you were a full-time
20  employee for Delta?
21      A    I was a temporary employee for I
22  believe nine months before I was promoted to full
23  time.
24      Q    Okay.  And tell me your basic job
25  responsibilities as a customer service agent for
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                              August 27, 2020

Page 63

1    Delta.

2         A      Basically, my job responsibilities

3    entails -- of course, I work as a ramp agent.  We

4    unload and, you know, load baggage in the planes.

5    Of course, we transport the baggages to different

6    concourse.

7              Then we -- some of us work, you know,

8    in the bag rooms.  I know that.  But I was a ramp

9    agent.  Just, you know, I had to do whatever ramp

10   agents do.

11        Q      All right.  Do you agree with me that

12   they put a high priority on safety for ramp

13   agents; correct?  They talk about safety a lot?

14             MS. MOLDEN:  Object to the form.

15        A      Yes.

16        Q      (By Mr. Stone)  All right.  Did you

17   work with equipment when you were a ramp agent?

18        A      Yes.

19        Q      What type of equipment would you work

20   with?

21        A      I work with belt loaders.  Tubs that we

22   use hauling baggage to and from aircrafts.

23   Container loaders.  I was loading cans, you know,

24   that come from the West Coast.  And pretty much, I

25   mean, that's what would happen and so on.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 64

1      Q      Okay.  And you had access -- you were
2  laying your hands on customers' bags, right, as
3  you were moving it?

4      A      Yes.

5      Q      All right.  Was there traffic down on
6  the ramp?  In other words, a lot of moving
7  vehicles down there?

8      A      Oh, yeah.  Yes, sir.

9      Q      Okay.  So it was dangerous down there?

10     A      Well, yes.  Kind of.  Yes.

11     Q      Okay.  Are there tools down there that
12 you have to use from time to time?

13     A      Yes.  You know, such as PPE.  Like, I'm
14 talking about the masks, you know.  Of course, you
15 can wear goggles.  You know, it depends on where
16 you are assigned to work.  You know, knee pads if
17 you have to maybe load bags on the airplanes, you
18 know.  Of course, you have to use gloves and all
19 that.

20     Q      I'm with you on that.
21            Do you sometimes see maintenance people
22 down there working on the aircraft?

23     A      Yes.  Pretty much, yes.

24     Q      All right.  And they have their tools
25 with them presumably?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 65

```
 1                    MS. MOLDEN:  Object to the form.
 2        A     Yes.  Yes.  Yes, sir.
 3        Q     (By Mr. Stone)  Yes?
 4        A     Yes, sir.
 5        Q     All right.  Did you ever see the kind
 6   of tools that they would work with?
 7                    MS. MOLDEN:  Object to the form.
 8        A     No, sir.  Because it was not my -- I
 9   was not in that department, you know.  And I was
10   in the category of no need to know.  So --
11        Q     (By Mr. Stone)  Okay.  So you never saw
12   what kind of tools they were working with?
13                    MS. MOLDEN:  Object to the form.
14        A     No.  I did not, sir.
15        Q     All right.  When you were working as a
16   bag agent, were you assigned to a particular
17   location?  Would you move to different locations?
18   How did assignments work at Delta?
19        A     Yeah.  Every six months, you just had
20   to bid.  So some people might bid the bag room.
21   Some people might bid the ramp.  And some people
22   might bid at different zones.  Like, C Concourse,
23   for instance, is in Zone 9.  Then A Concourse is
24   split into two, A North and A South.  Then, of
25   course, you have a B North and B South.  Then --
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 66

1      Q      All right.

2      A      And all of that.

3             So then, you know, some people -- you

4      know, whichever, you know, bids that is convenient

5      for you or bids that you want, you bid those days.

6             So if you are comfortable working the

7      ramp, you bid the ramp.  If you are comfortable

8      working the bag room, you bid the bag room.  Then

9      you bid, you know, your days, you know, just like

10     that.

11     Q      Do you remember where you were assigned

12     immediately prior to your termination from Delta?

13     What area?

14     A      I was in A North ramp.

15     Q      A North.

16            All right.  And how long had you been

17     assigned to A North?

18     A      That bid would have been my -- I was in

19     and out of there.  Like I said, we bid every six

20     months.  Sometimes you bid, you end up A North

21     this bid.  And this bid, you might end up

22     D Concourse.  So overall, I was in A North around

23     for I would say maybe four bids.  Four bids.

24     Q      For four bids?

25     A      Yeah.  I mean, in and out.

Page 67

1     Q     So about two years?

2     A     Yes.

3     Q     All right.

4           MS. MOLDEN:  Ben?

5     Q     (By Mr. Stone)  You worked in A North

6  for that two-year period?

7     A     Say that again, sir.

8           MS. MOLDEN:  Ben, I don't want to --

9  can you hear me?

10          MR. STONE:  Yes.

11          MS. MOLDEN:  Okay.  We're coming up on

12  two hours, and so just -- I don't want to

13  interrupt you in the middle, but I'd like to see

14  about getting a break soon.

15          MR. STONE:  Sure.  Give me five more

16  minutes to finish this line, and we'll take a

17  break.

18          MS. MOLDEN:  No problem.  Thank you.

19          MR. STONE:  Okay.

20    Q     (By Mr. Stone)  Mr. Oniha, you heard my

21  last question.  Just to be clear, you were

22  assigned to A North for the two years prior to

23  your termination; is that correct?

24    A     No.  No.  That was not what I said,

25  sir.  What I said was my total bid in A North

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 68

```
1    would have been maybe four bids.  I was in and

2    out, again.

3              I would say maybe my last two bids, I

4    was in A North before my separation of employment

5    with Delta.

6         Q    Your last two bids?

7         A    Yes.

8         Q    Okay.  Do you remember where you were

9    before that?

10        A    Okay.  I was in T Concourse, Zone 9.

11        Q    Okay.  So you bid -- for the two bids

12   before your last termination, you were assigned to

13   A North.

14             And then was it immediately before that

15   you were at T?

16        A    Yeah.  Yes.  The bid -- yeah.  The

17   bid -- I spent one bid in T Concourse.  Put it

18   that way.

19        Q    Do you remember when that bid was?

20        A    That was -- the bid happens when --

21   actually, when the issue that set about this

22   situation, of course, I was in C Concourse at the

23   time.

24        Q    Okay.  We'll talk about that in a

25   minute.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 69

1              Other than that one bid in T Concourse,

2      had you been in A North for the two years

3      preceding your termination?

4           A     Again, yes, total time.  I think the

5      most time that I worked, that was actually my --

6      that would have been my total fourth bid in that

7      zone.  You know, like I said, you move around

8      quite a bit.  That would be my fourth bid in that

9      zone.

10          Q     I didn't hear the sentence.  I'm sorry.

11     Say it again.

12          A     I said, when I was separated from the

13     company, that -- when I separated, that was my

14     fourth bid total in A North.

15          Q     That was your fourth bid total.  So you

16     had bid four times for A North?

17          A     Yes.  But not consistently -- I mean,

18     not consecutively.  You know, at different times.

19          Q     Okay.  How many consecutive bids had

20     you been in A North at the time of your

21     termination?

22          A     I would say three and a half.

23          Q     Say again?

24          A     Three-and-a-half bids.

25          Q     Three-and-a-half consecutive bids?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 70

```
 1        A     Yes.
 2        Q     How could it be three and a half?  I
 3   don't understand how it could be half a bid.
 4        A     I mean, I was -- yes.  It would
 5   be -- hold on.  I work with T one bid.  I work
 6   with -- that's two.  Again with -- it was three.
 7   Yeah.  Yes.  Because it was still at half because
 8   actually I was on the fourth bid when my
 9   separation of employment, you know, took place.
10        Q     Fourth consecutive?
11        A     I was on my fourth bid when my -- when
12   my separation of employment took place.
13        Q     All right.  Speak slowly because I
14   didn't understand you.
15              I'm trying to figure out how many
16   consecutive bids you had bid in A North at the
17   time of your termination.
18        A     Okay.  Put it four bids because I
19   didn't finish the last bid before my employment
20   was ended with Delta.
21        Q     I got it.  I'm with you.
22              Okay.  So you had four consecutive bids
23   in A North, but you had not finished your fourth
24   at the time of your termination?
25        A     I didn't.  Yeah.  I did not.
```



Page 71

1              MR. STONE:  All right.  We can take a

2    break at this point, Regina, if you'd like.

3              MS. MOLDEN:  Okay.

4         (Proceedings in recess, 11:24 a.m.

5         to 11:39 a.m.)

6              MR. STONE:  Back on the record.

7         Q    (By Mr. Stone)  Mr. Oniha, you

8    understand you're still under oath; correct?

9         A    Yes, sir.

10        Q    All right.  Mr. Oniha, during the time

11   that you were employed at Delta as a customer

12   service agent, you had training on a fairly

13   regular basis; correct?

14        A    Yes, sir.

15        (Whereupon a document was identified

16        as Defendant's Exhibit 4.)

17        Q    All right.  Take a look at Exhibit

18   No. 4.  And the first question I'm going to ask

19   is:  Have you ever seen that document before?

20        A    Are you talking about eLearing Revenue

21   or something?

22        Q    No.  There's a document -- the document

23   that's on your screen right now, No. 4, it's

24   labeled "Completed Training - All Types."  And it

25   has your name on the left-hand side.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                              August 27, 2020

Page 72

1      A      Yes.

2      Q      Do you see that?

3      A      Yes.

4      Q      All right.  My question is:  Have you

5   ever seen that document before?  That's my first

6   question.

7      A      Yes.  Yes, I have.

8      Q      Okay.  Then you understand this is a

9   listing of all the training that you would have

10  taken during your time at Delta; correct?

11     A      Yes.

12     Q      All right.  Do you have any reason to

13  believe -- I know you haven't looked at the whole

14  thing, but do you have any reason to believe this

15  is not an accurate listing of your training that

16  you took at Delta?

17             MS. MOLDEN:  Object to the form.

18     A      No.  I don't have no reason.

19     Q      (By Mr. Stone)  All right.  Does it

20  appear to be a listing of all the training that

21  you took at Delta?

22             MS. MOLDEN:  Object to the form.

23     A      I would think so.

24     Q      (By Mr. Stone)  Okay.  Sometimes you

25  took training online.  Sometimes you took it in

1   person; is that right?

2       A     Yes.  Most of time, yeah, we took it in

3   person in the training room.  Yes.

4       Q     Mr. Oniha, your head is cut off fairly

5   significantly.  Can you reframe --

6       A     (Witness complies with request of

7   counsel.)

8       Q     There you go.  Thank you.  Just so I

9   can see you.  Appreciate it.

10      A     Okay.  You're welcome, sir.

11      Q     All right.  Mr. Oniha, part of the

12  training that you had -- and it's reflected in

13  your training log -- is something called SIDA,

14  S-I-D-A, training.  Do you see that?

15      A     Yes.

16      Q     Do you know what SIDA is?

17      A     Yes.

18      Q     Okay.  Do you know what it stands for?

19      A     Yes.

20      Q     What does it stand for?

21      A     Security Information Data Asset.

22      Q     In fact, it stands for Security

23  Identification Display Area.  Does that refresh

24  your recollection?

25      A     Yes.  That's what it stands for.

1      Q     Sorry?

2      A     Yes.

3      Q     All right.  And you understand that

4   SIDA, the Security Identification Display Area,

5   refers to certain areas at the airport that under

6   federal law you have to show your -- you have to

7   have your badge displayed; correct?

8      A     That's correct, sir.

9      Q     All right.  And that's a badge that you

10   get after a background check at Delta, correct, as

11   a Delta employee in a certain position?

12      A     Yes, sir.

13      Q     Okay.  And you receive training with

14   respect to the use of that SIDA badge on an annual

15   basis; correct?

16      A     Yes, sir.

17      Q     Okay.  And if I'm looking and

18   understanding the exhibit that's up on the screen

19   right now, that very first entry, it looks to me

20   like you had SIDA video training on June 18th of

21   2019; is that correct?  First line.

22      A     You're talking about -- you're talking

23   about the (inaudible)?

24      Q     Yes.

25      A     That's March 1, 2018; right?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 75

```
 1              THE COURT REPORTER:  I didn't
 2  understand.  Mr. Oniha, I did not understand.
 3       A    Okay.  Which item are we talking about
 4  here?  Which item?
 5       Q    (By Mr. Stone)  I understand your
 6  confusion.
 7              So the first line -- you're correct --
 8  it says that there was an eLearning dated
 9  3-1-2018.
10       A    Yes.
11       Q    But it has a Complete Date on the
12  fourth column that says you took it on June 18th,
13  2019.  Does that refresh your recollection that
14  you would have taken SIDA training on June 18th,
15  2019?
16       A    Yes, sir.
17       Q    All right.  And you took that after an
18  incident you had at the employee checkpoint in
19  2019 --
20       A    Yes, sir.
21       Q    -- June 2019; correct?
22       A    That's what it says.  Yes.
23       Q    All right.  And you had taken -- I
24  think we said this a moment ago.  You had taken
25  SIDA training on an annual basis throughout your
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 76

1    career at Delta; correct?

2        A    That's correct, sir.

3        Q    All right.  Do you remember the content

4    of that training?  Everything that was in there?

5             Give me just a moment, please.

6        A    Yeah.  I think --

7        Q    Go ahead.  I'm sorry.

8        A    Yeah.  The content training had to do

9    with, you know, the job operations of the entire

10   operation.

11       Q    But it also had to do with the proper

12   use of your SIDA badge; correct?

13       A    Yes.

14       Q    All right.  And was that -- did you

15   watch a series of videos that were put on by the

16   airport relating to that?  Did you go through that

17   training?

18       A    Yes.  Yes.

19       Q    Okay.  It was a series of the six or so

20   videos as I recall; is that correct?

21       A    Well, I want to say maybe not six.

22   But, you know, back then, I think it was about two

23   or three.  Something like that.

24       Q    All right.  And they came to me in six

25   segments.  So it might have been that there was

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 77

1    less than that.

2              Do you remember the content?  Did they

3    talk about -- do you remember what they talked

4    about in those videos?

5         A    Yes.  Some of things, yeah.  I

6    remember, you know, what it talked about.  Yes.

7         Q    Okay.  You had other security training

8    as well -- correct -- during the time that you

9    were employed at Delta?

10        A    Yes.  As it related to operations, yes.

11        Q    Okay.  How frequently would you take

12   security training at Delta?  Do you remember?

13        A    It's supposed to be, you know -- I have

14   no idea.  But every so often, the managers make

15   some training, some random training, you know.

16             So I can't just say for sure, okay,

17   maybe every two months or three months.  It's

18   supposed to be annually -- annually, you know.

19        Q    At least annually you would have

20   security training?

21        A    Yes.

22        Q    You understand aviation security is an

23   important issue for Delta and for the country;

24   correct?

25        A    Yes.  I know.  Yes.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 78

1        Q        The videos that we talked about a
2    moment ago, those Atlanta airport videos, do you
3    remember how many times you watched those?  Was it
4    more than once?
5        A        Again, it's learned into your -- I
6    don't know how they call it -- training.  Like,
7    every year at least you watch it once.
8        Q        You watch the videos every year at
9    least once?
10        A        Yes.
11        Q        Got it.
12                In one of your handwritten statements
13    that you provided, Mr. Oniha, you said that one of
14    the things you knew was that you couldn't lend
15    your SIDA badge to another employee.
16                Do you remember saying that?
17        A        Yes.
18        Q        How did you learn that?
19        A        First of all, it's common sense.
20    That's my unique SIDA badge.  I should not give it
21    to somebody else.  If I do, that's a breach of
22    security, you know.
23        Q        Okay.  So it's a breach of the security
24    policies of the airport?
25        A        Yes.

Page 79

1        Q        And of Delta?

2        A        Yes.

3        Q        Okay.  Did you understand that just

4    from common sense, or do you recall receiving

5    training in the airport videos and otherwise that

6    made that clear?

7        A        Yes, sir.

8        Q        You recall receiving that training?

9        A        As I said earlier, yes, sir.  Every

10    year it's learned into required training.

11        (Whereupon a document was identified

12        as Defendant's Exhibit 6.)

13        Q        Mr. Oniha, take a look at that

14    document, and confirm for me if you've seen that.

15        A        Okay, sir.  Yes.  Yes, sir.

16        Q        You're familiar with that policy?

17    You've seen it before?

18        A        Yes.  Yeah.

19        Q        All right.  Have you understood it I

20    take it when you saw it?

21        A        Repeat that question.

22        Q        You understood the policy?  You've seen

23    it?  You understood it?

24        A        Yes.  I understood.  Yes.

25        Q        All right.  Mr. Oniha, who was your

Page 80

1    manager at the time that you were fired from

2    Delta?

3         A      It's a Jaron Jeter.

4         Q      And how long had he been your manager?

5         A      Okay.  One, two -- that would have been

6    one year and six months.

7         Q      Okay.  So for about 18 months, he was

8    your manager?

9         A      Yes.

10        Q      All right.  And who was your -- his job

11   tile was an operations service manager; is that

12   correct?

13        A      Yes.  That's correct, yes.

14        Q      All right.  Did you work under other

15   operations service managers during the time of

16   your employment?

17        A      Yes.  I mean, at different times.  Yes.

18        Q      Okay.  You told me a minute ago it was

19   Mr. Jeter for the last 18 months of your

20   employment; correct?

21        A      Yes.

22        Q      Who was it immediately before

23   Mr. Jeter?

24        A      It was Mr. Forts, Roderick.

25        Q      Say it again.  I'm sorry.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 81

```
1        A      It was Mr. Forts, Roderick.  Forts,
2    F-o-r --
3        Q      We can't hear you, Mr. Oniha.  I
4    couldn't hear you.
5        A      Forts, Roderick.
6        Q      Spell it for me because I can't
7    understand what you're saying.
8        A      Okay.  F-o-r-t-s.
9        Q      Mr. Forts?
10       A      Roderick.
11       Q      Got it.  Roderick Forts.  I'm with you.
12   I'm familiar with Mr. Forts.
13              All right.  He was your operations
14   service manager immediately before Mr. Jeter was;
15   correct?
16       A      Yes.  Him.  Then Mr. Baldwin.
17       Q      Okay.
18       A      B-a-l-d-w-i-n.
19       Q      Okay.
20       A      And Mr. Moses.  There were three of
21   them.
22       Q      All right.  Were you treated fairly
23   by -- I'm putting aside the termination events for
24   a moment.
25              Were you treated fairly by them
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 82

```
 1   otherwise?

 2           MS. MOLDEN:  Object to the form.

 3      A    I was treated fairly by the last two

 4   but not with Mr. Forts.

 5      Q    (By Mr. Stone)  You were treated fairly

 6   by Mr. Jeter and who else?

 7      A    Mr. Jeter was -- yes, he treat me

 8   fairly.  Yes.

 9      Q    All right.  Never any problems -- did

10   you have any problems with him?

11      A    No.  No.  No.  No.  No.

12      Q    Okay.  Did he ever do anything

13   inappropriate in your view?

14      A    Of me or of -- of me?

15      Q    Yes.

16      A    No.  No, he did not.  No.

17      Q    Okay.  Did you say Mr. Forts you

18   thought did not treat you fairly?

19      A    No, he did not.

20      Q    All right.  What did Mr. Forts do to

21   treat you unfairly?

22      A    Yeah.  He was -- he would show

23   favoritism to other employees but not me.

24      Q    He was unfair to other employees but

25   not you?  Is that what you said?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 83

```
1       A       No.   No.   He would show favoritism to
2   other employees but not me.
3       Q       Criticism?   Is that what you said?
4       A       Favoritism.   Favoritism.
5               MS. MOLDEN:   Favoritism.
6               MR. STONE:   I can't understand the
7   word.   What's the word?
8               MS. MOLDEN:   Favoritism.
9       Q       (By Mr. Stone)   Favoritism to other
10  employees but not you.
11              All right.   Tell me in what way did he
12  show favoritism to other employees but not you.
13      A       Okay.   (Inaudible) was I lost my
14  father-in-law --
15      Q       You've got to speak slowly, Mr. Oniha.
16  It's hard to hear you over this, and your volume
17  has gone down.
18      A       Okay.   I lost my father-in-law, my
19  wife's daddy.   So I request a day off to escort my
20  wife to Africa to bury him.   Okay?   And I request
21  a day off.   I had preapproved dates but no
22  particular day that would afford me to go.   But he
23  denied me.
24              I requested it.   I was asking him.   I
25  said, Mr. Forts, please.   I need this day.
```



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 84

```
 1              He said, oh, okay.  I got you.
 2              And I was under the impression that he
 3   had actually approved me.  Went home.  Buried my
 4   father-in-law.  Came back.
 5              We had a briefing.  He called me to the
 6   office.  Mr. Oniha, you took a day off unapproved.
 7   Why did you do that?
 8              I said, Mr. Forts, I told you.  You
 9   said you got me.  If you had told me that you were
10   not going to approve it for me, I would look for
11   somebody to work for me.  Then when I come back, I
12   would work for that person.  But you make me to
13   understand it that you had approved it.
14              And now -- and that showed on my
15   record.  And I still have it on my record.
16       Q    Okay.  When was that incident involving
17   the day off?  When did that take place?
18       A    That happened in October of 2017.  26th
19   to be precise.
20       Q    October 26th, 2017?
21       A    Yes.
22       Q    All right.  And other than that event
23   where you said you took an unapproved day off
24   where you say he granted you the day off, did he
25   treat you unfairly in any other way that you can
```

Page 85

 1   **recall?**

 2        A       Yeah.  Like I said, he was -- when it

 3   comes to me, I have no clue what the problem was.

 4   But he didn't treat me with respect, and I didn't

 5   like that.

 6        **Q       What did he do to not treat you with**

 7   **respect?**

 8        A       Like, for instance, if we have an air

 9   up -- say, for instance, maybe it's raining.  We

10   had delays and all that kind of stuff.  I usually

11   always volunteer to stay.

12        **Q       Wait.  Slow down, Mr. Oniha.  I can't**

13   **understand you.  I'm sorry.**

14        A       Okay.  I'm saying, sir, that some days

15   when we have an air up, like, if there's a

16   thunderstorm, then we have flight delays going out

17   and coming in.  And because of that, we must

18   stretch our schedule beyond our normal eight

19   hours.

20             So I usually always volunteer to stay

21   to cover the operations.  Okay.  And other people

22   will just tell him they will not stay.

23             And when I want to leave maybe a little

24   bit early, he will say, no.  I cannot leave.  And

25   so many instances of that nature.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 86

1      Q      So you asked to leave early on an

2   irregular operation, and he said no?

3      A      Yes.  At least -- and he did that

4   several times.

5      Q      Several times?  How many times?

6      A      I mean, at least -- you know, more

7   than, I mean, reasonable times.  Reasonable times.

8      Q      Reasonable?  I don't know what

9   reasonable means.  How many times?

10     A      Anywhere from ten -- you know, ten

11  times and up.

12     Q      All right.  So ten times during

13  irregular operations, you asked to leave early,

14  and he said no?

15     A      Yeah.  He would say no.  I have to

16  have --

17     Q      Okay.

18     A      Okay.

19     Q      All right.  Any other times where he

20  treated you not with respect or unfairly in any

21  way?

22     A      I mean, the whole time that I was with

23  him, you know, he was my supervisor.  So we did

24  not really have that, you know -- I mean, he

25  didn't treat me with respect the whole time of --

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 87

```
 1    I mean, during that week, no, he did not.
 2        Q    Can you give me any other examples
 3    other than the ones you've already given me?
 4        A    Sir, I think those that I gave you
 5    suffice enough.  I mean, I don't -- if you turn me
 6    down, you know, when I ask you for a leave for
 7    release, I will not come back to you again.  So --
 8        Q    I can't understand you, Mr. Oniha.  I
 9    apologize.  Say it again.
10        A    Sir, I can understand you.  Okay?  Why
11    can't you understand me?  I can understand you,
12    but why can't you understand me?
13        Q    Mr. Oniha, I understand you --
14        A    I can understand you.
15        Q    I'm having a hard time understanding
16    you because of the video.  I'm trying to -- let me
17    ask the question again.
18             You've given me two examples of how, in
19    your view, Mr. Forts did not treat you with
20    respect.  Are there any other examples that you
21    can recall?  Yes or no?
22        A    No, sir.  No.  No, sir.
23        Q    Okay.  All right.  During the irregular
24    operations, were there other people who asked to
25    go home that you can recall?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 88

```
 1      A      Yes.
 2      Q      Yes?
 3      A      Yes.
 4      Q      Who were those people?  Do you recall?
 5      A      Yeah.  I don't know them by names.
 6      Q      Can you give me the best description?
 7      A      I mean, there was African-Americans,
 8   and there's some whites, you know.
 9      Q      Some were African-American, and some
10   were white?  Is that what you said?
11      A      Yes.
12      Q      All right.  Can you give me any more
13   information?
14      A      Some females, of course.
15      Q      Some females?
16      A      Yes.
17      Q      And some males presumably?
18      A      Yes.
19      Q      Any other information you can give me?
20      A      I think that's it, sir.
21      Q      All right.  Okay.  Other than
22   Mr. Forts, was there anybody else who treated you
23   unfairly or without respect?  Anybody else in
24   Delta management that you can recall?
25                 MS. MOLDEN:  Object to the form.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 89

```
 1        Q      (By Mr. Stone)  You can go ahead and
 2   answer, Mr. Oniha.
 3        A      No, sir.  No, sir.
 4        Q      Okay.  All right.
 5               MS. MOLDEN:  Mr. Oniha, point your
 6   screen down.  I'm seeing the top of the head
 7   again.  Can you put your screen down a little bit?
 8               THE WITNESS:  (Complies with request of
 9   counsel.)
10               MS. MOLDEN:  Thank you.
11               THE WITNESS:  That's good?
12               MS. MOLDEN:  Thank you.
13               THE WITNESS:  Okay.
14        Q      (By Mr. Stone)  Okay.  Did anybody make
15   any inappropriate comments to you?  Anybody in
16   Delta management?
17               I'm putting aside the termination
18   events for a moment and the event with the lunch
19   inspection.
20               Other than that, did anybody in Delta
21   management make any inappropriate statements or
22   comments to you?
23        A      Yes, sir.
24        Q      All right.  Tell me about that.
25        A      Yeah.  It was the corporate security
```

Page 90

1    man of Delta Air Lines whose name --

2        Q    I'm ignoring Mr. Taylor for a minute.

3    I meant to put that aside.

4             Other than Mr. Taylor.  We'll talk

5    about that in a minute.

6        A    No one else.

7        (Whereupon a document was identified

8        as Defendant's Exhibit 7.)

9        Q    All right.  Mr. Oniha, on your screen

10   right now is Exhibit No. 7.  That's your team

11   journal, your performance journal at Delta.  Have

12   you seen that before?

13       A    No.  This is my first time seeing this.

14       Q    All right.  It's only a couple, three

15   pages.  Why don't you go ahead and look at it very

16   quickly.  I'm going to ask you just about a couple

17   of entries.

18       A    I can't see this.  It is not clear.  I

19   can't even read nothing off of this.

20       Q    Fair enough.  That's fair enough.

21   Okay.

22             Stop right there.  Stop at the top of

23   the first page which has the Bates stamp No. 60 on

24   it, and tab back up just a little bit.

25             Okay.  Stop right there.  You see



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha
August 27, 2020

Page 91

1    there's an entry -- no.  Put the bottom of the

2    page up.

3        A    (Witness complies with instruction of

4    counsel.)

5        Q    Okay.  You see there's a -- keep going

6    down a little bit more.

7        A    (Witness complies with instruction of

8    counsel.)

9        Q    Stop right there.

10       A    Okay.

11       Q    All right.  You see there's an entry

12   there.  It's a little hard to read, but it looks

13   like it's from operation service manager Jim

14   McLaren at the bottom of the page.  Do you see

15   that?

16       A    Yeah.  I see that, but I can't read it.

17       Q    All right.  Let me read it to you.  It

18   says, "I had a discussion today with Elias about

19   his job performance.  He missed an assignment, and

20   his bags had to be run by the OC driver."

21            Do you see that?

22            MS. MOLDEN:  I'm going to object to

23   form because I can't even see that.

24       Q    (By Mr. Stone)  All right.  Let me ask

25   a question.  Do you remember having a conversation

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 92

1      about your job performance with Mr. McLaren,

2      Mr. Oniha, in 2018?

3           A      The only conversation I remember having

4      with Mr. Jim was to ask for a day off when my

5      father-in-law died.  And that was it.

6           Q      You don't recall -- you don't remember

7      this event where you had a conversation about you

8      missing a bag assignment?

9           A      I did not.  I can't remember.

10          Q      Okay.  Are you saying it didn't happen

11     or you just don't recall it?

12          A      I don't recall it, sir, to be honest

13     with you.  I don't recall it, sir.

14          Q      All right.  Page down to the next page

15     for me real quick.  Can you get down to the next

16     page, page 2?

17          A      (Witness complies with request of

18     counsel.)  Okay.

19          Q      Okay.  I see there it looks like you

20     had a couple of other counselings by operation

21     service managers about missed assignments.  One in

22     2015 and one in 2017.

23                 Do you recall either of those?  One by

24     Mr. Maldonado and one by Mr. McLaren?

25          A      Mr. Molden?

**Elizabeth Gallo**
COURT REPORTING, LLC

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 93

1      Q      Mr. Maldanado and Mr. McLaren.

2      A      Sir, to be honest with you, I don't

3   remember none of this.  I don't even know.

4      Q      Okay.  You just don't recall one way or

5   another?

6      A      I don't remember none of this.

7      Q      Okay.

8      A      Mr. Molden?

9      (Whereupon a document was identified

10      as Defendant's Exhibit 8.)

11      Q      All right.  Mr. Oniha, I want to talk

12   to you for a moment about an event which happened

13   in -- this is going to be the lunch event -- an

14   event that happened in June of 2019.  All right?

15      A      Okay, sir.

16      Q      All right.  And I've got up here what's

17   been labeled or will be labeled as Exhibit No. 8,

18   which is a statement prepared by you.  Do you see

19   that?

20      A      Yes, sir.  Yes.

21      Q      Okay.  And it is an exhibit that you

22   would have -- a statement that you would have

23   given to Delta; correct?

24      A      That is correct, sir.

25      Q      All right.  Take a look at it for me

1    for a moment.  Have you looked at this statement

2    recently?

3         A    Yeah.  I looked at a copy.  I look at

4    it.  Yes.

5         Q    Okay.  When was the last time you saw

6    this statement?

7         A    I look at it yesterday.

8         Q    Yesterday.  Okay.

9         A    Yes.

10        Q    Do you still have it on your computer?

11        A    It was a copy of it that you sent to my

12   lawyer, and they email it to me.

13        Q    Okay.  Do you still have this statement

14   on your computer?

15        A    The same -- yes.  I've seen it.  Yes.

16        Q    Okay.  All right.  Let's go through the

17   June 2019 statement, if we could, please -- the

18   one that's in front of you -- and let me

19   understand

20   what happened on that day.

21             Let's start at the beginning.  You're

22   coming to work on June 14th; correct?

23        A    Yes, sir.

24        Q    All right.  And you're going through an

25   employee checkpoint, an employee security

```
 1   checkpoint; is that correct?

 2        A     That's correct, sir.

 3        Q     Okay.  That's something you have to do

 4   every day; right?  All employees who are working

 5   on the ramp or in secure areas have to go through

 6   the employee checkpoint; correct?

 7        A     That's correct, sir.

 8        Q     All right.  And so you were going

 9   through the line.  And I presume you put your

10   possessions on the belt so that they can be

11   x-rayed; correct?

12        A     A point of correction.  Not x-ray.  On

13   the table.

14        Q     On the table.  You put it on a table?

15   It's not going through the x-ray?  It's being hand

16   inspected?

17        A     Yes, sir.

18        Q     All right.  And there's an inspector

19   there who's looking at your stuff; correct?

20        A     That's correct, sir.

21        Q     It's a female; correct?

22        A     Say that again.

23        Q     It's a woman?  It's a female; correct?

24        A     Yes.  Yes.  Yes.

25        Q     Got it.  All right.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 96

1              And she wants you to open up your

2    lunch; correct?

3         A    That's correct, sir.

4         Q    All right.  And your lunch is in -- is

5    it in a bag?

6         A    Yeah.  My lunch was -- as I stated on

7    my statement, was packed in a clear see-through

8    plastic bag.

9         Q    All right.  Is it like a Ziploc® bag?

10        A    No.  Just like, you know, a regular

11   plastic bag, you know.  Yeah.

12        Q    Just what kind of bag is it?  Does it

13   have a zip tie?  What kind of bag was it?

14        A    No.  It's a plastic bag.

15             Can you give me a moment?  Let me just

16   bring it and show it to you.  Is that okay?  Just

17   give me one second.

18             MS. MOLDEN:  No.  No.  No.

19        Q    (By Mr. Stone)  You don't have to do

20   that.  You can just describe it to me, Mr. Oniha.

21        A    It's a see-through clear plastic bag.

22   You can see the contents.

23        Q    Okay.  All right.  Fair enough.

24             All right.  What were the contents of

25   your lunch?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 97

1     A      It was just my meal.

**2     Q      What was your meal?  What was in there?**

3     A      It was my meal, rice and beans, you

4   know.

**5     Q      Rice and beans?**

6     A      Yes.

**7     Q      Okay.  Was the rice and beans in**

**8   something?**

9     A      Yeah.  It was in a container.

**10    Q      What kind of container?**

11    A      A (inaudible) container.  A

12   see-clear-through container.

**13    Q      Glass?**

14    A      Yes.

**15    Q      It was a glass container?**

16    A      Yes.

**17    Q      All right.  Was there a lid on it?**

18    A      Yes.  There was a lid on it, yes.

**19    Q      Okay.  And was the lid see-through, or**

**20   was it --**

21    A      No.  No.  The lid was colored.

**22    Q      What color?  What color was the lid?**

23    A      Yeah.  It was navy blue.

**24    Q      Navy blue?**

25    A      Yes.

Page 98

1    Q    All right.  Do you still have that
2  container, the container that your rice and beans
3  were in?

4    A    Yes.  I think still I do.  Yes.

5    Q    All right.  And if I'm correctly
6  understanding, the inspector wants you to take the
7  glass container out of the plastic bag and open up
8  the blue lid; is that correct?

9    A    Yeah.  She want me to, you know, open
10  my lunch.  That was how she put it.  And I said
11  no.

12    Q    And you tell her you're not going to do
13  that; correct?

14    A    Yeah.  I told her no.  Yes.

15    Q    Okay.  And there's a fight between you
16  two; correct?

17        MS. MOLDEN:  Object to the form.

18    A    Well, not fight.  It was just, you
19  know, we have a disagreement.  I said, I'm not
20  doing that.  I'm not comfortable, you know,
21  opening my lunch.  So I said --

22    Q    (By Mr. Stone)  All right.  Well,
23  let's --

24        MS. MOLDEN:  Ben, can you let him
25  finish, please?  Ben, please let him finish his



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 99

```
 1    statement.
 2             MR. STONE:  I didn't intend to
 3    interrupt him.  But if I did, I apologize.
 4        Q     (By Mr. Stone)  Were you done,
 5    Mr. Oniha?
 6        A     So I told her I'm not comfortable
 7    opening my lunch.  You know, I lift it up.  You
 8    can see the contents on both sides, what is inside
 9    the lunch.
10             So she asked me to open it.  It's
11    nothing but, you know -- she just -- she selected
12    me for a selectee (inaudible).  Because, you know,
13    she -- you know, I know that people were passing
14    without her telling them to open their bag or
15    their lunch.
16        Q     I can't understand you, Mr. Oniha.
17    Mr. Oniha, you're speaking very quickly so I can't
18    understand you.  I apologize.  Can you slow down?
19        A     I'm saying that -- I told her that
20    I cannot open my lunch because the lunch is
21    already -- it's visible for her to see.
22             And while she was talking to me, people
23    were passing by, and she never asked them to stop
24    and inspect their lunch.
25        Q     All right.  She was an airport
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 100

1    employee; correct?  She's not a Delta employee;

2    correct?

3        A    No.  Yeah.  She's HSS security

4    personnel, I think.  Yeah.  A contractor with

5    Delta and the Department of Aviation.

6        Q    Okay.  Does she -- I'm looking at your

7    statement now, Mr. Oniha, which is up on the

8    screen, Exhibit No. 8.

9        A    Right.

10       Q    And you say in this statement, "that if

11   I would not open my lunch for inspection, that I

12   should take my 'B' and go back home."

13            Is that what she said?

14       A    Yeah.  She was --

15       Q    Were those her exact words?

16       A    No.  She did not say that.

17            What happened, when I refused to open

18   my lunch, she now call her supervisors.  So her

19   supervisors now --

20       Q    Well, you say in a minute "this was her

21   exact words/language."

22       A    No.

23       Q    So did she not say those words?

24       A    No.  I know you did read the statement

25   properly.  It was her supervisors that she called

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

1    that used those words.  That if I would not open

2    my lunch for inspection, I should take by "B" back

3    home.

4              Go back and read the statement very

5    well, sir.

6        Q    Those were the supervisor -- I

7    understand.  Those were the supervisor's exact

8    words?

9        A    Yeah.

10       Q    All right.

11       A    Those were --

12       Q    And you say to her, Who the hell are

13   you to use such a word of profanity; is that

14   correct?

15       A    I say, How dare you use words of

16   profanity on me that are not professionally

17   acceptable.

18       Q    Okay.

19       A    And she said, quote, unquote, that all

20   Nigerians, they don't follow orders.

21       Q    She said what?

22       A    She said Nigerians don't follow orders.

23       Q    Okay.  That's what the airport

24   supervisor said to you?

25       A    Yeah.  The supervisor.  Yes.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 102

1        Q       Okay.  Let me make sure I understand

2   for a minute.  You say in your statement, "I

3   responded by asking who the hell is she to use

4   such a word of profanity on me?"

5            Are those your words?

6        A       Yes.  Because when she used those

7   words, I said, how dare you use those words of

8   profanity on me that are not professionally

9   acceptable.

10       Q       I see.

11            Okay.  And then she responds with the

12   statement about Nigerians that you just stated a

13   moment ago?

14       A       Yes.

15       Q       Where is that in your statement?

16       A       Well, I mean, she used those words.

17   And that statement is certainly in a different --

18   on a separate sheet I keep in my records that I

19   emailed to my lawyer.

20       Q       That's in a statement you gave to your

21   lawyer?

22       A       Yes.

23       Q       Okay.  Is that in a statement that you

24   ever gave to Delta Air Lines?

25       A       No.  This is a statement that I gave to

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 103

1    Delta Air Lines.

2         Q    Okay.  So you never told Delta

3    Air Lines in any statement that the airport

4    supervisor made that comment; is that correct?

5         A    I did not in this statement, but they

6    became aware of it after my lawyer has, you know,

7    emailed you, you know, the statement.

8              Have you seen it?

9         Q    Say that last sentence again.  I'm

10   sorry.

11        A    They were not made to be aware of these

12   statements right here that I'm reading.  But the

13   one that I sent to my lawyer that he sent to you,

14   yes, reflects all those words.

15        Q    All right.  Did you ever give any

16   statements to Delta Air Lines before your

17   termination that reflected that statement by the

18   airport supervisor?

19        A    No.  No, I did not.

20        Q    Had you ever met the airport supervisor

21   before?

22        A    No.  I mean, that was my very first

23   time coming in contact with them.

24        Q    Okay.  Had you ever met the inspector

25   before?



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 104

```
 1      A      No.  Never did.  That was my first
 2  time.
 3      Q      Okay.  Did you ever meet George Taylor,
 4  the corporate security representative -- corporate
 5  security manager before that day?
 6      A      No.  No.  I never met him before.  That
 7  was my first time.
 8      Q      All right.  He didn't know you, and you
 9  didn't know him; correct?
10             MS. MOLDEN:  Object to the form.
11      A      No.  No.  I never met him.  He probably
12  have seen me, you know, but I never -- I don't
13  know him.
14      Q      (By Mr. Stone)  Okay.  And you don't
15  know whether he's ever seen you before or not, do
16  you?
17      A      I don't.  Because, you know, he says
18  he's the corporate security officer.  Maybe he fly
19  around.  He probably have seen me around.  So I've
20  not seen him.  I don't know him.
21      Q      Okay.  Am I correct in understanding
22  that the next thing that happened after that is
23  your operation service manager Mr. Jeter was
24  called?
25      A      Yes, sir.  Yeah.
```



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 105

1      Q      Who called him?  Was that you or

2  somebody else?

3      A      No.  I was the one that called

4  Mr. Jeter.

5      Q      You're the one who called Mr. Jeter?

6      A      Yes.

7      Q      All right.  And did Mr. Jeter arrive or

8  did the Department of Aviation -- the airport

9  manager arrive -- airport security manager arrive

10  first?

11      A      No.  Mr. Jeter arrived first.

12      Q      I got you.  All right.

13             And did you talk to Mr. Jeter at the

14  time that he arrived?

15      A      Yes, I did.  I explained to him that I

16  have a situation with -- I told him, you know,

17  before he arrived, I'm having a situation here in

18  F Concourse over lunch inspections and all that,

19  and he came.

20             And when he came, again, I explained to

21  him.

22      Q      Okay.  You told him what?  Did you tell

23  him what happened, that the inspector wanted you

24  to open your lunch --

25      A      Yes, I did.

Page 106

1      Q      -- and you didn't want to open your

2   lunch?

3      A      Yes, I did.

4      Q      All right.  Fair enough.

5             My understanding from your statement is

6   that a gentleman by the name of Rogers Williams

7   who's with Airport and Aviation Security arrived

8   on the scene; is that correct?

9      A      That's correct, sir.

10     Q      How long after Mr. Jeter arrived did

11  Mr. Williams arrive?

12     A      I couldn't put a time on it.  But, you

13  know, at least, you know -- I can't say precisely

14  how long, but Mr. Jeter arrived first.

15     Q      All right.  Can you give me an

16  estimate?  Was it more than a couple of minutes?

17     A      It was more than that.  At least maybe

18  about five or ten minutes.

19     Q      All right.  When the security -- when

20  Mr. Williams arrived, the aviation security

21  manager, did Mr. Jeter talk to him?

22     A      Yeah.  But before Mr. Jeter could talk

23  to him, the two supervisors that the inspector

24  called -- you know, just call him, you know, maybe

25  about 150 feet away from us.  And they had their

```
 1   conversation.

 2            And in that conversation was when --

 3   was when the female supervisor told Mr. Williams

 4   that, you know, she has had situations with

 5   Nigerians, I believe, in the domestic side of the

 6   airport, that we don't follow instructions.

 7       Q     Okay.  So the statement you told me

 8   about, that was after Mr. Williams arrived?  That

 9   wasn't before Mr. Williams arrived?

10       A     No.  No.  No.  It's simultaneously.

11   The lady that stated that Nigerians don't follow

12   orders, she made that statement again when

13   Mr. Williams arrived.

14       Q     Okay.  She made that statement twice;

15   correct?

16       A     Yes.

17       Q     Okay.  I got you.

18            So Mr. Williams was talking to the

19   aviation supervisor.  And you said it was about

20   50 feet away; is that correct?

21       A     About more than 50 feet.  150.

22       Q     Okay.  But you could hear the

23   conversation?

24       A     Yes.

25       Q     Okay.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                            August 27, 2020

Page 108

```
1        A     Yes.

2        Q     Anything else that you heard either the

3   aviation supervisor or Mr. Williams say in that

4   conversation?

5        A     No.  I didn't hear nothing that they

6   was saying, you know, before --

7        Q     You only heard one statement, and it

8   was that Nigerians don't follow directions?

9              MS. MOLDEN:  Object to the form.

10       A     No.

11             MR. STONE:  I'm trying to understand

12   his testimony.

13       A     No.  She said that -- no.  They were

14   going back that they asked me to open my lunch.  I

15   refused.  And when they arrived, they asked me to

16   open my lunch.  I refused.

17             And I told them that, "Who the hell are

18   they to address me in the manner that's not

19   professionally acceptable?"

20             And he was telling -- both supervisors

21   were telling Mr. Williams to a degree just that.

22   And I could hear that conversation.

23       Q     Okay.  Anything else that you heard the

24   two supervisors tell Mr. Williams or Mr. Williams

25   tell the two supervisors?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 109

1      A     No, sir.  I think what I just told you

2  suffice.

3      **Q     Is that everything you can remember**

4  **about that conversation?**

5      A     Yes.  That's everything that I can

6  remember that those two supervisors told

7  Mr. Williams.

8      **Q     Okay.  What does Mr. Williams look**

9  **like, Mr. Oniha?  Describe him for me.**

10     A     He's maybe about five seven; dark skin,

11  you know, very dark skin.

12     **Q     Very what?  I'm sorry.  What's the**

13  **word?**

14     A     Dark in complexion.

15            MS. MOLDEN:  Dark skin.

16     **Q     (By Mr. Stone)  He's an**

17  **African-American man?**

18     A     Yes.  Yes, sir.  And, of course, he

19  should be in his maybe early 30s.

20     **Q     He's what?**

21     A     Early 30s.

22     **Q     Early 30s.  Okay.**

23            **Can you describe him any more to me?**

24     A     I would say maybe about 165 or 170, you

25  know, weight.  And, again, I would say maybe about

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 110

1   five seven, five eight tall.

2        Q     All right.  Did you hear anything that

3   he said, Mr. Williams said, to the supervisors?

4        A     Well, he say that he would talk to me

5   and he would talk to my supervisor.

6        Q     That he would talk to you?

7        A     Yes.

8        Q     Okay.

9        A     And he would talk to my supervisor.

10             MS. MOLDEN:  Please let him finish,

11   Ben.  That's part of the problem.

12             MR. STONE:  I apologize.

13        A     And he said he would talk to my

14   supervisor, and he would talk to me.  And that was

15   exactly what he did.

16        Q     (By Mr. Stone)  Okay.  So is that the

17   next thing that happened is he talked to you?

18        A     Repeat that question again, sir.

19        Q     Is that the next thing that happened in

20   the story?  In other words, Mr. Williams --

21        A     No.  No.  No.  Once he finished talking

22   with them, then he now talked to my supervisor

23   Mr. Jeter.

24        Q     I see.  Okay.

25        A     Okay.  So --



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 111

1       Q       Where did that conversation take place?

2       A       The whole conversation take place at

3   the scene of where I refused to open my lunch at

4   F concourse.

5       Q       So I want to make sure I understand

6   you.  Mr. Williams said to Mr. Jeter that you were

7   refusing to open your lunch?

8       A       Yes, sir.  Yes.  That was how the whole

9   conversation went.

10      Q       Okay.  And did Mr. Jeter -- did you --

11  first of all, did you hear this conversation?

12      A       Yes.  I was --

13      Q       Were you close enough to hear them?

14      A       Yes.  I was right there.  I mean, I was

15  right there when he was talking to them.

16      Q       Okay.  How far away from you were they?

17      A       I was just, you know, maybe about -- I

18  don't know.  About a few feet away.  Put it that

19  way.

20      Q       All right.  And did Mr. Jeter say

21  anything to Mr. Williams?

22      A       Well, no.  All Mr. Jeter said was,

23  okay.  Just, you know -- just take care of the

24  situation.

25              And then shortly before Mr. Jeter left

Page 112

1   was when this corporation security man -- whatever

2   you call his name -- George Taylor was walking

3   back.

4        Q     Okay.  Before we get to that, let me

5   make sure I've exhausted everything you can recall

6   about the conversation between Mr. Williams and

7   Mr. Jeter.

8             Did you hear anything else in that

9   conversation?

10       A     No, I did not hear anything.  No.

11  Nothing else.

12       Q     All right.  Then Mr. Taylor comes upon

13  the scene; correct?

14       A     Yes.

15       Q     All right.  Did you know Mr. Taylor at

16  the time he showed up?

17       A     No.  I never did.  No.  I did not.

18       Q     All right.  Do you know why he happened

19  to be there?

20       A     I have no clue.  I don't know.

21       Q     Okay.  Okay.  I'm looking at your

22  statement now.

23       A     Okay.

24       Q     And you say that the corporate -- the

25  security officer was passing by and stopped to ask

Page 113

1    what was going on; is that correct?

2         A    That's correct, sir.

3         Q    Okay.  And who did he ask what was

4    going on?

5              It looks like you because you say, "I

6    relayed my side of the story to him."

7         A    He didn't ask me.  He asked Jeter and

8    Mr. Williams for the information of what was going

9    on.

10        Q    Okay.  Well, you say in your statement,

11   "He stopped to ask what was going on," and "I

12   relayed my side of the story to him."  Is that

13   true?

14        A    Sir, he did not ask me.  After he

15   finished talking to Mr. Jeter and Mr. Williams,

16   then he now come to me.

17        Q    I see.  Okay.

18             So tell me first of all, did you hear

19   his conversation with Mr. Jeter and Mr. Williams?

20        A    Yes.  I heard it.

21        Q    Tell me about that conversation.

22        A    Okay.  He had the conversation with

23   Mr. Jeter separate from Mr. Williams.  Okay?  So

24   when he was talking to Mr. Williams, he told

25   Mr. Williams particularly -- clearly that



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                             August 27, 2020

Page 114

```
1    Nigerians are criminals.  Okay?  And that if there
2    was nothing hidden in my lunch, I should have, you
3    know, presented it for inspection.
4              And he told Mr. Williams that he, the
5    corporate security man, would make sure that he
6    conducts investigative audits about my badge.  And
7    that any violation that he find out will lead to
8    the separation of my employment.
9              And that was exactly what he did a
10   little bit -- two weeks later.
11        Q     All right.  Mr. Oniha, when you say
12   that Mr. Taylor made this statement, first of all,
13   where was he standing?
14        A     He was standing, you know, again, about
15   maybe somewhere around -- it would be about maybe
16   50 feet or maybe less than that.  He was talking
17   to --
18        Q     And he was talking simultaneously --
19   was he talking both to Mr. Jeter --
20        A     No.  No.
21        Q     -- and to --
22        A     No.  He didn't -- he talked to
23   Mr. Williams separate, and he talked to Mr. Jeter
24   separate.
25        Q     Okay.  So this conversation was just
```



1    between him and Mr. Williams; is that correct?

2         A    Yes.  Yes.  That's correct.

3         Q    All right.  Was there anything else

4    that you heard between -- either of them say in

5    that conversation?

6         A    Again, sir, what he said was that,

7    Mr. Williams, don't worry.  That him will conduct

8    the investigative audits about my SIDA badge.  And

9    that if there was nothing hidden in my lunch,

10   should presented it for inspection again.

11             And that whatever he found out in the

12   course of his investigation, that he would use it

13   to end my employment with Delta Air Lines.

14             And that was what he did a little

15   bit -- two weeks after, the 14th of June.

16        Q    Okay.  Is that all he said, or did he

17   talk about Nigerians as well?

18        A    Sir, I said earlier that he said

19   Nigerians are criminals.

20        Q    All right.  Had he talked -- he hadn't

21   spoken with you at this point before this

22   conversation; correct?

23             He had not gotten your side of the

24   story or spoken to you; correct?

25        A    No.  He spoke with me.  And, you know,

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 116

1    he was -- he spoke with me and tell me that I

2    should -- he pretend to be nice as if he's trying

3    to give me some kind of, you know, wisdom or some

4    kind of advice.  But he was not.

5         Q    Okay.  That was after his conversation,

6    though, with Mr. Williams; correct?

7         A    Yes.  Yes.

8         Q    All right.  He hadn't talked to you

9    before the conversation?

10        A    No.

11        Q    He talked to Mr. Williams first?

12        A    Yes.

13        Q    All right.  Did he talk to Mr. Jeter

14   after he talked to Mr. Williams?  Did Mr. Taylor

15   talk to Mr. Jeter after he talked to Mr. Williams?

16        A    Yes, he did.

17        Q    Okay.  Did you hear that conversation?

18        A    I did not.  I did not.  I did not at

19   all.

20        Q    Okay.  Where was that conversation

21   taking place?

22        A    Again, it took place in the same scene

23   where we were except, you know, it was at a

24   distance.  I didn't hear what he was telling

25   Jeter.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 117

1    Q    I got.

2         How far away were they?

3    A    Say that again.

4    Q    How far away was it, the conversation

5    between Mr. Jeter and Mr. Williams?

6    A    About maybe -- about 80 feet away.

7    Something like that.

8    Q    I said it wrong.  The conversation

9    between Mr. Jeter and Mr. Taylor, how far away?

10   About 80 feet?

11   A    Yeah.  Yeah.  About 80 feet.  Yes.

12   Q    Okay.  And tell me, again, how far away

13   was the conversation between Mr. Taylor and

14   Mr. Williams?

15   A    About maybe -- about maybe 50 feet.

16   Something like that.

17   Q    50 feet?

18   A    Yeah.  Yes.  Yes.  I mean, you can

19   literally hear, you know, what they were saying

20   basically.

21   Q    All right.  Why is that allegation, the

22   statements by -- alleged statement by Mr. Taylor,

23   why is that nowhere in the statement you gave to

24   Delta?

25   A    Again, sir, I was really just trying to

Page 118

1   keep my job.  As I wrote this statement, we are at

2   it, you know.

3           And the second one that my lawyer sent

4   to you guys, you know, I wrote that just to keep

5   my record because I might reference it.  And,

6   again, it was --

7       Q      The statement Exhibit No. 8 that we're

8   looking at right now, when did you write that

9   statement?

10      A      It was written on the 14th.

11      Q      On the 14th?

12      A      Yes.

13      Q      On your home computer; correct?

14      A      No.  It was written, you know, offsite.

15      Q      Offsite.

16             Well, you told me a moment ago it's

17   still on your home computer; correct?

18      A      No.  It is.  It is.  Because, you know,

19   I have it, you know, saved on my computer.  Yes.

20      Q      Okay.  When did you put it on your home

21   computer?

22      A      Pretty much that's that day.  That's

23   the day of that incident.  When I got home, I put

24   it on my computer.

25      Q      So which computer did you originally

1    write it on, Exhibit No. 8?

2        A     It was written right at the airport.

3        Q     At the airport?

4        A     Yes.

5        Q     It was written on an airport computer?

6        A     Yes.

7        Q     And then you saved it to a hard drive

8    or a thumb drive?

9        A     Well, I saved it to my flash drive.

10       Q     Your flash drive?

11       A     Yes.

12       Q     I got you.

13             So you wrote it on a computer at the

14   airport.  Do you remember which computer?

15       A     I can't remember which one precisely.

16   I don't remember.

17       Q     Can you tell me anything?  Can you give

18   me any idea?

19       A     It was -- you know, it was right on

20   F Concourse.

21       Q     On F Concourse?

22       A     Yes.

23       Q     Okay.  Was it the one closest to the

24   employee checkpoint?  Do you remember?

25       A     It was right there on, you know, where

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 120

```
 1   passengers check in.
 2        Q     Right where you check in?
 3        A     Yes.  I can't remember which one
 4   really, you know, basically because they have a
 5   bunch of them up there, you know.
 6        Q     And then you saved it to your flash
 7   drive; correct?
 8        A     Yes.
 9        Q     What did you call it?  Your hard drive?
10        A     Yeah.  My flash drive.  Yes.
11        Q     Okay.  And then you put it on your home
12   computer?
13        A     Yes.
14        Q     Same day?
15        A     Yes.  When I got home then, you know,
16   yes.
17        Q     Okay.  All right.  Where did you print
18   it?  Did you print it at home, or did you print it
19   at the airport?
20        A     No.  I printed it at home.
21        Q     You printed it at home.  I got you.
22              And then when you printed it at home,
23   how did you get this statement to Delta, this
24   Exhibit 8?
25        A     I emailed it through my --
```



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                          August 27, 2020

Page 121

 1        Q      Emailed it?

 2        A      Yeah.  Through my gmail account to my

 3   supervisor.

 4        Q      Got it.

 5               From your home email?

 6        A      Yes.

 7        Q      Got you.

 8               And you were at home when you did that,

 9   just to be clear?

10        A      Yes.  Because --

11        Q      Okay.

12        A      Okay.

13        Q      All right.  Okay.  At that point, if

14   I'm correctly understanding -- let's go back to

15   the story for a moment.  You said you spoke with

16   Mr. Taylor, and he was kind to you; is that

17   correct?

18        A      Sir, as I said earlier, I was only

19   trying to keep my job.  Otherwise, I have no

20   intention of saying anything nice about that man.

21        Q      All right.  That wasn't my question.

22   My question was:  You then spoke to Mr. Taylor;

23   correct?

24        A      Yes.

25        Q      After Mr. Taylor spoke with Mr. Jeter

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 122

1    and he spoke with Mr. Williams, he spoke with you?

2        A    Yes.  I did.  Yes.

3        Q    Okay.  And you said he was -- I can't

4    remember your exact words.  But you said he said

5    words of kindness or something to that effect?

6        A    Yes.  I guess -- I say that -- like I

7    said, it was not -- I say that to save my job.

8    Otherwise, it was not my intention to say anything

9    nice about that man.

10       Q    Okay.  Tell me what Mr. Taylor said to

11   you after he spoke with Mr. Jeter and

12   Mr. Williams.

13       A    As I said earlier, he said, don't I

14   know that I have to present all my items for

15   inspection, food or whatever you want to call it?

16            I said, yes, sir, I did.  I empty my

17   backpack for her to inspect.  She finished that,

18   and I put all my books back in my backpack.  And

19   she request that I open my lunch.  And I felt a

20   bit uncomfortable doing that, and I refused to do

21   that.

22            And he said I should have opened my

23   lunch for her to inspect.

24       Q    Okay.  Anything else he said to you?

25       A    No.  He didn't say -- he just said

Page 123

1    that.

2        **Q     Did he say anything else?**

3        A     He didn't say nothing to me.  I don't

4    know what he -- again, you know, that's all he

5    said to me.  That, you know, next time I should

6    allow them to inspect my lunch.

7              I said --

8        **Q     Okay.**

9        A     -- sir, I lift up my lunch.  I said, do

10   you see the contents of this?

11             He said, yes.

12             So I said, would it make any sense for

13   me to open it for anybody to inspect it?  So I

14   said that conversation.

15             Then, you know, he left.  He gave his

16   business card to Mr. Jeter and to Mr. Williams,

17   and he went on his way.  He didn't give me his

18   card, which is why I referred to him as a

19   corporate security man in my -- in your report

20   because I had no information to work with.

21       **Q     I didn't hear the end of it.  So at**

22   **that point, he gave you his business card?  Is**

23   **that what you told me?**

24             MS. MOLDEN:  Object to the form.

25       A     No, he did not.  He gave his business

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 124

1    card to Mr. Jeter and Mr. Williams, but he never

2    give me, which is why I referred as a corporate

3    security man the whole time in my report.

4          Q     (By Mr. Stone)  Say that again.

5    Corporate security man what?

6          A     Because I don't know his full name,

7    that is why I referred to him as a corporate

8    security officer.

9          Q     Okay.  That's why you referred to him

10   as the corporate security manager in your report?

11   Is that what you're saying?

12         A     Yes.

13         Q     Okay.  Did he say anything else to you,

14   or did you say anything else to him --

15         A     No, I didn't.

16         Q     -- during that conversation?

17         A     I didn't say nothing to him.  So he

18   just about his way, and I went my way.

19         Q     Okay.  I know that at the end of this

20   incident, you were asked by the aviation security

21   manager, Mr. Williams, to surrender your SIDA

22   badge; is that correct?

23         A     That is correct, sir.

24         Q     Okay.  Before we talk about that event,

25   were there any other conversations or statements

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 125

1   made during this event up to the point where you

2   were asked to surrender your SIDA badge?

3       A    So you're talking about speaking to

4   who?  Me or Williams or Jeter?

5       Q    Anybody.  So did anything else happen,

6   any another conversations occur that you can

7   recall during this event up to the time that you

8   were asked to surrender your SIDA badge, or have

9   we exhausted everything?

10      A    Well, nothing that I remember.  All I

11  know is as soon as he finish his conversation, he

12  went his way.  And Jeter left.  Went to his zone,

13  A Concourse, you know.

14           Then now I'm left with Mr. Williams.

15  So he demands that I surrender my SIDA badge to

16  him, and I did that.

17      Q    Got it.  I'm with you on that.

18           Did the fact that you lost your SIDA

19  badge on that day mean you couldn't go to work

20  that day?

21      A    No.  I did not.

22      Q    Okay.  You went home that day; correct?

23      A    Yes.

24      Q    All right.  And Delta had to get

25  somebody else presumably to cover your assignment

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 126

1    that day, correct, since you couldn't be at work?

2        A      Yes.

3        Q      All right.  Do you know who covered

4    your assignment that day?

5        A      I don't know who did.

6        Q      Okay.  Fair enough.

7               You did not get fired on this day for

8    this offense, did you?

9        A      No.  No, I did not.

10       Q      All right.  And you got your SIDA badge

11   back and continued to work for Delta; correct?

12       A      Yeah.  I got it back about four days

13   later, and I continued to work.

14       Q      All right.  You're aware, Mr. Oniha,

15   that Delta was fined because of your conduct by

16   the airport; correct?

17       A      No.  They were not fined, sir.  They

18   were not fined.  It was Mr. George Taylor -- or

19   whatever you call him -- he is the one that

20   instigated it.  They were not fined.

21       (Whereupon a document was identified

22       as Defendant's Exhibit 9.)

23       Q      Mr. Oniha, take a look at Exhibit

24   No. 9.  It's a three-page document.  Let me ask if

25   you've ever seen that document before.

Page 127

```
 1      A     Oh, no.  You are talking about this?  I
 2  thought -- okay.  Okay.  All right.  I thought you
 3  were talking --
 4            Okay.  Go ahead.  Go ahead.  I'm
 5  listening.  Go ahead.
 6      Q     Well, do you want to revise your prior
 7  answer?  You understand Delta was fined for your
 8  conduct; correct?
 9            MS. MOLDEN:  Object to the form.
10      Q     (By Mr. Stone)  Okay.  You can answer
11  the question, Mr. Oniha.
12      A     Well, I don't know if you call this a
13  fine.  But all I know is whatever fee that was
14  related to this was released to reinstate my
15  badge.  I don't know if you want to call that a
16  fine, sir.
17      Q     Okay.  Do you know whether Delta
18  had to pay any money because of what you did
19  on June 14th, 2019?
20      A     Well, like I say, sir, I have no idea.
21  I don't have a recollection of that.
22            This over here is the BORN, you know,
23  that Delta Air Lines had to pay -- or Delta
24  Air Lines have to pay on behalf of the employee to
25  get their badge reinstated.
```



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                          August 27, 2020

1        Q      Okay.  So you do know Delta had to pay

2   money to the airport to get your badge reinstated

3   and to pay a fine for what happened on June 14th;

4   is that fair?

5             MS. MOLDEN:  Object to the form.

6        A      Sir, you keep going back and forth to

7   the same question.  I'm saying that this could

8   have happened if I lost my badge, for instance.

9   This is exactly how Delta Air Lines will have the

10  situation resolved.  It's called BORN.  So you

11  keep saying, like, a fine or fined.  Not because

12  of the incident that happened on that day I did

13  not lose my badge.

14       Q      (By Mr. Stone)  Well, I don't

15  understand what you are saying, Mr. Oniha.

16       A      All right.  Sir --

17       Q      Let me make sure I understand.

18             First of all, have you ever seen this

19  document that's Exhibit No. 9?  Take your time,

20  and take a look at it, and let me ask if you've

21  ever seen it.

22       A      Sir, again, this letter was not sent

23  to me until -- I was only to be aware of this BORN

24  when I went to go pick up my SIDA badge at

25  training information.  So --

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 129

1      Q     My question is a simple one.  Have you

2 ever seen this document before?

3      A     No.  I never -- no.  This is my first

4 chance.

5      Q     Okay.  Look at the second page for a

6 moment.  Let me ask you, have you ever seen that

7 page?

8            You're on the third page.  The second

9 page is what I'm asking you about of Exhibit

10 No. 9.

11     A     Are you talking about this one right

12 here?

13     Q     Yeah.  That page.  Have you ever seen

14 that?

15     A     No.  I didn't see this.  This is not my

16 handwriting.

17     Q     Okay.  Do you have any reason to

18 believe that this was not a BORN that was issued

19 to Delta by the airport?

20     A     Sir, I never dispute the genuinity

21 [sic] of this form or even the one that precede

22 this.  I never dispute it.

23     Q     Okay.  All right.  And the same is true

24 of page 3 then?  You have no reason to believe

25 that this is not a letter sent by the airport to

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                      August 27, 2020

Page 130

1    Delta on page 3?

2        A     Sir, I have no reason to, you know --

3    like I said, I never discredit it.  But I didn't

4    see it is what I'm saying.

5        Q     So the answer to my question is no, you

6    have no reason to believe this is not a letter

7    sent to Delta?

8        A     I don't think there is any reason to

9    doubt it.  I didn't doubt it.  Put it that way.

10       Q     Are you aware of anybody else who

11   refused an inspection at an employee checkpoint

12   during the time you were employed there?

13       A     Well, no.  I wouldn't -- I mean, I

14   don't know what happened before my shift or before

15   anybody, but I don't know.

16       (Whereupon a document was identified

17       as Defendant's Exhibit 11.)

18       Q     All right.  Mr. Oniha, take a look at

19   this.  This is the second statement that you wrote

20   that you referred to a moment ago.

21       A     Yes.  Right.

22       Q     Take a look at the document.  Get

23   familiar with it.  I'm going to ask you some

24   questions about it.

25       A     Yes.  I'm familiar with it.  Go ahead.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 131

1   Ask your question.

2        Q      Okay.  First of all, when did you write

3   this second statement?

4        A      It was just wrote about the same time

5   that, you know, the first one was written.

6        Q      Sorry.  Say that again.  The same time

7   what?

8        A      Right about the same time -- you know,

9   right about the same time that the first one was

10  written.

11       Q      So around June 14th of 2019?

12       A      Yes.

13       Q      How long between the time that you

14  wrote the first statement, which was Exhibit 8,

15  and the time you wrote this statement?  How many

16  days?

17       A      How many days?

18       Q      Yes.

19       A      No.  There is no -- just right about

20  the same time that I wrote the first one.

21       Q      I'm trying to figure out what the same

22  time is.  How many days?

23       A      It wasn't days, sir.  It wasn't days.

24  It was only hours.

25       Q      Hours?



Page 132

1      A      Right.  It wasn't hours.  It probably

2   was as soon as I get home, then I wrote this

3   statement, you know, in more details for my

4   record.

5      **Q      Okay.  On the computer that you're on**

6   **now; correct?**

7      A      Yes, sir.

8      **Q      All right.  And it looks to me like**

9   **this statement, this second statement that we're**

10  **looking at, Exhibit No. 11 --**

11     A      Right.

12     **Q      -- is very similar in wording to the**

13  **first statement, Exhibit No. 8; correct?**

14     A      Yes.  You're correct except that, you

15  know, I had to add --

16     **Q      Okay.**

17     A      Okay.  Go ahead.

18            MS. MOLDEN:  Let him finish his --

19            Finish your statement, Mr. Oniha.

20            MR. STONE:  I thought he was, Regina.

21  He stops, and then he starts again.

22     **Q      (By Mr. Stone)  Mr. Oniha, am I correct**

23  **in understanding what you did is you took your**

24  **first statement and then saved it as a new file**

25  **and rewrote it?  Took out and added stuff?**

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                           August 27, 2020

Page 133

```
 1              MS. MOLDEN:  Object to the form.
 2        Q     (By Mr. Stone)  Okay.  You can answer,
 3   Mr. Oniha.
 4        A     Again, when I got home, I take my time
 5   to write in detail everything that transpired on
 6   the 14th, on that day, for my record for a
 7   day --
 8        Q     All right.
 9        A     Hold on a second, sir.
10              -- for a day like this because I know
11   I'm going to need it.  So that's why, you know, I
12   wrote it, you know, in details.
13        Q     Here's what I'm trying to understand --
14   that wasn't my question, Mr. Oniha.
15              What I'm trying to understand is how
16   did you create this second document, Exhibit
17   No. 11?  Did you pull up your first statement on
18   your computer as a Word document, save it as a new
19   document, and then edit it?  Is that what you did?
20        A     All I did was I put -- you know, add
21   additional information to it to help my case,
22   which is exactly how it happens.
23        Q     Okay.  You may have answered my
24   question.  I may just not have heard you.
25              Did you start -- when you were writing
```

Page 134

1    this second statement, were you starting with the

2    document that was your first statement, Exhibit

3    No. 8?

4        A    I started, you know, with the

5    statement.

6        Q    So you saved it as a new document?

7        A    Yes.

8        Q    Okay.  And then you made the edit?

9        A    Say that again.

10           MS. MOLDEN:  Listen to him carefully,

11   and answer the question.  Make sure you understand

12   what he's saying.  So don't -- I feel like y'all

13   are crossing over each other.

14           MR. STONE:  I think he understands me,

15   Regina.  But I think I've got it.

16       Q    (By Mr. Stone)  And then you saved it

17   as a second document after you made the edit;

18   correct?

19           MS. MOLDEN:  Object to the form.

20       A    No.  I didn't make no edit.  I save it

21   to, you know, a second document.  A second

22   document.

23       Q    (By Mr. Stone)  Okay.  Well, you edited

24   it.  You changed the first -- you changed the

25   statement; correct?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 135

1            You changed your first statement; took

2    out some stuff and added some stuff?

3        A     I did not take any stuff out.  I just,

4    you know, write it exactly how it happens.  There

5    were no details.

6        Q     Okay.  Well, Mr. Oniha, if you go back

7    to Exhibit No. 8 for a moment --

8        A     Okay.

9        Q     Do you see the statement in Exhibit

10   No. 8, "I relayed my side of the story to him, and

11   he was very kind enough to give me words of advice

12   relative to security checkpoints"?  Do you see

13   those words?

14       A     Yes, I see those.  Yes.  I see them.

15       Q     Okay.  Now, go back to Exhibit No. 11.

16   Those words were removed; correct?

17       A     As I said earlier, I was doing this to

18   keep my job.

19       Q     Mr. Oniha, you've got to answer my

20   question.

21            Those words were removed; correct?

22       A     I wrote that for obvious reasons

23   because there is no way I will say something nice

24   about that man because I was --

25       Q     You said a moment ago you had not

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 136

1    removed any words.  That's not correct.  You did

2    remove words in your second statement; correct?

3         A    Mr. Stone --

4         Q    Correct, Mr. Oniha?  Answer my

5    question.  Then you can provide an explanation.

6    But that's a correct statement?

7         A    It was not my intention to say anything

8    nasty about that man.

9         Q    Mr. Oniha, you can answer a different

10   question if you want.  And you're attorney is

11   going to have a chance to ask you different

12   questions.

13             My question was simple.  You said a

14   moment ago that you had not removed any words.

15   You did, in fact, remove words from your second

16   statement; correct?

17        A    Those nice or he was being nice to

18   me --

19        Q    Mr. Oniha, correct or incorrect?

20   Answer the question, please, sir.

21        A    Yes.

22        Q    Okay.  Thank you.

23             And you added words; correct?

24        A    Yes.

25        Q    Okay.  Mr. Oniha, this second

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 137

1   statement, Exhibit No. 11, is dated June 14th,

2   2019 at the top.  Do you see that?

3        A    It's dated what now?  June 11th?

4        Q    June 14th, 2019 at the top.  Do you see

5   that?  Go to the top of the document.

6        A    Yes.  Yes.

7        Q    Did you say yes?  I just didn't hear.

8        A    I said, yes, sir.

9        Q    Okay.  Is that the day you wrote this

10  document?

11       A    Yes.  That's the day.  Yes.

12       Q    Okay.  Mr. Oniha, let's turn, if we

13  can --

14            Does anybody need a break?

15            Okay.  Let's turn, if we can, to your

16  trip on September 25th of 2018 from Atlanta to

17  Lagos, Nigeria.  You with me?

18       A    Yes, sir.

19       Q    All right.  You recall that trip, I

20  take it?

21       A    Yes, sir.

22       Q    All right.  When did you first make

23  plans to go to Lagos?

24       A    I made plans to go because we had a --

25  because I had some days off, and we had a

**Elizabeth Gallo**
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                August 27, 2020

Page 138

```
 1   convention at my church.

 2        Q     A convention at your church?

 3        A     Yes.

 4        Q     All right.  And that's the reason you

 5   were going to Lagos?

 6        A     Yes.  That's why I went.

 7        Q     All right.  How far in advance of

 8   September 25th did you make your reservations to

 9   go, or did you list on a flight to go?

10        A     Yeah.  As soon as I found out that the

11   convention was scheduled, then I requested some

12   days along with my off days to accommodate my

13   trip.

14        Q     And when did you list -- were you

15   flying positive space?  Did you buy a ticket on

16   Delta, or were you flying non-revenue travel?

17        A     I'd say non-revenue travel.

18        Q     Okay.  And in order to fly non-revenue

19   travel, you have to put yourself on a list?

20        A     Yes, sir.

21        Q     Correct.

22              When did you put yourself on that list?

23        A     It was within maybe a week, you know.

24   When I found out that I was going to go, you know,

25   I put myself on that list.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 139

1    Q    The week before you were planning to

2    travel?

3    A    Yeah.

4    Q    Okay.

5    A    Yes.

6    Q    Okay.  And what was the planned length

7    of the trip?  How long were you going for?

8    A    I was just going for five days because,

9    like I say, it was a convention, you know.

10    Q    Okay.  So you were just planning a

11    five-day trip going out on the 25th and coming

12    back on the 29th?  Those were your original plans?

13    A    Yes.

14    Q    All right.  When did you list on the

15    plan flight for the 29th?

16    A    When?

17    Q    Yes.  You listed a week before to go

18    for the flight for Lagos.  When did you list for

19    the flight to Lagos -- from Lagos to Atlanta?

20    A    I left on the 29th to come -- to go

21    back to Atlanta on the 30th.

22    Q    I understand that.  That was your

23    original plan.

24    A    Yes.

25    Q    And what I'm trying to understand is

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 140

1   when you listed on that flight back from Lagos.

2   In other words, when did you put yourself on the

3   non-rev list?

4        A    Well, see, back -- I don't know if you

5   know that country.  But back home, you know, you

6   have to -- they have to list you, you know.

7             But, I mean, you may request it because

8   once you list yourself to and fro, you know, you

9   can only fly based on availability.

10       Q    Got it.

11            So you listed for both the going and

12  the return flight at the same time?

13       A    Yes.  Yes.

14       Q    And that was the week before the trip?

15       A    Pretty much.  Yes.

16       Q    Perfect.

17            And you said a moment ago you were

18  there for a church convention; is that right?

19       A    Yes, sir.

20       Q    Were you traveling with anybody?

21       A    No.  It was just me.

22       Q    Okay.  And what church is it?

23       A    It was called Mountain of Fire and

24  Miracles Ministry.  Mountain of Fire.

25       Q    And where is it located?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 141

```
1        A       It's located in Ibafo.  That's
2    I-b-a-f-o.
3        Q       Nigeria?
4        A       Yeah.  In Lagos State, Nigeria.  Yes.
5        Q       Okay.  Who were you there with?
6        A       No.  You know, I was, you know, by
7    myself.  Of course, there were a bunch of people
8    that travel all over, you know, that came for, you
9    know, the events.
10       Q       Okay.  Who were some people that were
11   there that you knew?
12       A       I mean, I did not know anybody, I mean,
13   that went from here -- from the United States.
14   But I was there -- you know, like I said, there
15   were people from the UK and all that that went.
16       Q       Okay.  You don't know any of them
17   personally?
18       A       No.  I don't know them.  No.
19       Q       Is there anybody who can vouch for the
20   fact that you were at this churn retreat?
21       A       Oh, yes.  Of course.  Yes.
22       Q       Who is that?
23       A       The associate pastor.  The Zuna pastor.
24   The Zuna pastor of -- you know, of course, the
25   pastor here knows that I went.
```



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 142

1     Q     Okay.  I'm wondering whether there's

2   anybody who knows that you were actually there.

3   In other words, that was with you and can say

4   where you were during the time that you were in

5   Nigeria.

6     A     You can -- I can provide you with a

7   number.  And the guest house where I stayed, they

8   have a telephone.  They can tell you how long I

9   was there and all of that.

10     Q     Okay.  I'm not saying that you weren't

11   in Nigeria.  I was asking a different question,

12   which is:  Is there anybody who can vouch for the

13   fact that you were at the church retreat and when

14   you were at the church retreat?

15     A     Yes.  Yes.

16     Q     Who is that?

17     A     If the pastor here knows about it.

18     Q     Is there anybody who was there with you

19   who can vouch for you?

20     A     That I went from the United States with

21   me to -- no.

22     Q     Is there anybody who was there who can

23   vouch for it?  Is there anybody who saw you at the

24   church retreat that can vouch that you were there?

25     A     Yes.  Yes.

Page 143

1       Q       Who is that?

2       A       The head of the -- how would I call it?

3  The head of Women Ministry was that.  And then the

4  Zuna evangelist was there.

5       Q       Okay.  What are their names?

6       A       Emmanuel Ajayi.

7       Q       Spell it for me, please.

8       A       Ajayi is A-j-a-y-i.

9       Q       Do you have contact information for

10  them?

11      A       Yes, I do.  Yes.

12      Q       Okay.  And who else?

13      A       Susan Majekodunmi was there.

14  S-u-s-a-n --

15      Q       Okay.

16      A       -- and M-a-j-e-k-o-d-u-n-m-i.

17      Q       Okay.  Do you have phone numbers for

18  them?

19      A       Yes, I do.  Yes.

20      Q       What are they, please?

21      A       Can I get my phone?

22      Q       Yeah.

23      A       Okay.  Hold on one second.

24              Okay.  I have for (inaudible), it's

25  011-234-706-526-7146.

Page 144

1       Q      All right.

2       A      Okay.  Hold on.  Let me see if I can

3  get (inaudible).  Give me one moment.  Because she

4  was there.  She was actually the one that picked

5  me from the airport and took me down there.

6              THE COURT REPORTER:  I can't understand

7  what he's saying.

8              MR. STONE:  Mr. Oniha, the court

9  reporter is asking again that you adjust your

10 camera because you're sort of falling out of the

11 screen here.

12             THE WITNESS:  Okay.  Can you see me?

13 Can you see me now?

14             THE COURT REPORTER:  You need to bring

15 it down.

16             MS. MOLDEN:  More.

17             THE COURT REPORTER:  A little more.

18             MR. STONE:  There you go.

19             MS. MOLDEN:  There you go.

20             THE COURT REPORTER:  Perfect.  Perfect.

21 Thank you.

22             THE WITNESS:  Okay.  Can I give --

23 because I don't have Emmanuel's number here.  You

24 know, maybe I wrote it somewhere.  I don't know

25 where, you know.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 145

1          MS. MOLDEN:  If you find it later, you

2    can give it to me, and I'll get it to him.

3          THE WITNESS:  Okay.  All right.

4     **Q     (By Mr. Stone)  All right.  When you**

5     **were in Nigeria on this trip, were you at the**

6     **church retreat all day every day.**

7     A     Yes, I was.  Yes, I was.

8     **Q     How many hours a day?**

9     A     It was required that you have to be in

10   the church presence anyway from -- it was broken

11   into sessions.  Sometimes from 7:00 in morning to

12   noon.  Then we take a break from noon, and we come

13   back.  Then we resume.  Then we conclude.  It had

14   to be about 6:00.  Then we break.  Then we go back

15   for night activity.

16         MS. MOLDEN:  Mr. Oniha -- I'm sorry,

17   Ben -- can you not see us all in the screen?  Can

18   you see all of us?

19         THE WITNESS:  Yeah.  I can see.

20         MS. MOLDEN:  And can you see how all of

21   us are up down to the shoulders?

22         THE WITNESS:  Yes.

23         MS. MOLDEN:  Can you see yourself too?

24         THE WITNESS:  Can you see me?

25         MS. MOLDEN:  Can you see yourself on

Page 146

 1   the screen?  Can you see yourself on the screen?

 2              THE WITNESS:  Yeah.  I can see myself

 3   now.

 4              MS. MOLDEN:  Okay.  Can you see how

 5   you're cut off, and everybody else is from the

 6   shoulders up?

 7              THE WITNESS:  Okay.

 8              MS. MOLDEN:  Every time you adjust it,

 9   you sit back.  So monitor yourself, and make sure

10   you stop letting it -- because we keep looking

11   just at your head.

12              THE WITNESS:  Okay.  All right.  Can

13   you see me now?

14              MS. MOLDEN:  So when you sit back

15   again, it's going to go right back.  So you should

16   see yourself just like we see ourselves.

17              THE WITNESS:  Okay.

18              MS. MOLDEN:  Keep the camera down so we

19   can see all of you.

20              THE WITNESS:  Okay.  All right.

21              MS. MOLDEN:  Okay.

22        (Whereupon a document was identified

23        as Defendant's Exhibit 12.)

24        Q    (By Mr. Stone)  Mr. Oniha, my question

25   is:  Do you recognize those as postings that are

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 147

1   at the employee checkpoint when you come through

2   the airport?

3        A     Yes, sir.

4        Q     All right.  Mr. Oniha, we're going to

5   go back to your trip, your Lagos trip.

6        A     Okay.

7        Q     And I want to talk to you about the

8   steps that you took as you were -- on that day of

9   travel here.

10       A     Okay.

11       Q     And am I correct in understanding,

12   first of all, that the day you were traveling to

13   Lagos was not a workday for you?

14       A     No.  It was not.  It was not.

15       Q     Okay.  It was a day off, and you were

16   on vacation at that point?  You were getting ready

17   to travel on a vacation to Lagos?

18       A     Like I said, it was not, like, a normal

19   vacation.  I had some days off, you know, to use,

20   and, of course, I went.  Yes.

21       Q     I'm with you.  I'm with you on that.

22             While you were traveling that day, you,

23   I assume, drove to the airport or took MARTA to

24   the airport or something?

25       A     No.  I -- no.  No.  I think -- I drove.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 148

1    I drove to the airport.  I drove to the airport.

2         Q    You drove to the airport.  Parked at

3    the airport?

4         A    Yes.

5         Q    Okay.  And then you came in presumably

6    through the main entrance of the airport; correct?

7         A    Yes.  Through the parking side.  Yes.

8         Q    Came in through the International side?

9         A    Yes, sir.

10        Q    Yes.  All right.

11             Did you -- and then you would have come

12   through TSA screening to get through to the

13   airport; correct?

14        A    Oh, yes.  Yes.

15        Q    Okay.  Why did you come through TSA

16   screening as opposed to the employee checkpoint?

17        A    Because that is what is required.  You

18   have to go through -- you know, through TSA.

19   Whether you're an employee or you're a passenger,

20   you come through TSA.

21        Q    How do you know that?  Was that in the

22   training?

23        A    That is their routine.  You know, that

24   traveling -- whether you're an employee or whether

25   you're a revenue agent, you go to -- you know, you

Page 149

1   just go through TSA.

2        Q     Okay.  And you understood that?

3        A     Yes.

4        Q     Delta has told you that, and you

5   understood that?

6        A     I will be honest.  I understand that

7   before.  Before Delta Air Lines, I understood

8   that.

9        Q     You say you knew that before Delta Air

10  Lines.

11             Okay.  You've known about those -- you

12  know that's federal law; correct?

13       A     Yes.  I know that, yes.  I know that.

14       Q     All right.  So you go through TSA

15  screening.  Did you check bags before you went

16  through TSA screening?  Do you remember?

17       A     I just check my, you know, two -- I

18  have bags.  Yes.

19       Q     All right.  Do you know why you have

20  to -- I know you know the rule.  But do you know

21  why that's the rule, that you have to use TSA

22  screening when you're traveling?

23       A     Yes.  They want to make sure -- of

24  course, yes.  Yes.  Yes.

25       Q     What's the reason?

Page 150

1      A      They want to make sure that you are not

2   carrying any contraband, you know, any weapons

3   that could potentially, you know, not just harm

4   you or that will endanger airplanes or whatever

5   you want to call it or even the airport in

6   general.  Yes.

7      **Q      All right.  And you understood that the**

8   **TSA screening you've got to go through, for**

9   **instance, millimeter wave detection, that machine**

10  **where you hold your hands up and it spins around?**

11     A      Yes.

12     **Q      Okay.  And that's not something they**

13  **have at the employee screening checkpoint;**

14  **correct?**

15     A      Well, I don't really know that because

16  most of the -- all the time that I travel, I go

17  through TSA.  So I don't really know much about

18  the employee screening.

19     **Q      Well, you don't have to go through that**

20  **at the employee screening checkpoint when you're**

21  **going to work, for example; correct?**

22     A      No.  No.  You don't have to lift up

23  your hands.  No.  You just -- you know, you just

24  go through TSA.  That is set aside for employees.

25  You just go through that, and you put all your

1   belongings through that carousel.  And, of course,

2   some places might ask you to take your shoes off

3   and do that.  So --

4        Q    Okay.  It's a different kind of

5   screening when you go through the employee

6   checkpoint; correct?

7        A    Yes.

8        Q    Okay.  So am I correct in understanding

9   that after you go through TSA, you decide to go to

10  the gate where you're going to fly.  And then you

11  leave the area of the airport and use your badge

12  to swipe out?

13       A    Repeat that question one more time,

14  sir.

15       Q    Sure.  I didn't ask it very well.

16            So you come through TSA security.

17  Where do you go after you go through TSA security?

18       A    Usually you go to the gates.  You go

19  straight to the gates and then --

20       Q    Is that what you did on your day that

21  you were traveling to Lagos?

22       A    Yeah.  That was what I did.  Yes.

23       Q    Okay.  And then you're on what's called

24  the sterile area of the airport.  You're where all

25  the passengers are; correct?



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                            August 27, 2020

Page 152

1        A      That's correct, sir.

2        Q      Okay.  And you decide at some point to

3   leave that sterile area of the airport and go

4   downstairs for a moment; correct?

5        A      Yeah.  That was -- yes.  That was the

6   incident that happened.  Yes.

7        Q      Okay.  And so you use your SIDA badge

8   to do that; correct?  To swipe through the door?

9        A      Yes.

10       Q      All right.  And you go downstairs;

11  correct?

12       A      Yes.

13       (Whereupon a document was identified

14       as Defendant's Exhibit 13.)

15       Q      Okay.  Mr. Oniha, I'll represent to you

16  that that is a document that reflects the

17  locations and the times where you were swiping

18  your badge on the dates indicated on the

19  documents.

20              My question is a simple one, which is:

21  Have you ever seen this document before?

22       A      Yeah.  I saw this.  I saw this on a --

23       Q      Okay.  And do you have any reason to

24  believe it's inaccurate?  That it doesn't

25  accurately reflect your badge swipes?

Page 153

```
 1       A     No.  I mean, that's true.
 2       Q     All right.  Mr. Oniha, do you remember
 3  which door you went through when you went
 4  downstairs on the day you were traveling to Lagos?
 5       A     Yeah.  I went to -- my departing gate
 6  was Echo 10.  And I went to Echo 9 which is, you
 7  know, across from there, you know.
 8       Q     Okay.  And you went downstairs to do
 9  something; correct?
10       A     Yes, sir.  To give a check to Mr. Juan.
11  Yes.
12       Q     Okay.  And, again, who were you giving
13  a check to?
14       A     Mr. Juan Neverson.
15       Q     Okay.  And why were you trying to give
16  him a check?
17       A     Yeah.  Because he bought me something,
18  and I was -- you know, I called him before my
19  flight leaves, you know, that he should meet me at
20  the gate.  But apparently he was not answering his
21  phone.  And I had no intention of, you know,
22  traveling to Nigeria with the check.
23             So after I'm looking around the
24  airport, I go look around to see if I can find
25  somebody, you know, in the stair area whom I can
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 154

1    just give the envelope and say, please give it to

2    Mr. Juan for me.  So I couldn't find anybody.

3              And I just, you know, swipe my badge,

4    you know, to go down to his office.  And when I

5    even get there, he wasn't there.  I slide the

6    check under the door.

7        Q     Okay.  Did you ever -- did you --

8              Well, first of all, let's go back to

9    the beginning.  So was it a $200 check is my

10   understanding?

11       A     Actually -- it was actually 400.

12       Q     It was 400.

13             Do you know why you repeatedly told

14   Delta it was 200?

15       A     Yes.

16       Q     Why?

17       A     No.  No.  It was just -- you know, like

18   I said, I never -- I didn't make that up.  It was

19   just, you know, an error that I stated 200, you

20   know.

21       Q     You told Delta on multiple occasions it

22   was $200; correct?

23       A     Repeat that question, sir.

24       Q     Sure.

25             You told Delta on many occasions,

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 155

1    several occasions, that it was $200?  It was a

2    $200 check?

3         A      No, not many occasions.  Not many

4    occasions.  It was just that statement that I

5    wrote on that July 2nd was when I said $200.  I

6    didn't said it, you know -- it was not several

7    occasions.  It was just that one time.

8              You know, and again, it wasn't --

9         Q      You also said it in --

10        A      -- intentional.

11        Q      -- your appeal; correct?

12             MS. MOLDEN:  Please don't interrupt

13   him.

14        A      It was not an attempt to deceive

15   anybody.  Like I said, it was one time, and that

16   was on that day, on that July 2nd, when, you know,

17   I was brought in to be interrogated about this

18   incident, you know.

19             And I couldn't just -- you know, it was

20   so sudden that I never -- I never knew that this

21   was going to come up.  So when I said $200 --

22        Q      (By Mr. Stone)  You said it --

23        A      -- it was not an attempt --

24        Q      You said it as well in your appeal that

25   it was $200 check, didn't you?

Page 156

```
 1      A      Sir, it was not an attempt to deceive

 2   anybody.  It was --

 3      Q      Mr. Oniha, you've got to answer my

 4   question.  The question is:  You said in your

 5   appeal, it was a $200 check; correct?

 6      A      Yes.

 7      Q      All right.  So it was more than one

 8   occasion?

 9      A      Yes.

10      Q      All right.  You said that you were

11   giving this check to Mr. Neverson because he

12   bought you something.  What did he buy you?

13      A      He bought me some clothes and some

14   shoes.  So --

15             And, like I said, it was not my

16   intention to, you know, travel with the check, you

17   know.  I made a reasonable effort to get ahold of

18   him, but I couldn't.  You know, and I went to

19   see --

20      Q      Tell me about these clothes and shoes

21   he bought you.  What specifically did he buy you?

22      A      Jeans and, you know, sneakers.

23      Q      Jeans and what?  Sneakers?

24      A      Jeans and sneakers, yes.

25      Q      I see.
```

Page 157

1              And where did he get them?

2       A      I don't know where he get them, but,

3    you know, he just bought them.  I don't know where

4    he get them.

5       Q      Do you still have them?

6       A      Yes.

7       Q      In your closet?

8       A      Yes.

9       Q      All right.  How did you know that it

10   was $400?

11      A      Because I wrote the check.

12      Q      Because why?

13      A      I wrote the check.  I wrote him a

14   check.

15      Q      Well, I know you know how much the

16   check was for.  How did you know that what he

17   bought you cost him exactly $400?

18      A      I did what he says, and -- you know, I

19   did what he says.

20      Q      He said it was $400 exactly?

21      A      400 and some change.  But, I mean,

22   there was no -- you know, I just give him the

23   check for $400.  So --

24      Q      But you don't know where he got this

25   stuff for you; is that correct?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 158

```
 1        A     I don't.  No.

 2        Q     All right.  Was it anything other than

 3   jeans and sneakers?

 4        A     No.  No.  No.  Those are the stuff that

 5   he bought for me.

 6        Q     Sorry?

 7        A     Those are things that he bought for me.

 8        Q     Okay.  Were they for you personally?

 9        A     Yeah.  They were for my special use.

10   Yes.

11        Q     Okay.  How many pairs of jeans?

12        A     It was about three.

13        Q     What was the brand?

14        A     And -- yeah.  Three.

15        Q     Okay.  What was the brand?

16        A     Calvin Klein.

17        Q     Calvin Klein.  Three pairs of Calvin

18   Klein jeans.

19        A     Uh-huh (affirmative).

20        Q     Okay.  How many pairs of sneakers?

21        A     One.

22        Q     Okay.  What was the brand?

23        A     Nike.

24        Q     Okay.  All right.  Was there any

25   reason you went downstairs other than to give
```

 1    Mr. Neverson the check?

 2        A    No.

 3        Q    Did you tell Mr. Neverson that you had

 4    delivered the check?

 5        A    Yes.  As I said earlier, I called him

 6    that I was, you know, headed to Lagos and that my

 7    flight was going to be leaving at Echo 10.  If you

 8    please, stop by and meet with me so I can hand

 9    over the check.

10             Again, I guess he was so busy.  He

11    didn't have no time to come down there.  So I went

12    downstairs.

13        Q    Did you ever call him after you had

14    delivered the check to tell him it was there?

15        A    Yes, I did.  Yes.  I told him -- I

16    called him.

17        Q    Okay.  All these calls to him, were

18    they phone -- sorry.

19        A    It was two phone -- yes.  I called him

20    on the phone that day.  You know, since he didn't

21    come -- I didn't see him, I slide the check under

22    his office door.

23             And that, you know, I'll be back from

24    Lagos -- I will leave Lagos on the 29th to get

25    here on the 30th, you know.  So --

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 160

1      Q     All right.  I still don't understand

2  the answer to my question.  Did you call him after

3  you left the check for him?

4      A     I did, sir.  I just told you.  I said,

5  after I slide the check under his office door, I

6  called him to let him know that, you know, I left

7  the check under his office door.  I did.

8      Q     All right.  And called him on your cell

9  phone, I presume?

10     A     Yeah.  Yeah.  On my cell phone.  Yes.

11     Q     Was it a text, or was it a call?

12     A     No.  I called him, you know, and I left

13  him a voice --

14     Q     All right.  So that will be reflected

15  on your cell phone records when I look at them?

16     A     Most definitely, yeah, if you want.

17  Yes.

18     Q     All right.  After you left him the

19  check, you came right back upstairs?

20     A     Yes.  I just did.  Yes.

21     Q     Came back through the same door?

22     A     Yes.

23     Q     Yes?

24     A     Yes.

25     Q     Okay.  And then you got on your flight

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Page 161

1    a few minutes later?

2         A     Yes, a few minutes later.

3         Q     **Okay.  Did you go anywhere other than**

4    **the gate after you came back in?**

5         A     No.  As soon as I just came back, I

6    went straight to the gate.

7              MR. STONE:  Okay.  All right.  I'll

8    tell you what.  Let's take five minutes.

9              MS. MOLDEN:  Okay.

10   (Proceedings in recess, 1:29 p.m.

11   to 1:43 p.m.)

12   **Q     (By Mr. Stone)  Mr. Oniha, we were**

13   **talking a moment ago about your trip to Lagos,**

14   **Nigeria.  And we were talking about the clothes**

15   **that Mr. Neverson purchased for you to get the --**

16   **that led to you writing a $400 check.  You recall**

17   **that testimony; yes?**

18        A     Yes.

19        Q     **Did Mr. Neverson give you those clothes**

20   **before or after you wrote the check?**

21        A     No.  He give me the clothes before I

22   even -- you know, before I give him the check.

23        Q     **When did he give you those clothes?**

24        A     It would have been about maybe

25   three weeks or four weeks before.  I don't

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 162

```
 1   remember --
 2        Q    Three or four weeks before?
 3        A    Yes.  But I don't remember exactly
 4   when.
 5        Q    Okay.  Why didn't you pay him before
 6   your trip if he had given you the clothes three or
 7   four weeks before?
 8        A    Well, that was the agreement.  That was
 9   an agreement between him and that I will pay him,
10   you know, before I left on my trip to Lagos.  I
11   tell him --
12        Q    You said you had reached an agreement
13   with him that you'd pay him right before you took
14   your trip to Lagos?
15             MS. MOLDEN:  Object to the form.
16        A    Yes.  He --
17        Q    (By Mr. Stone)  I'm sorry?
18        A    At the time when he approached me, I
19   didn't have the money in my hand to pay him.
20   and I told him -- I said, okay.  I will pay him
21   once -- I mean, before my trip to Lagos comes up.
22             And he said, okay.
23        Q    So you didn't have any money in your
24   bank account to pay him at that time?
25             MS. MOLDEN:  Object to the form.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha
August 27, 2020

Page 163

1        A        Mr. Stone, like I said, I did not have

2    money at the time to -- you know, to settle with

3    him before my trip to Lagos.

4        Q        **(By Mr. Stone)  Did you ask him to buy**

5    **these jeans and shoes for you?**

6        A        Yes, I did.

7        Q        **Okay.  Tell me about that conversation.**

8    **How did that happen?**

9        A        It was just because he had the same

10   type of jeans, and he was wearing it.  And, you

11   know, I like them.

12               I asked him, could you, you know, get

13   me some of these?

14               He said yes, he would.

15               And I just give him my size, you know,

16   and he provide me with it.

17       Q        **I didn't hear the last thing you said.**

18       A        He was wearing the same type of clothes

19   that we're talking about now, and it pleased my

20   fancy.

21               I asked him, I said, where did you get

22   them from?  And he told me.  I said, the next time

23   you go there, just, you know, bring me three

24   slacks and one sneakers.

25               And he said, okay.  So --

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 164

1    Q      Did you tell him how much to buy?

2    A      Mr. Stone, like I said, you know, it

3   was $400 and some change.  But then, you know, I

4   just give him a check for $400.

5    Q      You told him -- you know, when you were

6   having the conversation with him and you asked him

7   to buy the materials, the jeans and sneakers --

8    A      I didn't.  Mr. Stone --

9    Q      -- what did you tell him about how much

10  to buy?

11   A      Mr. Stone, I didn't -- you know, you

12  don't go to the store and -- you don't know how

13  much the merchandise costs until you get there.

14          So when I saw he was wearing the same

15  clothes and I like it, I told him, I said, look.

16  I like this style.

17          And he told me where he bought it.

18          I said, the next time you go there,

19  please bring me three slacks and the sneakers.

20  so -- and that was what he did.

21   Q      Okay.  So he told you where he bought

22  them?

23   A      Yes.

24   Q      Where was that?

25   A      It's in Bodiford, New York.  I don't

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 165

```
 1   know which store in New York.  So --
 2       Q     So he went to New York and bought them
 3   in New York?
 4       A     Yeah.  But I don't know which store.
 5   So --
 6       Q     All right.  You took a trip to Orlando
 7   on September 30th.  Do you recall that?
 8       A     Yes.
 9       Q     All right.  And when did you make the
10   plan to take that trip?
11       A     Actually, that trip was not planned.
12   When I was running on my program in church in
13   Nigeria, my wife called that my first son -- whom
14   I mentioned earlier in college at the University
15   of Central Florida -- was terribly sick.
16            And the school had called that one of
17   us need to come down there and pick him up.  So
18   then my wife flew down to Orlando by herself and
19   wanted to bring my son -- she flew to Orlando on
20   the 28th.
21            But my son said he was okay, that he's
22   not coming home with my wife.  So my wife looking
23   at his condition.  You know, she seemed so
24   disturbed.  So she didn't want to leave him alone.
25   So she called me that this is the situation, that
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 166

1    she's in Orlando.

2            I said, okay.  Anyway, I am wrapping up

3    program tonight.  I'll be --

4        **Q      Mr. Oniha, I apologize.  You're**

5    **speaking so fast.  I cannot understand what you're**

6    **saying.  So start the story again, please.**

7        A     Okay.  My trip to Orlando was not

8    planned initially.  But when I was in Lagos

9    wrapping up my program in the church, my wife

10   called that my first son, Emanuel, age 22 that I

11   described earlier, that he was terribly sick, and

12   he was in school in Orlando.

13           The school had called that either me or

14   my wife should come and pick him up.

15           Are you there with me so far?

16       **Q      Yes.  I'm with you so far.**

17       A     Okay.  So my wife flew to Orlando on

18   the 28th to pick him up, but my son refused to

19   come with my wife.  He said he's okay, that he's

20   not coming home.  That he's okay.  So my wife was

21   disturbed.

22       **Q      Okay.**

23       A     All right.  So she called me that day.

24   This is the situation at home.

25           I said, okay.  Don't panic.  That I'm

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 167

1    wrapping up my program today on the 29th, and I'll

2    get on the flight in Lagos on the 29th.  Then I'm

3    coming home.

4              Then once I get to Atlanta, instead of

5    going to the house, I will just come to Orlando to

6    join her.  So at least we can encourage my son to

7    come home with us.  And that was what I did.

8        Q     Okay.  So you fly home from Lagos;

9    correct?

10       A     Yes.

11       Q     All right.  And tell me, did you come

12   into F Concourse?

13       A     Yes.  Usually the international flight

14   comes through either E Concourse or F Concourse,

15   but our flight came in through F Concourse.

16       Q     Okay.  When your -- going back for a

17   moment.  It was your wife who called you and told

18   you that your son was ill; correct?

19       A     Yes.

20       Q     What was your son's medical condition?

21             MS. MOLDEN:  Object to the form.

22       A     He was just -- he was sick just like,

23   you know, I guess he was homesick.  Whatever you

24   call it.  He was sick, you know.

25       Q     Hold on a second.  He didn't have a

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 168

1    medical condition?  He was homesick?

2         A      Yeah.  He was just sick.  And the

3    school had called that, you know, he's sick, and

4    he has missed, you know, some of his classes.  And

5    it was giving them concern.

6              So they called my wife, like, you know,

7    maybe we need to bring him home and, you know,

8    just see to his situation.

9         Q      He wasn't physically ill?  He was

10   homesick?

11        A      Mr. Stone, like I said, I don't know

12   how you want me to put it.  He was sick, and the

13   school called us that, you know, one of us need to

14   to come to the school and pick him up.  So --

15        Q      Okay.  And what I'm trying to

16   understand is did he have a physical illness, or

17   was he homesick?  What was the nature of his

18   illness?

19        A      He was physically sick.  Physically

20   sick.

21        Q      Did he have a diagnosis?

22        A      No, he doesn't.  He did not.

23        Q      Okay.  So he wasn't diagnosed with any

24   medical condition or anything?

25              MS. MOLDEN:  Object to the form.  He

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 169

1    answered the question.

2         Q    (By Mr. Stone)  All right.  Okay.  And

3    your wife would have called you on your cell phone

4    in Lagos to tell you about this on the 28th, you

5    said?

6         A    Yeah.  Because when I get to Lagos, my

7    phone had died.  There was no way she could reach

8    me.  But then she called the guesthouse where I

9    was staying at, you know, to reach out to me, to

10   bring the news to me.

11        Q    Got it.

12             So you couldn't use your cell phone in

13   Lagos?

14        A    Yeah.  Because, one, you know, I have

15   to convert it to Lagos and all that.  And second

16   of all, the phone was dead.  And so she couldn't

17   call.

18        Q    How long was your phone dead during the

19   time you were in Lagos?  Was it the whole time?

20        A    Yeah.  Like I said, even when I was in

21   Lagos, I couldn't even use my phone because I

22   don't have the capability on my phone, you know,

23   for it to work here in the United States -- I

24   mean, in Nigeria.

25        Q    I'm with you.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 170

1          Okay.  When you flew down to Orlando to

2   get your son, did he fly back with you?

3       A    Yes.  All of us, we came together.

4   Myself, my wife, and my son.

5       Q    All right.  So I apologize.  I took a

6   little detour there.

7          Coming back from Lagos, you come

8   through TSA security?

9       A    Right.

10      Q    I'm sorry.  You come through customs?

11  You clear customs; correct?

12      A    Correct.

13      Q    All right.  And then you go back

14  through TSA security; correct?

15      A    Yes.

16      Q    All right.  So you were, again, in the

17  sterile area of the airport; correct?

18      A    Yes.

19      Q    All right.  And then at one point, like

20  when you were going to Lagos, coming back from

21  Lagos, you used your SIDA badge and left the

22  sterile area of the airport and went down to the

23  ramp; correct?

24      A    Okay.  Correct.  Okay.

25          Can I interrupt you for a minute, sir?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 171

1      Q      You've got to answer my question first.
2    And then if you have an explanation -- if your
3    explanation is not clear or your answer's not
4    clear, you can explain it.
5           But was my question correct?
6      A      Yeah.  But not immediately.  No, not
7    immediately.
8      Q      You didn't go downstairs immediately?
9      A      No.  No.
10     Q      Okay.  Where did you go within the
11   airport before you went downstairs?
12     A      As soon as I cleared customs upon
13   arrival, then I went upstairs, list myself on the
14   Orlando flight because I was not listed.
15           So then I went to TSA.  Went to -- you
16   know, to the gate assigned, Terminal 6, T-6.
17     Q      Okay.  All right.  And was it at that
18   point you went downstairs?
19     A      Yes.
20     Q      Okay.
21     A      Yes.
22     Q      And where did you go downstairs?
23     A      Yeah.  Again, I went to Tango 6.  That
24   was where my flight was scheduled to be departed.
25   And I have three hours before my flight leaves.

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 172

1          And I went downstairs to Zone 9 break

2   room where my locker was.

3        Q     All right.  Let me make sure I

4   understand.  You used your SIDA badge to go

5   downstairs; correct?  You swiped out?

6        A     Yes.  Yes.

7        Q     All right.  So you go downstairs to the

8   break room.  And what do you do in that break

9   room?

10       A     Well, all I did was removed some of my

11   stuff in my locker -- from my locker and took them

12   down to my new locker in A North because the next

13   day the new bid starts.

14       Q     All right.  And you had changed

15   locations is your testimony?

16       A     Yes.  Yes.

17       Q     All right.  And so how did you get from

18   T to A?

19       A     No.  I took the -- I took the train.  I

20   took the concourse train from T to A because I was

21   carrying my uniform, snow boots, whatever you want

22   to call it.  Everything was in --

23       Q     Okay.  Where did you get on to come --

24   did you come back into the sterile area to get on

25   the train?  How did you get on the train?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 173

1        A       Yeah.  As soon as I finished, I get on

2    the stair area.  Then took the train, you know, to

3    A Concourse.  Then put the stuff in my new locker

4    there in A North.  Then took the train back, you

5    know.  Then maybe three -- you know, a few times.

6        **Q       So each time, you'd go down -- use your**

7    **SIDA badge, go downstairs, get your stuff, bring**

8    **it up, take the train, then use your SIDA badge to**

9    **go back downstairs and put it in your locker and**

10   **then repeat?**

11       A       Yes.  That was what I did, sir.  Yes.

12   Yes.

13       **Q       All right.  And the last time that you**

14   **did this, you're in the locker -- the A -- at your**

15   **locker in the A Concourse; correct?**

16       A       Yes.  Yeah.  In my new area.  In my new

17   work area.  Yes.

18       **Q       Okay.  And then where do you come back**

19   **into the sterile airport?  Through A?**

20       A       Yeah, through A.  I just -- you

21   know, I --

22       **Q       Do you remember which door?**

23       A       Yes.  It would have been in front of --

24   I'm beginning to lose my (inaudible).  Gate --

25   right there by the -- it's been a while.  Right

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha
August 27, 2020

Page 174

1    there by -- you know, by the pilot, you know,

2    flight attendant lunch area.  I remember there's

3    a -- Gate 21.  Gate 21.  Excuse me.

4         Q     Okay.  You came in by the security door

5    at Gate A-21?

6         A     Yes.

7         Q     Okay.  And then at some point, did your

8    gate -- the departure gate change?

9         A     Yes.

10        Q     Okay.  Where did it change to?

11        A     Yeah.  When I went up to -- when I went

12   up to Tango 6 -- you know, in front of there, you

13   know, there was a gate change announcement that

14   was made.  You know, and that happens all the time

15   anyway.

16              And now, you know, I come back to

17   Alpha 21 and board my flight.

18        Q     Okay.  I don't understand.

19              So you came back -- the last time you

20   moved your stuff, you came back up by the door at

21   Gate A-21; correct?

22        A     Yes.

23        Q     Okay.  And then what did you do after

24   that?  You're at Gate A-21.  Where did you go?

25        A     I went back to Tango 6, the original



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 175

1    gate to where my flight was supposed to leave for

2    Orlando.

3          **Q     Okay.**

4          A     So when I got there, I found out that

5    there was a gate announcement -- I mean, a gate

6    change announcement made, you know.

7          **Q     Okay.**

8          A     And I had to now come back to, you

9    know, Alpha 21.

10         **Q     Got it.**

11         A     And I board my flight to Orlando.

12         **Q     So you went from A to T back to A?**

13         A     Yes.

14         **Q     I got you.**

15                **But you stayed in the sterile area the**

16    **whole time?**

17         A     Yes.

18         **Q     Got it.  All right.**

19                **And then you got on your plane, and you**

20    **flew to Orlando?**

21         A     Yes, sir.

22         **Q     Got it.  All right.**

23                **At some point, you were called in for**

24    **an investigation of your SIDA badge usage and**

25    **these particular events we were just talking**

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

1    about; correct?

2         A    Yes.  Yes, sir.

3         Q    All right.  And that happened in July

4    of 2019; is that correct?

5         A    Yeah.  July 2nd, 2019.  Yes.

6         Q    All right.  And who called you to tell

7    you that you were going to have such a meeting?

8         A    It was Mr. Forts, Roderick.

9         Q    Roderick Forts told you that?

10        A    Yes.

11        Q    Okay.  And did he tell you where to go,

12   or did he come get you?  How did you get to the

13   meeting?

14        A    No.  This is what -- I was working the

15   flights.  Then he told Mr. Abby Hawkins to bring

16   me to his office.  Okay?

17             So then Mr. Hawkins tell me just leave

18   whatever I'm doing, and I just follow him.

19   Everything was on hold.  Then we went to

20   Mr. Forts' office.  So as soon as we get to his

21   office, then Mr. Forts told Mr. Hawkins that he

22   can go.

23        Q    Okay.

24        A    Okay.

25        Q    And so you're in there with Mr. Forts;

1   is that correct?

2       A     Yes.  I was there with Mr. Forts.  I

3   ask him --

4       Q     Okay.

5       A     Okay.  Go ahead.

6       Q     What happened next?

7       A     So he said, we have a meeting with

8   somebody.  He didn't tell me who.

9             I said, okay.

10            So we were there, you know, for almost

11  about 45 minutes.

12            I said, Mr. Forts, who are we having a

13  meeting with?

14            He said, with somebody.  He didn't tell

15  me who the person was.

16            Then almost about 50 minutes later,

17  then the corporate security man and an

18  African-American lady from HR -- so they went to

19  the conference room.  So they now confer on the

20  phone; that they're over there, that we should

21  come.  So we all went there.

22      Q     Okay.  So there's four people including

23  you in the meeting?

24      A     Yes.

25      Q     Okay.  It's the corporate security

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 178

1   person.   Do you know who that was?

2      A      Yeah.   This man that we're talking

3   about, Mr. George Taylor.

4      Q      George Taylor.   Okay.

5             And Mr. Forts was in the meeting?

6      A      Yes, Mr. Forts was in the meeting.

7      Q      And you're in the meeting?

8      A      Yes, I was.   And an HR female

9   African-American.

10     Q      Do you remember who it was?

11     A      I don't know.   That was my first time

12  seeing her.   I don't know who she was.

13     Q      Was it Michelle?

14     A      Sir -- like I said, sir, I don't even

15  know who she is, which is why I referred to her --

16     Q      And you don't remember her name?

17     A      I don't.

18     Q      Okay.   All right.   Do you remember if

19  Kiha Jones was the human resources person?

20     A      Like I said, I don't -- you know, I

21  don't remember her name and -- which is why I

22  refer to her as -- the same way I refer to the

23  corporate security man.   You know, I don't

24  remember her name.   All I know she's

25  African-American with a low-cut hair.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

```
 1          (Whereupon a document was identified
 2       as Defendant's Exhibit 16.)
 3       Q     I'm with you.  All right.
 4             Okay.  Mr. Oniha, this is a report
 5    prepared by corporate security.  And I want you to
 6    go to page 2, the second paragraph.
 7       A     Okay.  Hold on one second.
 8             Okay.  What page are we going to?
 9       Q     The second page.  You'll see a
10    paragraph that begins with 7-2-19.  It's the
11    second paragraph on the second page.
12       A     Okay.  Okay.
13       Q     Do you see that paragraph 2 on
14    Exhibit 16, page 2?
15       A     Yeah.  Hold on.  Yes.
16       Q     Read that paragraph silently to
17    yourself -- that's about the meeting we're talking
18    about right now -- and tell me if that paragraph
19    is accurate.
20       A     Yes.  It is accurate.  Just as I stated
21    earlier.  Yes.
22       Q     Okay.  That's accurate.
23             Can you recall anything else about the
24    discussion at that 7-2-2019 meeting other than
25    what's in that second paragraph?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                    August 27, 2020

Page 180

```
 1              MS. MOLDEN:  Mr. Oniha, can you stop

 2    reading and listen to his question?

 3              THE WITNESS:  Yes.

 4       Q     (By Mr. Stone)  Mr. Oniha, my question

 5    is -- I'll repeat it -- other that what's in the

 6    paragraph you just read --

 7       A     Right.

 8       Q     -- can you recall anything else about

 9    what was discussed during the July 2, 2019 meeting

10    that involved you and Mr. Forts and Mr. Taylor and

11    an HR person who I believe was Kiha Jones?

12       A     Yes.  There is something, you know,

13    stated -- said by Mr. George Taylor, which when I

14    find out who he is, that is not here in this

15    statement.  And --

16       Q     Okay.  Tell me about that.

17       A     You want me to tell you about that?

18       Q     Yes.  Tell me any other things that

19    were discussed during that meeting.

20       A     Okay.  So he asked me questions about

21    all this itinerary.  And just as I was trying to

22    explain to him -- you know, so he told me I should

23    not dare him.  And that after so many years of

24    experience with the FBI, if he sees a criminal,

25    that he will recognize him.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                        August 27, 2020

Page 181

 1       Q      Say that statement again.  I didn't
 2   understand you.
 3       A      Okay.  He stated -- as he asked me
 4   questions about this and I was trying to explain
 5   to him about the circumstances behind why I did
 6   what I did, and he got angry.
 7              He told me I should not dare him.  That
 8   in so many years of experience in the FBI it
 9   afforded him the opportunity to recognize a
10   criminal when he sees one.
11       Q      Okay.  Anything else that he said?
12       A      And he told -- he took control of my
13   SIDA badge, and he then instructed Mr. Forts
14   specifically.  He said make sure that he collects
15   the SIDA badge from me and the corporate ID from
16   me.
17       Q      Okay.  Other than those discussions,
18   was there anything else that was talked about
19   during the meeting that you can recall?  Or have
20   we exhausted it?
21       A      Well, those are the clear things that I
22   can remember that was said, which does not stand
23   out in my head.
24       Q      Okay.  There's nothing else that you
25   can recall about that meeting; is that correct?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 182

1      A      Yeah.  As soon as that meeting was

2   over, you know, Mr. Forts walked me out of -- you

3   know, escorted me out of the property, and I

4   handed him over the corporate ID as well as the

5   SIDA.

6      **Q      Okay.**

7      A      And that was that.

8      **Q      Okay.  You were asked also to write a**

9   **statement; correct?**

10     A      Yes.

11     (Whereupon a document was identified

12     as Defendant's Exhibit 17.)

13     **Q      All right.  Mr. Oniha, Exhibit No. 17**

14  **is now up on the screen.  Take a look at that, and**

15  **let me ask you if that's your handwritten**

16  **statement.**

17     A      It is.  Yes.

18     **Q      Okay.  When was the last time you**

19  **looked at that statement?**

20     A      Okay.

21     **Q      Okay.  When was the last time you**

22  **looked at the statement was the question.**

23     A      No.  I never -- I don't look at the

24  statement because I think, you know, I never had

25  access to it because it was a statement that I

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                August 27, 2020

Page 183

```
 1   wrote on July 2nd.  So --
 2        Q     Where were you when you wrote that
 3   statement?
 4        A     It was in that conference room where
 5   all four of us were meeting at.
 6        Q     All right.  And who did you give it to?
 7        A     I give it to Forts because --
 8        Q     Mr. Forts.  Okay.
 9              So you just handed it to him?
10        A     Yes.
11        Q     And you didn't keep a copy?
12        A     No, I did not.  I mean, there was --
13   yeah.  I did not.
14        Q     All right.  I'm with you.
15              And then was that before Mr. Forts
16   walked you out?
17        A     Yeah.  As soon as I handed over him the
18   letter, then he asked for the SIDA badge and the
19   corporate ID.  And I gave it to him, and that was
20   it.  It was after the letter was written.
21        Q     You may have answered this.  I want to
22   make sure I'm clear on this.
23        A     Okay.
24        Q     You were asked to write a statement,
25   and you wrote this statement at the end of the
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 184

1    meeting that we've been talking about; correct?

2         A    Yes.

3         Q    All right.  Were you in the room by

4    yourself when you were writing this statement, or

5    were there people in there?

6         A    Forts was there, but he was in and out,

7    you know, just to check on me, you know,

8    periodically.

9         Q    Okay.  Mr. Taylor and the HR person had

10   left however?

11        A    Oh, they had left.

12             And, again, he instructed Mr. Forts to

13   collect the Delta Air Lines property in my

14   possession, which is the SIDA badge and corporate

15   ID.

16        Q    I can't understand you.  Say that

17   again.

18        A    Yes.  He had instructed Mr. Forts to

19   collect Delta Air Lines property in my possession,

20   corporate ID and the SIDA badge.

21        Q    I got you.  Okay.

22             All right.  Is there anything else that

23   happened in that meeting or that was said in that

24   meeting that we have not talked about?

25        A    Except that they were asking me

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 185

1   questions that made me feel uncomfortable.  How

2   often do I travel to Nigeria?  This trip that I'm

3   going -- that I went, did somebody give me any

4   load to carry or maybe give to somebody for them?

5   Was I given any kind of money?  You know, what was

6   the weight of the luggage that I was traveling

7   with?  All kinds of things.  Stuff like that.

8        Q     Anything else that you can recall?

9        A     And the statement was, you know, hmm,

10  you are just going for five days.  Must be nice.

11       Q     Okay.  Anything else?

12       A     I mean, those are some of the -- you

13  know, those are the things that I can remember

14  right now.

15       Q     Okay.  Can you remember anything else

16  right now?

17       A     No.

18       (Whereupon a document was identified

19       as Defendant's Exhibit 18.)

20       Q     All right.  You subsequently prepared a

21  typewritten statement in addition to your

22  handwritten statement; correct?

23       A     Yes.

24       Q     Okay.  Were you asked to prepare a

25  typewritten statement, or was this something that

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 186

1    was done by you voluntarily or in addition to the

2    statement that you provided in handwritten form?

3        A    No.  I did this -- I did this, you

4    know, voluntarily on my own.

5        Q    You did this on your own.

6             When did you do this?

7        A    Yeah.  After I wrote the first

8    statement, I found out, you know, that it probably

9    won't be legible for anybody to read.  Then I

10   prepared this.  This is more legible, and somebody

11   can be able, you know, to read and understand it

12   very clear.

13            So it was probably when I get home the

14   next day -- I mean, that same day or the next day.

15   Yeah.  The next day.

16       Q    Okay.  You wrote it the next day when

17   you got home?

18       A    Yes.

19       Q    All right.  And you wrote it on your

20   computer, I presume?

21       A    Yes.

22       Q    All right.  It's still there, I

23   presume?

24       A    Yes.

25       Q    All right.  Have you given everything

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

1    that's on your computer -- have you given it to

2    your attorney?

3         A    Yes, I did.  Everything that I had,

4    yes, I did.

5         Q    All right.  When did you do that?

6         A    Well, as soon as we had a conversation

7    and she choose to retain me, and then she asked

8    for all this information and the subsequent

9    information as you, Delta Air Lines, demands.  And

10   I forwarded it to her.

11        Q    Okay.  Did you send it by email?  Did

12   you print it all out?  How did you get her all the

13   information that's on your computer?

14        A    Yeah.  Some of them were sent by email.

15   Some were printed out, and I handed over.

16        Q    Okay.  You can't remember which were

17   printed and which were emailed, though?

18        A    No.  I couldn't remember which one.

19        Q    All right.  But you gave them all to

20   her one way or the other?

21        A    Yes.

22        Q    Okay.  And that was the time that you

23   retained her?

24        A    Yes.

25        Q    Okay.  So before the Complaint was

Page 188

```
 1   filed?

 2              MS. MOLDEN:  I object to the form

 3   because that's misstating the testimony.

 4        Q    (By Mr. Stone)  Okay.  Did you retain

 5   her before the Complaint was filed?

 6        A    I retained her before I -- I retained

 7   her before I sent all the required documents.

 8        Q    Okay.  But you sent all the documents

 9   before the Complaint was filed?

10              MS. MOLDEN:  Object to the form.

11        Q    (By Mr. Stone)  You can answer,

12   Mr. Oniha.

13        A    Yeah.  As you demand for additional

14   documents, then I sent them to her.  I don't know

15   when --

16        Q    Got it.

17        A    Okay.

18        Q    All right.  This statement that we're

19   looking at, Exhibit No. 18, Mr. Oniha --

20        A    Okay.

21        Q    -- did you submit it to Delta?

22        A    Yes.  I think -- yeah.  I submit a copy

23   of this to the general manager.  The person named

24   Mr. Chris Bowen.

25              I submit a copy of this to
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 189

1   Mr. -- I believe to Mr. Gregory Kennedy when I

2   just run around asking for help to -- you know, to

3   help with my reinstatement and all of that kind of

4   stuff, to prove my case for them.

5              But, you know, I know for sure that

6   Mr. Chris Bowen have this letter.

7        Q     Okay.  How did you get it to Mr. Chris

8   Bowen?

9        A     I email it to him and also sent a copy

10  through an employee who was working there, you

11  know.

12       Q     Who was that employee?

13       A     Mr. Nicholas.

14       Q     Mr. Nicholas?

15       A     Yes.

16       Q     Is that his first name or his last

17  name?

18       A     No.  That's his first name.  Imarhiagbe

19  is the first name.

20       Q     What is it?

21       A     Imarhiagbe is his last name.

22       Q     Spell it.

23       A     Okay.  I-m-a-r-i-a-g-b-e [sic].

24       (Whereupon a document was identified

25       as Defendant's Exhibit 19.)

Page 190

1         Q      All right.  Click on, Mr. Oniha, the

2    next document, Exhibit No. 19.

3         A      (Witness complies with request of

4    counsel.)

5         Q      All right.  Is that a statement that

6    you wrote on July 13th, 2019?

7         A      Yes.

8         Q      Okay.  And that's a document that you

9    would have done at home on your computer as well?

10        A      Yes, I did.  Yes.

11        Q      All right.  What prompted you to write

12   this statement?

13        A      Again -- let me just back up a little

14   bit.

15               When I was told that the meeting from

16   the second -- they were going to conduct an

17   investigation, and it was taking longer than

18   necessary.

19               So I now wrote a letter to Mr. Chris

20   Bowen who was the general manager there, you know,

21   to see what he can do, you know, to help with my

22   the reinstatement or to see why it's taking so

23   long for investigation to be concluded.  So that

24   was what prompted that.

25        Q      Okay.  So was this a letter that was

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 191

1    written to Mr. Bowen?

2        A    Yes.

3        Q    Okay.  And how did you get this letter

4    to Mr. Bowen?

5        A    As I just stated earlier, that

6    Mr. Nicholas Imarhiagbe would help me.  But when

7    he got to Mr. Bowen's office, he wasn't there.  So

8    I guess maybe he left it with administrative

9    assistants.  So some --

10        Q    I just misunderstood.  I'm not fully

11    understanding what you're saying.

12             You gave this letter to Mr. Bowen?

13        A    I did not give it to him by myself, but

14    I sent an employee who was working A North at the

15    time, the person of Mr. Nicholas Imarhiagbe that I

16    just gave you.

17             But when he got to the office,

18    Mr. Bowen wasn't there.  But he handed the letter

19    to the administrative assistant to be given to

20    Mr. Bowen.

21        Q    Okay.  How do you know that?  Did

22    Nicholas tell you that?

23        A    Yes, he told me that.  Yes.

24        Q    Okay.  When did he tell you that?

25        A    Round about the same time that, you

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 192

1    know, the letter was written and given to him, you

2    know, to be submitted.

3        Q    All right.  The first sentence of this

4    letter, Exhibit No. 19, is a thank you by you for

5    the "zealous and un-relented efforts ... to

6    retrieve my SIDA badge."  Do you see that?

7        A    Yes.

8        Q    Did Mr. Bowen do something specific to

9    retrieve your SIDA badge that you were thanking

10   him for?

11       A    Yeah.  Because when that incident

12   happened on the 14th -- you know, of course, he's

13   the general manager.  His attention was called to

14   it, and it was on the weekend.

15            Then on Monday, he called me that,

16   Mr. Oniha, he is aware of what happened -- or he

17   was made to be aware of what happened on Friday --

18   I mean, on Saturday.  So that he had called DOA to

19   retrieve my badge, and he's working on.

20       Q    So you called him, and he said he was

21   working to get your badge back?

22       A    Yes.

23       Q    Okay.  Did he tell you anything else?

24       A    No.  He said that, you know, he's

25   working on it.  And that as soon as he got it,



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 193

1    that he would call back.  So --

2         Q    Okay.  He didn't say anything else?

3         A    No.  What he said was once my badge is

4    reinstated, that he would have to have a meeting

5    with me, you know.  So -- and that meeting never

6    took place.

7         Q    All right.  Am I correct in

8    understanding that you were informed by Mr. Forts

9    that you were being terminated?

10        A    Yeah.  Mr. Forts was the one that

11   called me, you know, to let me know that, oh --

12   that after the reinvestigation, that they have

13   decided to move forward to end my employment with

14   Delta Air Lines.

15             Mr. Forts was the one that -- he was

16   the one that made that phone call.

17        Q    Was there anybody else on the call or

18   just the two of you?

19        A    I wouldn't know.  I don't know who was

20   there at his end, but it was just me that I was

21   just on the phone by myself.  I don't know who was

22   there with him when he made that phone call.

23        Q    Did he say anything else?

24        A    He told me that at this point -- I

25   mean, at that point, that I need to either resign,



Page 194

1   or they will move forward and fire me.

2          And I told him --

**3          Q     Okay.**

4          A     And I told him, I can't -- I'm not

5   going to give him any answer.  I have to speak

6   with my lawyer first before I make any decision.

7          And he said I have 24 hours to do that.

8          I never call him back.

**9          Q     You never called him back after that?**

10         A     No.

**11         Q     Okay.  Do you know who decided that you**

**12  should be terminated?**

13         A     It was Mr. -- like I said, this

14  decision was reached based on the conversation

15  that I had with Mr. Forts, Ms. Jones from the HR,

16  and Mr. George Taylor.

**17         Q     Okay.**

18         A     That was actually when they decided

19  that they were going to end my employment with

20  Delta Air Lines.

**21         Q     How do you know the decision was made**

**22  at that time?**

23         A     Yeah.  Because no investigations were

24  conducted.

**25         Q     How do you know that?**



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 195

1       A      Because, I mean, if they do that, they

2    would have at least said, based on X, Y, Z, you

3    know -- based on these factors, we have decided to

4    end your employment, you know.  So that was not

5    done.

6       **Q      You don't know what other investigation**

7    **was done after the meeting, do you?**

8       A      No, I did not.  But I am just saying

9    that based on the conversation that we had, you

10   know, during the course of that meeting.  So it

11   was just an evidence that, you know, they have

12   decided that they were going to, you know, end my

13   employment with Delta Air Lines.

14      **Q      How do you know that?  How do you**

15   **know it was that meeting as opposed to something**

16   **else?**

17      A      Because, I mean, what could it have

18   been, sir?  You know, I don't have any -- you

19   know, any other thing.  I have not -- I don't have

20   any -- you know, I have not done anything that

21   could potentially, you know, lead to my -- to the

22   end -- the separation of my employment apart from

23   this statement from Mr. George Taylor that I made.

24             My question is, is why do you have to

25   wait until --

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

```
 1              MS. MOLDEN:  Mr. Oniha?
 2      Q     (By Mr. Stone)  Mr. Oniha, you need to
 3   answer my question.
 4              MS. MOLDEN:  I'm sorry.  I'm sorry.
 5              THE COURT REPORTER:  That's okay.
 6   You've been muted.
 7              MS. MOLDEN:  I'm having a hard time.
 8   Can you slow down, Mr. Oniha?  Because I'm not
 9   even following you right now.
10              THE WITNESS:  Okay.  All right.  Okay.
11      Q     (By Mr. Stone)  Mr. Oniha, let me ask
12   my question again.
13              The question is:  Do you know who made
14   the decision to terminate your employment at
15   Delta?
16      A     I guess it is Mr. George Taylor.
17      Q     How do you know that?  Why do you say
18   that?
19      A     Because he's the one that initiated all
20   these investigations.
21      Q     Because he participated in the
22   investigations, that's different, though, from
23   deciding to end your employment.
24      A     No.  He did not just participate.  He
25   initiated it.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                      August 27, 2020

Page 197

1        Q      He what?

2        A      He is the one that initiated this

3    investigation.

4        Q      Yes.  I understand that you said that

5    he's the one that said there was going to be an

6    investigation.

7               My question is:  Who decided after the

8    investigation that your employment should end?  Do

9    you know the answer to that question?

10       A      I couldn't answer that question because

11   I wasn't there.  I wasn't there.

12       Q      Okay.  All right.  You appealed your

13   termination, though, correct, after Mr. Forts told

14   you you were terminated?

15       A      Yes, I did.

16       (Whereupon a document was identified

17       as Defendant's Exhibit 21.)

18       Q      Okay.  Click on, if you would, Exhibit

19   No. 21.

20       A      (Witness complies with request of

21   counsel.)

22       Q      And you can page down.  It's a two-page

23   document.  And you'll see your appeal letter at

24   the bottom.

25       A      Okay.

Page 198

1        Q       Okay.   My question is simple.   Is that
2   the appeal letter that you sent?

3        A       Yes, that's the letter.   Yes.

4        Q       Okay.   You never sent any other appeal
5   letter just to be clear?

6        A       No, I never did.   No.   That was the
7   only one.

8        Q       Okay.   And you did not say in that
9   appeal letter anything about the statements that
10  you say Mr. Taylor made on the day of the lunch
11  inspection; correct?   The statements about
12  Nigerians?

13       A       Hold on.

14               Okay.   So the question was --

15       Q       Yes.   The question was:   You don't say
16  anything in there -- anything about any alleged
17  statements by Mr. Taylor relating to Nigerians;
18  correct?

19       A       No, I don't.

20       Q       Okay.   And you never told Delta about
21  those statements before your termination or even
22  during your appeal; correct?

23       A       Phrase that question again.   Ask the
24  question --

25       Q       Yeah.   You never sent Delta your

Page 199

1    statement about these alleged statements or said

2    anything to Delta about these alleged statements;

3    correct?

4              And then my question would be:  Why

5    not?

6        A    Because I never -- I mean, I never knew

7    that my -- you know, that I was going to be, you

8    know -- I was going to be terminated.  I never

9    knew.  So --

10       Q    Well, you knew by the time of your

11   appeal that you were terminated; correct?

12       A    Yeah.  Yeah.  Yes.  I know after.  Yes.

13       Q    And you still didn't tell Delta about

14   these statements; correct?

15             And my question is:  Why?

16       A    Again, I was trying to, you know, see

17   if I could get my job back.  I don't want to say

18   anything that will potentially threaten, you know,

19   my chance of, you know, getting my job back.

20       Q    Okay.  And that's why you didn't tell

21   Delta?

22       A    That's why they don't, you know --

23             THE COURT REPORTER:  Hold on one

24   second.  I've got some kind of plane flying low.

25   I can't hear you.  I apologize.

Page 200

```
 1              MR. STONE:  That's all right.

 2              THE COURT REPORTER:  You just need to

 3    start the question again.

 4         (Technical difficulties and an

 5         off-the-record discussion ensued.)

 6         Q    (By Mr. Stone)  I'll ask the question

 7    again, Mr. Oniha.

 8              Is that the reason that you did not

 9    tell Delta about Mr. Taylor's alleged statement?

10         A    Was that question for me, or it's

11    for --

12         Q    For you, Mr. Oniha.  Yes.

13         A    Yeah.  Because I don't want to, you

14    know, jeopardize the chances of me, you know, you

15    know, winning my appeal.  Hence, I did not

16    indicate those profanity words used by Mr. George

17    Taylor.

18         (Whereupon a document was identified

19         as Defendant's Exhibit 22.)

20         Q    Okay.  I'm going to ask you to look at

21    Exhibit 22 for a minute, Mr. Oniha.

22              Mr. Oniha, read, if you would, the

23    second entry on this document, 8-1-2019, called

24    Appeal Call.

25              Take your time, and I'm going to ask
```

Page 201

1    you just a couple questions about it.

2        A    Okay.  Sir, what was your question?

3        Q    **Sure.  Have you read now that entry**

4    **about the Appeal Call?**

5        A    Yes.

6        Q    **Is it accurate?**

7        A    Yes.  I think.  Yes.  Yeah.

8        Q    **Okay.  Is there anything inaccurate**

9    **about it that you can see?**

10       A    The only statement that stands out that

11   (inaudible) stated which -- I called attention to

12   was that I was not --

13            THE COURT REPORTER:  I'm not

14   understanding.  I'm sorry.  Could you slow down

15   just a minute?  Go ahead.

16       A    Yeah.  What Jim Brimberry said, who

17   wrote this statement, I did not agree with.  And,

18   of course, there was no way I could, you know -- I

19   could call him or maybe ask him why he write what

20   he wrote.  He said that I was not very familiar

21   with the policy; and I was not really aware, you

22   know, that it was a violation, you know.

23            And I start to explain to him when we

24   had that conversation; but then, you know, we end

25   the conversation during our, you know, telephone

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 202

1    interview.

2        Q      (By Mr. Stone)   Okay.   Anything else

3    that's incorrect or inaccurate or incomplete?

4        A       In that letter, he said that I think it

5    wasn't right -- I don't know if it is true in the

6    legal setting -- was, you don't ask somebody who's

7    not a witness to write a report of incident that

8    he or she never witnesses.

9              So -- and I was trying to call his

10   attention to the best person to write the report

11   or to talk to me about the incident that happened

12   on the 14th would have been Mr. Jeter.  But you

13   see that Mr. Jeter was not mentioned here, you

14   know.

15       Q      Is that it?

16             MS. MOLDEN:  Ben, when you come to a

17   stopping point, I'm going to need a brief break.

18   I'm crashing a little bit here.

19             MR. STONE:  Sure.  That's okay.  Yeah.

20   I think once we're done with -- I think I've got

21   three more questions after we're done with this,

22   and then we can take a break.

23             MS. MOLDEN:   Okay.

24             MR. STONE:  And then I've probably got

25   15 minutes to finish up.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 203

```
 1              MS. MOLDEN:  Okay.

 2      A     I notice that he wrote that was not

 3  accurate was -- do you see that it don't have

 4  2014?  He need to have 2014 over there.

 5              I don't know if, you know, he was

 6  referring me to somebody else or maybe it was a

 7  typo, you know, if you look at the last part of

 8  that date, you know.  So --

 9      Q     (By Mr. Stone)  I'm sorry.  I don't

10  understand what you're saying.

11              Are you not talking about the last

12  entry now, 8-7-2019?

13      A     Yeah.  It's listed --

14      Q     Oh, I see.

15              Okay.  He told you that he didn't see

16  any discipline in your file; correct?

17      A     Yes.

18      Q     Okay.  All right.  Anything else that's

19  inaccurate or incomplete?

20      A     Well, that's all I can -- I mean, all I

21  can tell that he put on there.

22      Q     All right.  Exhibit No. 23.  Click on

23  that.

24      A     Okay.  One second.

25              Another thing he did when we had the
```

Page 204

```
 1   telephone conversation, he flipped on me a few

 2   times.  He said he was going to be in the

 3   conference room by himself.  We were supposed to

 4   have a meeting and set a time, you know, 2:00.  He

 5   changed all that.

 6           When we finally have it, he said that

 7   he cannot hold it in his conference room anymore.

 8   You know, all kinds of excuses.  But finally, you

 9   know, we do the telephone conversation, and I just

10   gave my response to his answer.  That's all.

11       Q     Okay.  Was there anybody else on the

12   call other than you and him?

13       A     Again, I can only speak for myself.  I

14   was just by myself.  I don't know who was there

15   with him.

16       Q     Okay.  Anything else that happened in

17   that call that's not in this memo or that we

18   haven't talked about?

19       A     No.

20   (Whereupon a document was identified

21       as Defendant's Exhibit 23.)

22       Q     All right.  Look at No. 23 for me,

23   please.

24           Okay.  Do you recognize Exhibit No. 23

25   as a letter that you received denying your appeal?
```

Page 205

```
 1        A    Yes.

 2        Q    Okay.  Did you have any communications

 3   with anybody at Delta about your termination or

 4   your appeal after you received that letter?

 5        A    No.  Except EEOC and my lawyer.

 6        Q    Okay.  But nobody at Delta?

 7        A    No.

 8        Q    All right.  Did you have any -- have we

 9   covered now all the communications that you've had

10   with Delta relating to your suspension from

11   employment or your termination?  Were there any

12   other communications we haven't talked about?

13        A    Yeah.  Well, we did not cover -- I

14   think that the operations security officer had

15   used his office to overreach --

16        Q    No.  I'm not asking about your opinions

17   or your legal claims, Mr. Oniha.  I'm asking about

18   communications you had with Delta.

19        A    No.  I didn't have no communications

20   with anybody.  No.

21        Q    Okay.  So have you told me all the

22   communications that at least you believe are

23   relevant to your legal claim?

24        A    Yes.

25        Q    Okay.  Have you told me about all the
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                                    August 27, 2020

1   communications you believe that constitute

2   inappropriate or discriminatory or other improper

3   comments by anybody in Delta management?

4        A     Yes.  Except this one here, this

5   opinion from Mr. Jim Brimberry.  There's a whole

6   lot of things that were not written right to my

7   understanding.

8        Q     I'm sorry.  I didn't understand that

9   sentence.

10       A     I said, this particular letter here

11  denying my appeal, you know, there is a whole lot

12  of things that were wrong with it that did not --

13  you know, that did not fit for me one way or the

14  other.

15            MS. MOLDEN:  Can you listen to his

16  question, and answer his question?

17       Q     (By Mr. Stone)  I understand you

18  disagree with the appeal.

19            MS. MOLDEN:  I'm sorry.  Can you listen

20  to his question, Mr. Oniha, and just answer the

21  question?

22            Ben, do you mind repeating that

23  question because I don't know what he's --

24            MR. STONE:  Sure.

25            Can you read it back, Libby?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 207

```
 1        (Whereupon the court reporter read back
 2        the referred-to portion as follows:)
 3        Q     Okay.  Have you told me about all the
 4   communications you believe that constitute
 5   inappropriate or discriminatory or other improper
 6   comments by anybody in Delta management?
 7        (Whereupon the reading back was concluded.)
 8        A     Yeah.  The meeting that I had with
 9   Mr.  George Taylor --
10        Q     You've told me about that.  I'm talking
11   about -- I'm talking about --
12        A     Yes.
13             MS. MOLDEN:  Ben, please let him finish
14   to see if he's saying anything else.
15             MR. STONE:  I'm trying to expedite this
16   thing.  He keeps answering a different question
17   than what I'm asking here, Regina.
18             THE WITNESS:  And I'm explaining.
19        A     (Continued)  Okay.  The working of this
20   thing is discriminatory.  Okay.
21        Q     (By Mr. Stone)  Mr. Oniha, let me ask
22   the question again.  Have you told me about any
23   comment -- you've told me about Mr. Taylor,
24   correct, what he said?
25        A     Okay.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 208

1      Q      Have you told me about any other

2  comments by anybody at Delta that you consider to

3  be discriminatory or inappropriate or improper

4  that you think are relevant to this lawsuit?

5      A      Well, I told you at the beginning that

6  I was treated unfairly by Mr. Forts.  So when

7  you're singled out of the multitude and treated

8  unfairly, is that discriminatory?

9      Q      I can't understand a word you're

10 saying, Mr. Oniha.  Say it again.

11     A      What I said was I told you about

12 unfairness treatment from Mr. Forts.

13     Q      You told me about that.

14     A      Okay.  So is that discrim --

15     Q      Mr. Oniha, again, listen to my

16 question.  My question is:  Is there anything you

17 haven't told me?

18     A      No, sir.  That's fine.  Yes, sir.

19 That's fine.  No.

20            MR. STONE:  All right.  Regina, why

21 don't we take a break for a few minutes here.

22     (Proceedings in recess, 2:44 p.m.

23     to 2:59 p.m.)

24     (Whereupon a document was identified

25     as Defendant's Exhibit 24.)

Page 209

 1        Q      (By Mr. Stone)  Mr. Oniha, at some

 2   point, you decided you were going to file a charge

 3   of discrimination with the EEOC; is that correct?

 4        A      Yes, sir.

 5        Q      Did you retain counsel before you filed

 6   this charge?

 7        A      No.

 8        Q      Okay.  When did you first hire

 9   Ms. Molden as your counsel?

10        A      As soon as this right to sue was issued

11   to me.

12        Q      When the right to sue was issued.

13               Okay.  Let me ask you a question.  Go

14   ahead and look at this whole charge.  In

15   particular, look at sort of the bottom half of it

16   where you've got your allegation.

17        A      Okay.

18        Q      All right.  Who wrote this for you

19   where it's says, "The Particulars Are," at the

20   bottom of Exhibit 24 and it begins, "On

21   January 11, 2010"?  Who wrote that for you?

22        A      I wrote it myself.

23        Q      I'm sorry?

24        A      I wrote it myself.  I wrote it.

25        Q      You wrote all this yourself?

Page 210

```
 1       A     Yes.
 2       Q     Okay.  Did you write it at home?  Did
 3   you write it at the EEOC?  Where did you write it?
 4       A     No.  I wrote it in the EEOC, and I give
 5   it to him, and they type it up.
 6       Q     Okay.  All of these words are your
 7   words in this box labeled, "The Particulars Are"?
 8       A     Yes.  Yes, sir.
 9       Q     Okay.  Did anybody tell you to write
10   these words, or you made them up on your own?
11       A     I was just told to be -- you know, to
12   be specific as much as I can, and that's what I
13   wrote.  I wrote this.
14       Q     Okay.  So you were told to be as
15   specific as you can, and so you wrote these words?
16       A     Yes.
17       Q     Okay.  If you were told to be as
18   specific as you can, why did you not include the
19   statements about what you say Mr. Taylor said if
20   you were filing a discrimination charge?
21       A     You know, then after I hire my attorney
22   then, you know, I told my attorney, you know, I
23   need to add an addition which was age
24   discrimination.  And I did that because --
25       Q     I didn't understand what you said.  Say
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 211

1    those words again, please.

2         A    I said this was filed because I added a

3    supplement portion of it which stated age

4    discrimination.

5         Q    I apologize.  I still can't understand

6    you.  Say it slowly, please.

7         A    After this was filed, I supplement

8    called age discrimination in conjunction with

9    this.

10        Q    Okay.  So my question -- that doesn't

11   answer my question.

12             You told me a moment ago you were told

13   to be specific.  And so my question is:  If you

14   were told to be specific, why did you not include

15   anything about any statements made by Mr. Taylor?

16        A    Because I said that this information

17   here will suffice.

18        Q    Who told you that?

19        A    I just believe that what I wrote here

20   is enough to, you know -- to carry -- you know, to

21   carry on the investigation -- I mean, to file the

22   suit.

23        Q    So you were told to be specific by the

24   EEOC, but you didn't think it was important to

25   include specific evidence that you're relying on

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                        August 27, 2020

Page 212

1    now in this lawsuit?

2              MS. MOLDEN:   Object to the form.   Asked

3    and answered and answered.

4         Q    (By Mr. Stone)  You can answer,

5    Mr. Oniha.

6         A    Sir, again, I felt what I wrote here is

7    enough to pursue a case against Delta Air Lines.

8         (Whereupon a document was identified

9         as Defendant's Exhibit 25.)

10        Q    Okay.  All right.  Click over to the

11   next exhibit, No. 25.  And that's the second

12   charge that you were referring to a minute ago

13   that you filed; correct?

14        A    Yes, sir.

15        Q    Okay.  Page down to the bottom of

16   there.  Okay.  Page up just a little bit so we can

17   see the box that says, "The Particulars Are."

18        A    (Witness complies with request of

19   counsel.)

20        Q    Did you have an attorney at the time

21   you filed this charge on or about November 19th of

22   2019?

23        A    Yes, I did.  Yes.

24        Q    You had an attorney.

25             Did you write the language that's in

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 213

1     the box labeled, "The Particulars Are," or was

2     that your attorney?

3          A     I wrote this to my attorney.  Then she

4     typed it up.  I did not, you know, type it up but

5     my attorney.

6          Q     Okay.  You handwrote these words, and

7     your attorney typed them up for you?

8          A     Yes.

9          Q     Yes?

10         A     Yes.

11         Q     All right.  So these are all your

12    words.  They were just typewritten by your

13    attorney?

14         A     Yes.

15               MS. MOLDEN:  Object to the form.

16         A     Yes.

17         Q     (By Mr. Stone)  All right.  Where is

18    the mention of Mr. Taylor's statement in this

19    charge?

20         A     I filed this charge -- what I file over

21    here is enough to, you know, pursue a case against

22    Delta Air Lines.

23         Q     Okay.  So you filed two charges but

24    didn't think it was important to include

25    Mr. Taylor's statements; is that correct?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 214

1      A     Sir, again, what was filed first and
2  this is enough to pursue a case against Delta
3  Air Lines.  And that was what I did.
4      **Q     So you're agreeing with me?**
5      A     And Mr. Taylor works for Delta
6  Air Lines.
7      **Q     Okay.  So I'll ask the question again**
8  **because I'm not sure you answered it, Mr. Oniha.**
9  **You filed two charges with the EEOC, and you**
10 **didn't think it was important to include**
11 **Mr. Taylor's alleged statements in either of those**
12 **two charges?  Is that fair?**
13     A     I don't think it was necessary to
14 include his statements because this one would
15 suffice.
16     **Q     All right.  Mr. Oniha, you allege in**
17 **this charge and in the Complaint, I think, that**
18 **you "applied for several positions, but Delta**
19 **always hired a non-Nigerian, younger worker to**
20 **fill the position."**
21         **Do you see that under Roman numeral II?**
22         **No.  You paged away from it, Mr. Oniha.**
23     A     Okay.  All right.
24     **Q     All right.  Okay.  Do you see that?**
25     A     Yes.  I see that, yes.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 215

1      Q      Okay.  Are you alleging in this lawsuit
2  that you were denied any position because of your
3  race or national origin?
4      A      Yes, sir.  I'm alleging that, yes, I
5  was denied, you know, because of my race.
6      Q      Okay.  What positions are you alleging
7  you were denied because of your race or national
8  origin?
9      A      I applied for OSM.  I applied for --
10     Q      OSM?
11     A      Yes.
12     Q      What else?
13     A      I applied for supervisor.
14     Q      Okay.
15     A      Both within and outside Atlanta, I
16  applied for revenue analyst.
17     Q      All right.  Let's talk about the OSM
18  position first.  That's operation service manager;
19  correct?
20     A      Right.
21     Q      All right.  When did you apply for an
22  operation service manager position?
23     A      Over the course of my employment with
24  Delta Air Lines put it that way.
25     Q      No.  When did you apply for such

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 216

1    position?

2         A      From 2010 up to when I was separated.

3    I keep applying, applying, applying.  Yes.

4         Q      **All right.  Is there any specific**

5    **position that you -- any specific application that**

6    **you contend was denied to you because of your race**

7    **or national origin?**

8         A      All of the jobs where I have expressed

9    my interests, I was not --

10        Q      **Okay.  Let's start with the first**

11   **application then.  When is the first time you**

12   **applied for an OSM position?**

13        A      I could go back to 2010 -- 2010 -- I

14   mean, 2011, January.

15        Q      **January of 2011?**

16        A      Yes.

17        Q      **And how did you apply for that**

18   **position?**

19        A      A system for eBid.

20        Q      **EBid.  Okay.**

21               **Do you know who else applied for the**

22   **position?**

23        A      I have no clue.  But when I was denied,

24   a younger person got the job with less

25   qualifications.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 217

1      Q      All right.  Who was that person?

2      A      There are so many of them.  I can't

3  just, you know -- we're talking about a

4  nine-and-a-half year period that I applied for so

5  many jobs.

6      Q      All right.  Mr. Oniha, the only way to

7  do this is to identify specific positions that you

8  applied for that you contend were denied to you

9  because of your race and national origin.

10             So you said you applied for a position

11  in January of 2011.  What position was that?  OSM;

12  correct?

13      A      OSM.  Not just one.  Several.  OSM --

14      Q      Okay.  Several in 2011?

15      A      Yes.

16      Q      Okay.  And let's talk about the first

17  one in 2011.  Who got that job?

18      A      I don't -- I have no clue who did.  You

19  know, I don't know him.  But I just saw him as an

20  OSM.

21      Q      Okay.  You don't know -- do you know

22  his name?

23      A      It was -- Jaron Jeter is one of them.

24  My supervisor is one of them.

25      Q      Mr. Jeter?



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 218

1     A     Yes, is one of them.

**2     Q     Okay.  When did Mr. Jeter get the job?**

3     A     I mean, he's one of them.  I think he

4     become one in 2000 -- 2012 or so or '13.

**5     Q     2012?**

6     A     Yes.

**7     Q     Okay.  So I want to talk about the 2011**

**8     jobs first.  You said you applied several times in**

**9     2011; is that correct?**

10    A     Yes.

**11    Q     And who got the jobs in 2011?**

12    A     Like I said, I don't know his name; but

13    he's an African-American, and he was an OSM.

**14    Q     Okay.  Do you know anything about his**

**15    qualifications?**

16    A     From what I understand, he was -- he

17    had only been with the company for only about

18    maybe two years, and they --

**19    Q     Okay.  Do you know anything else about**

**20    his qualifications?**

21    A     No.  He has a high school diploma.

**22    Q     Okay.  Is there any job you applied for**

**23    where you know who the successful candidate was?**

24    A     Yes.  Of course.  Yes.

**25    Q     All right.  What job?**



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 219

```
 1        A      I applied for supervisor position,

 2    station manager in -- station supervisor, Lagos

 3    airport.

 4        Q      Okay.

 5        A      But then I wasn't hired.

 6        Q      Who got that job?

 7        A      Somebody else was given.

 8        Q      Sorry?

 9        A      Somebody else was hired.

10        Q      Who was it?

11        A      James -- well, I don't think he work

12    with the company anymore.  I think they fire him

13    or something like that.  I don't know what he did.

14        Q      Okay.

15        A      Yeah.  So --

16        Q      So you don't know his qualifications?

17        A      Yeah.  But I understand that he has an

18    associate degree but not much else.

19        Q      He already has a degree, but what?

20        A      The person who got the job only have

21    associate degree, not bachelor's.

22        Q      Okay.  How do you know that?

23        A      Because, I mean, we --

24        Q      I'm sorry?

25        A      He confide to me before he left.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                              August 27, 2020

Page 220

1      Q      I can't hear you.

2      A      He told me that he only have associate.

3  He told me specifically that he only have

4  associate.

5      Q      All right.  Who told you that?  James

6  did?

7      A      He told me that -- yes.  He told me

8  that he only had associates, that he was working

9  on his bachelor's to finish up.

10      Q      Okay.  When did he tell you that?

11      A      That he was doing, you know, online

12  classes to finish.

13      Q      Okay.

14      A      That was shortly, you know, after he

15  got the job.  That was it.

16      Q      Okay.  This is the station manager in

17  Lagos.  And when did he get that job?

18      A      Not station manager.  It was station

19  supervisor to report to --

20      Q      A supervisor in Lagos.  Okay.

21             And it's James, and you don't know his

22  last name; correct?

23      A      I don't know his last name.  No.

24      Q      Okay.  And he told you after he got the

25  job that he had an associate's degree?



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 221

```
 1      A     Yes.
 2      Q     Okay.  Do you know anything else about
 3  his qualifications?
 4      A     No.
 5      Q     All right.  Do you know who made the
 6  decision to put him in that job?
 7      A     I guess HR.  I don't know.  Maybe HR.
 8      Q     You don't know?
 9      A     Or maybe --
10      Q     I didn't hear you.  Do you know, or do
11  you not know?
12      A     I don't know.  I think it's HR.
13      Q     All right.  Is there any other job that
14  you applied for where you know who the successful
15  candidate was?
16      A     Like I said, not off the top of my
17  head.  You know, all of a sudden, they would say,
18  okay.  The job has been positioned by X, Y for
19  somebody who's more qualified than I do.
20            And I come to understand that --
21      Q     Is there any job that you know of
22  that --
23            MS. MOLDEN:  Can you let him finish?
24  Ben, I'm sure you hear him talking.
25            MR. STONE:  I did not hear him talking.
```

Page 222

1    I thought he was done.

2              MS. MOLDEN:  He was in the middle of

3    talking.

4         A    For instance, you know, I can count

5    several that we hired, you know, after I have

6    expressed my interest; that we hired those people

7    because they are younger in age and with less

8    qualifications, I can think of four of them.

9         Q    (By Mr. Stone)  Oh, you can think of --

10   so there are positions you applied for, OSM,

11   positions --

12        A    Yes.

13        Q    -- and there were four people that were

14   hired during your bid?

15        A    Yeah.  I mean, during some of the jobs

16   I applied for.  Not at the same time, but at least

17   at different times.

18        Q    So not when you were bidding?

19        A    No.  When I bid, yes.  I would bid

20   along with them, but then they would end up

21   getting it.  Yes.

22        Q    Okay.  All right.  So first of all, I

23   may have asked you this question.  This supervisor

24   Lagos job, when was that position awarded to

25   James?  Do you know?



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                    August 27, 2020

Page 223

1        A      It was 2012.  But then he was reporting
2    to Mr. Pila Ottowah (phonetic).  I think both of
3    them --
4        Q      All right.  These OSM jobs, tell me
5    specifically who was awarded OSM positions that
6    you bid for that you contend were less qualified
7    than you.
8        A      For instance, my supervisor Abby
9    Hawkins doesn't have a degree.
10       Q      Okay.
11       A      I bid for the same supervisor position,
12   but I didn't get it.  He did.
13       Q      Mr. Hawkins?  Is that what you said?
14       A      Yes.  Abby Hawkins.
15       Q      Okay.  And when did Mr. Hawkins get
16   awarded an OSM position?
17       A      It's going on two years now.
18       Q      Okay.  And who made the decision to
19   award him that position?
20       A      I don't know.  I don't know, sir.  I
21   don't know.
22       Q      All right.  And what makes you say that
23   you were more qualified than Mr. Hawkins?
24       A      Because, I mean, since he was my
25   supervisor, we communicate.  And he doesn't have a

Page 224

1    college degree.  (Inaudible) could have pushed

2    back.  That's about it.

3         **Q    You're speaking way too fast,**

4    **Mr. Oniha.  Slow down.**

5         A    I said, he doesn't have a college

6    degree.

7         **Q    Okay.**

8         A    We talk a little bit of business while

9    I was there.

10        **Q    He doesn't have a college degree, and I**

11   **didn't hear the second thing.**

12        A    I said we talk all the time while I was

13   there.

14        **Q    Okay.**

15        A    When I was with Delta Air Lines, we

16   talk all the time.  And so we got to share

17   information.  So he doesn't have a college degree.

18        **Q    Okay.  Other than him not having a**

19   **college degree, is there anything else that makes**

20   **you think he was less qualified than you?**

21        A    Like I just said, the reason I can

22   think of is my race, national origin.  Because you

23   can't --

24        **Q    No.**

25        A    You can't tell me for a nine-and-a-half

Page 225

1   year period that the same, you know, tape is being

2   played:  Oh, my resumé look impressive, but they

3   hire a candidate with less qualifications.  So how

4   do you explain that?

5         Q     All right.  Is there anything -- we're

6   speaking about Mr. Hawkins now, Mr. Oniha.  Is

7   there anything else that makes you say -- other

8   than the fact that he doesn't have a college

9   degree -- that you were more qualified for the OSM

10  job than him?

11        A     Like I said, he is an ALA.

12        Q     What?

13        A     Aircraft load agent.

14        Q     He was an aircraft load agent?

15        A     Yes.  And that's what the

16  requirement --

17        Q     Okay.  Were you an aircraft load agent?

18        A     No, I wasn't.  But I'm certified, but I

19  didn't take the certificate because it's not --

20        Q     Okay.  Other than the fact that he was

21  an aircraft load agent and you weren't, is there

22  anything else that makes you say that you were

23  more qualified than him?

24        A     As I said, I mean, those were some of

25  the requirements that you need to have.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                    August 27, 2020

Page 226

1        Q        You have to be an ALA?

2        A        Yes.  And you have to have at least a

3   college degree, and you have to be with the

4   company four years is -- six years.

5        Q        All right.  And how long had

6   Mr. Hawkins been with the company?  Do you know?

7        A        I think he's been there ten years now.

8   Ten years.

9        Q        And he was an ALA?

10        A        Yes.

11        Q        Okay.  All right.  Is there any other

12   person who received an OSM job that you know of

13   that you believe was less qualified than you?

14        A        I could go on and on.  There are so

15   many of them.  I can't count them on my head.  So

16   I don't, you know --

17        Q        Okay.  Well, can you give me any other

18   names other than Mr. Hawkins?

19        A        Like, Mr. Williams, for instance.

20   Mr. Williams, he was working --

21        Q        Okay.  What's Mr. Williams' first name?

22        A        Hold on.  Let me think.  His last name

23   is Williams.  I can't think of his first name.  I

24   just call him Williams, you know.  He doesn't

25   have --

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 227

```
 1        Q      Okay.  When was he awarded OSM?

 2        A      Around '18?

 3        Q      2018?

 4        A      Yes.

 5        Q      Okay.  And do you believe that you

 6   were more qualified or less qualified than

 7   Mr. Williams?

 8        A      Yes.

 9        Q      All right.  Do you believe you were

10   more qualified?

11        A      Yes, sir.

12        Q      Why?

13        A      Because he didn't have no college

14   degree as one of the requirements.  And --

15        Q      What makes you say this was a

16   requirement?

17        A      Yeah.  Because, I mean, it's stipulated

18   there.  It's stated there that for you to be a

19   successful OSM, you have to, you know, have a

20   college degree, at least associate's.  You have to

21   be with the company at least four years.

22        Q      Okay.  Does it say college degree or

23   equivalent experience?  Do you remember?

24        A      No.  It says college degree.  They

25   don't say no equivalent.  No.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 228

1     Q     So that's in the OSM job description?

2     A     Yes.

3     Q     All right.  So we can look at that and

4  confirm it; correct?

5     A     Yeah, you could.

6     Q     Okay.  Other than Mr. Williams lacking

7  a college degree, is there anything else that

8  makes you think he was more experienced -- I'm

9  sorry -- that you were more qualified than he was?

10    A     Yeah.  I have more time than him with

11  the company.

12    Q     You have more time with the company?

13    A     Yeah.  I have more time.  You know, I

14  was there before him.  Yes.

15    Q     Anything else?

16    A     No.  That's it.  No.

17    Q     All right.  Any other position where

18  you know the successful candidates that you

19  applied for?

20    A     Yes.  Some of them --

21    Q     You don't know anybody else's

22  qualifications?

23    A     Yes.  Some of them are in the general

24  office, and I don't work in the general office.

25  So I don't know much about their qualifications.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 229

1    So --

2         **Q      Okay.**

3         A      But what they do, however, is once they

4    hire somebody -- say X-Y-Z is hired.  And if you

5    know their name, then you can just go to the

6    directory and see what their qualifications are.

7         **Q      Do you know what information they look**

8    **at when they're reviewing applications for jobs?**

9         A      As I stated before, they look at how

10   long you've been with the company, your role, you

11   know.  Of course, they want to see at least, you

12   know, if you have a sense of urgency, whatever you

13   want to call it.

14              Then, you know, of course, if you are

15   dependable and all of that.  And if you're able to

16   make, like, a split-second decision and that kind

17   of stuff.

18        **Q      What specific documents are they**

19   **looking at?  Do you know?**

20              MS. MOLDEN:  Object to the form.

21              MR. STONE:  If he knows, he can answer.

22        A      Again, I've told you, sir, they want to

23   look at how long you've been with the company,

24   what role -- what are you currently performing.

25   Either you are ALA or whatever.  So they look at

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 230

```
 1    that.
 2            And, of course, if your OSM recommend
 3    you, then at least you move forward with that.
 4    But if you're not recommended --
 5       Q    (By Mr. Stone)  Do you know what
 6    documents they're looking at when they're making
 7    promotion decisions?  Are they looking at your
 8    eBid?  Do you know what documents they're
 9    specifically looking at?
10       A    No.  I don't know what they're looking
11    for other than what I listed for you.
12       Q    All right.  Other than what you've told
13    me, do you have any other basis for alleging that
14    you were denied any position based on your race or
15    national origin?  Any other facts that support
16    that?
17            MS. MOLDEN:  Object to the form.
18       Q    (By Mr. Stone)  You can answer,
19    Mr. Oniha.
20       A    Your question was what again?
21       Q    Yes.  So I'm asking you -- you've given
22    me your explanation of positions that you believe
23    you were denied because of your race or national
24    origin.  And you've given me the facts that you
25    believe support that allegation.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 231

```
1        A      Okay.
2        Q      Are there any other facts you haven't
3   given me?
4        A      No.  I mean, those are facts that I
5   think are relevant to this.
6        Q      All right.  Do you know anybody else,
7   Mr. Oniha, who was terminated from Delta Air Lines
8   other than you?
9        A      Well, I don't know what has happened
10  now.  You know, but I just know about me, you
11  know.  So --
12       Q      Okay.  Do you know anybody else who
13  left the sterile area of the airport when they
14  were traveling and came back in without going
15  through TSA?
16       A      So people do that all the time.  But,
17  yes, they're still doing it because --
18       Q      Who have you seen -- who do you know
19  that's done that?
20              MS. MOLDEN:  Can you let him finish?
21       A      I am not at the airport now.  So I
22  don't know, you know, what is going on there.  I
23  can't tell you right now what is going on there.
24       Q      (By Mr. Stone)  All right.  Who do you
25  know that's done this?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 232

```
 1      A     Either African-American, either white
 2  Americans, and all that, you know.
 3      Q     Who?
 4      A     Sir, I've given you the population.
 5  Black Americans and African-Americans.  I mean --
 6  and white Americans.
 7      Q     Okay.  Can you name anybody specific?
 8      A     No.
 9      Q     Can you name anybody specifically?
10      A     I can't give you any specific names.
11  No.
12      Q     Okay.  How do you know this is going
13  on?
14      A     Because at the airport, I've seen it
15  when I was there.
16      Q     Because what?
17      A     I've seen it happen while working at
18  the airport.
19      Q     All right.  Tell me what you saw.
20      A     Okay.  What I've seen is that somebody
21  was traveling to, for example, Phoenix, an
22  employee.  Oh, I left my keys in my locker.  They
23  come downstairs, go to their locker, take their
24  keys, and go back upstairs and board their flight.
25  All the time that happens.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 233

1      Q      Who did you see do this?

2      A      As I just said.  You want me to mention

3  them?  I can't just -- I can't list their names.

4  I told you white Americans, black Americans.

5      Q      Okay.  Can you tell me any specific

6  time when you saw this?

7      A      This happens all the time.  Every time

8  I -- on each shift that I work.  The days that I'm

9  scheduled to work.  Somebody left something in

10  their locker that they have to come down to get,

11  you know, something from their locker, and they

12  don't go back through TSA screening.

13           And they just get on the flight and go

14  their way.  Every day that I work.  On the days

15  that I'm scheduled to work, at least one or two

16  people that happens.

17      Q      Okay.  And how do you know this?  Like,

18  how do you know that that's what they're doing?

19      A      I'm working, for instance, at

20  Gate A 19.  They say, oh, Mr. Oniha, how you

21  doing?  Look, man.  I'm going to Maryland to BWI.

22  May I just -- what I taking with me -- you know, I

23  had books that I need to read on the airplane.  I

24  just let it.  And my flight leave in about

25  25 minutes.  Yes.



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                August 27, 2020

Page 234

1             And they will come back downstairs.  Go

2    to their locker.  They will remove their books or

3    whatever belongings that they want to take, and

4    they hop on the plane not knowing that it's a

5    violation.

6        Q     All right.  But you can't me tell me

7    any specific person or any specific date when this

8    happened?

9        A     No, I can't.  I can't.

10       Q     All right.  Mr. Oniha, you were

11   terminated in July of 2019; is that correct?

12       A     Yes.

13       Q     All right.  Have you worked for any

14   employer since then?

15       A     Right now I am on a temporary basis.

16   Yes.

17       Q     All right.  Let me ask a different

18   question.

19             Since you left Delta, has there been

20   any time when you've been unable to work?

21       A     Usually I wasn't -- yes.  It's been

22   very difficult because nobody want to, you know,

23   hire anybody before even with the Corona -- the

24   COVID-19 fix.  So it's been -- you know, it's been

25   a struggle.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 235

1      Q      Okay.  I asked a different question

2   which is:  Is there any time since you left Delta

3   that you've been unable to work for medical

4   reasons?

5      A      No.  No, please.  No.  No.  No.

6      Q      Okay.  After you left Delta, did you

7   apply for unemployment benefits?

8      A      Not instantly.  Not immediately.

9      Q      Not immediately?

10     A      No.

11     Q      Okay.  Did you eventually?

12     A      I did but for, like, maybe two months.

13   And that was it.

14     Q      Okay.  You received two months of

15   unemployment benefits?

16     A      Yeah.

17     Q      All right.  When did you first start

18   looking for work after you were fired from Delta?

19     A      Almost immediately.  You know, almost

20   immediately.  I was just looking, you know.  I

21   sent out my resumé, you know, as much as I can,

22   you know, but didn't hear nothing back.

23     Q      When did you first get employment?

24     A      I would say November.  Either

25   November -- either October or November, you know.

Page 236

1   So, yes.

2        Q     October or November of 2019?

3        A     Yes.

4        Q     All right.  So you did not work between

5   July and October or November of 2019; correct?

6        A     No, I did not.  No.

7        Q     Did you apply for any jobs?

8        A     Yeah, I did.  Yes.

9        Q     Where did you apply?

10       A     I've applied to so many companies

11   including temp agencies, which is what I'm doing

12   right now, you know.  So --

13       Q     Okay.  Can you name any companies or

14   temp agencies that you applied for between July

15   and October or November of 2019?

16       A     I applied to Coca-Cola.  I applied to

17   Pepsi.  I applied to Newell Rubbermaid.  I applied

18   to Sentra.  You know, all kinds of, you know,

19   companies that you can think of.

20       Q     How did you apply to these companies?

21       A     Just looked them up and proceeded

22   through their, you know, website and express

23   interest.

24       Q     Do you have any documents that would

25   show you applying for these jobs?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 237

```
 1       A     Yes.

 2       Q     Okay.  What do you have?

 3       A     My resumé and, of course, some of the

 4  responses that they have decided not to fill or

 5  whatever positions, you know, that I have applied

 6  for.  Or, you know, they put the position on hold

 7  or whatever you want to call it and all that.

 8       Q     Have you given all those documents to

 9  your lawyer?

10       A     Yeah.  The temp agency that I

11  registered with, yes, I did.

12       Q     Sorry?

13       A     The temp agency through which I have

14  registered, yes, I did.  They have already the

15  information.  Yes, I did.

16       Q     Okay.  Did you give your lawyers all

17  the documents you had about the applications that

18  you made between July and October or November of

19  2019?

20       A     Like I said, no.  I did not give them

21  all that because they did not ask me.  I didn't

22  give them.  So there was no reason for it.  They

23  didn't ask me.

24       Q     Your attorneys did not ask for those

25  documents?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 238

```
 1        A     No.  They didn't ask me.  No.
 2        Q     All right.  So you have documents
 3   relating to your efforts to find employment you've
 4   not yet given to your counsel?
 5        A     My unemployment?  Yes.  They have the
 6   documents for unemployment.  Yes, sir, they do.
 7        Q     I'm not talking about unemployment.
 8   I'm talking about the documents that you have that
 9   relate to your job search.  Your applications to
10   Coke and Pepsi and Newell Rubbermaid and the other
11   companies you described a moment ago.
12        A     Yes.  I never did -- again, they didn't
13   ask me.  I didn't give it to them.  So --
14        Q     All right.  Okay.  You first started
15   working for a temporary agency in October or
16   November of 2019.  Is that what you told me a
17   moment ago?
18        A     I kind of lost you.  Repeat that
19   question one more time.
20        Q     Sure.  I was just confirming something
21   you told me, which is, you first started working
22   for a temporary agency in October or November of
23   2019; is that correct?
24        A     Yeah.  That's correct, sir.  Yes.
25        Q     All right.  What agency was that?
```

Page 239

```
 1        A       Yeah.  I applied to Randstad.  I
 2   applied to Hire Dynamics.  And then finally Hire
 3   Dynamics gave me something to be doing.  Then the
 4   assignment ended, and I went to Randstad.  So then
 5   my assignment ended with --
 6        Q       When did you go to Randstad?
 7        A       November.
 8        Q       Of 2019?
 9        A       Yes.  Yes.  Before my ending.  Yes.
10        Q       All right.  How many hours a week have
11   you been working for a temporary agency?
12        A       Well, again, it depends on as needed.
13   Sometimes they send you somewhere where maybe they
14   only need you for maybe a week or they might keep
15   you for, like, a month.
16        Q       Okay.  During the time that you've been
17   doing temporary work, have you continued to look
18   for full-time employment?
19        A       Oh, yes.  Of course, yes.  Yes.  Yes.
20        Q       Where have you applied since October or
21   November of 2019 for full-time employment?
22        A       Again, I went back to the Pepsi.  You
23   know, I applied.  I went back to Coca-Cola.  I
24   applied.  I went back to even Southwest Airline,
25   if you will.  I applied.
```

```
 1               You know, and a bunch of other
 2    companies like that.  They just tell me that, oh,
 3    at this time, you know, they have a hiring freeze,
 4    or they decided not to fill whatever position that
 5    I've applied for.  So --
 6         Q    Have you kept the applications, the
 7    documents, that show you're applying for these
 8    jobs?  These full-time jobs?
 9         A    Yes.  Yes.  Yes.
10         Q    Have you given those to your lawyer?
11         A    Again, they never ask me.  I never have
12    given it to them.  If I get a request for it, then
13    I would send it to them.
14               MS. MOLDEN:  Just answer his question.
15               THE WITNESS:  Yes.
16         Q    (By Mr. Stone)  Who does your tax
17    returns for you, Mr. Oniha?
18         A    I do them myself.
19         Q    You do them yourself.
20               You don't have a tax preparing agency
21    do them?
22         A    Along with my -- with Mr. King who's a
23    CPA.  So once I finish it, he would review it for
24    me.
25         Q    I see.
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 241

1                 Does he file them for you?

2       A     No.  I mean, once I finish it, I will

3    submit it.  Once it's verified and he says it's

4    good, then I'll submit it.

5       Q     All right.  And you're truthful and

6    accurate in your tax returns?

7       A     Yes.  Never lied on it.

8       Q     Okay.  Are you paying your attorneys by

9    the hour, or are you paying them a percentage of

10   any recovery in this case?

11      A     I pay them monthly.

12      Q     Monthly.

13            Okay.  How much a month have you paid

14   them so -- how much in total have you paid them so

15   far?

16      A     Well, since she retain me and obviously

17   I retain her, I've been paying $500 every month.

18      Q     $500 a month?

19      A     Yes.

20      Q     Okay.  And you've been doing that since

21   the end of 2019 when you retained them?

22      A     Yes.

23      Q     All right.  Are you also paying them a

24   percentage of your recovery in this case?

25      A     Yes.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 242

1       Q       **And what's that percentage?**

2       A       30 or 40.  Something like that.

3       Q       **Okay.**

4       A       30 or 40.

5               MR. STONE:  All right.  Let's take a

6       quick break.  I'm done or very close here, Regina.

7       Give me five minutes to look at my notes.

8               Given the circumstances here, I'm

9       obviously going to leave the deposition open

10      because he's testified to a number of documents we

11      don't yet have.

12              MS. MOLDEN:  I'm going to have some

13      follow-up questions.  So if we could make it

14      15 minutes instead.  That way I can go ahead and

15      review my notes.  And when we come back, I'll be

16      ready to ask my follow-up questions.

17              MR. STONE:  That will be fine.

18              MS. MOLDEN:  Okay.  Thank you.

19      (Proceedings in recess, 3:39 p.m.

20      to 4:05 p.m.)

21              MR. STONE:  We're back on the record.

22              At this time, I'm leaving the

23      deposition open.  I don't have any further

24      questions.  Obviously, I may have some after

25      Ms. Molden's questions.  And we're not closing the

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                    August 27, 2020

Page 243

1   depositions at this time based on some additional

2   documents that Mr. Oniha has in his possession

3   that haven't been turned over yet.

4                    DIRECT EXAMINATION

5   BY MS. MOLDEN:

6        Q     All right.  Mr. Oniha, I have a few

7   questions for you.

8              I want to start by going back to the

9   meeting of July 2nd when you met with George

10  Taylor, the HR person, and Mr. Forts.

11             Do you recall talking about that

12  meeting?

13       A     Yes, ma'am.

14       Q     Okay.  What was the first thing George

15  Taylor said to you when you saw him in that

16  meeting?

17       A     When I walked in the meeting, the first

18  thing he asked me was do I remember him, you know.

19             I said, yes, I remember you, sir.

20       Q     Okay.

21       A     I remember you from the things that

22  happened on the 14th of June 2019 when you had --

23  when you were talking to Mr. Williams and you --

24       Q     Okay.  Let me ask questions, and then

25  you can answer the questions.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                              August 27, 2020

Page 244

1                    He asked you if you remember him.  And
2      you said, yes, you remember him from the June 14th
3      incident?
4           A     Yes.
5           Q     Okay.  All right.  After he asked you,
6      do you remember me, what happened next?  Did he
7      start asking questions?
8           A     Yes.  He start asking me questions
9      about the SIDA badge usage and all that kind of
10     stuff.  And I was starting to explain to him, you
11     know, the reason why I did what I did.
12                    Before I could finish that statement,
13     he paused me.  He said, I should not dare him, as
14     I told you, counsel, earlier.  That after so many
15     years of experience with the FBI, if he sees a
16     criminal, he will recognize one.
17          Q     If he sees a criminal, he will
18     recognize him?
19          A     Yes.
20          Q     Okay.  The types of questions that he
21     was asking you, what is your belief in terms of --
22     with respect to the types of questions he was
23     asking?
24                    Well, why don't you just share with me
25     the types of questions he was asking you.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 245

 1      A      He was asking questions that were

 2   criminal in nature such as what was the check

 3   for -- just like the counsel was asking me

 4   earlier.  What was the check for that I gave to

 5   Mr. Juan?  Who is Mr. Juan?  What is my

 6   relationship with him?  And all that.  Then how

 7   often do I travel to Nigeria back and forth?

 8            And when I was going to Nigeria, did

 9   somebody, you know, give me a package to deliver

10   or maybe bring some load back and all that.  What

11   was the contents of my luggages that I took to

12   Nigeria and all that.

13            So they were just -- they were criminal

14   in nature.  So I have no reason -- I don't know

15   why he was asking all those questions.

16      Q      **Now, you worked for Delta for almost**

17   **ten years; right?**

18      A      Yes.

19      Q      **How many times -- I mean, did you have**

20   **several trips where you went back and forth to**

21   **Nigeria?**

22      A      No, I did not.  As a matter of fact, I

23   only went to Nigeria at least -- you know, from

24   the time I was working for Delta Air Lines, maybe

25   three times, you know.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 246

1      Q      You went to Nigeria only three times in

2  the time that you worked --

3      A      Yes.

4      Q      So let me finish.  Don't talk over me.

5  Okay?  Because she can't take down what we're both

6  saying.

7              You went to Nigeria only three times --

8  approximately only three times during your entire

9  time that you were employed with Delta?

10     A      That's correct, ma'am.

11     Q      And was Mr. Taylor asking you about the

12  numbers of times you went to Nigeria?

13     A      Yes.

14     Q      Is that the same thing counsel was

15  asking about today?

16     A      Yes.  Yeah.  Yeah.

17     Q      Have you ever been arrested for any

18  crime?

19     A      No.  No.  No.  Never.  Never did.

20     Q      Has anyone ever given -- have you ever

21  given anybody any reason to think that you are a

22  criminal?

23     A      No.  I never did.  No.  No reason.

24     Q      So do you have any idea why Mr. Taylor

25  was asking you all these questions about whether

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                    August 27, 2020

Page 247

1    or not you received money to take a package to

2    Nigeria and how often you went to Nigeria?  Any

3    idea why he's asking you those types of questions?

4         A    I guess the only thing I could think of

5    is, you know, remember I said earlier that he had

6    told Mr. Williams during that incident that

7    Nigerians are criminals?  So criminals -- he just

8    linked me along, you know, with every Nigerian.

9    So every Nigerian that he sees are criminals.

10             I mean, he made a promise to

11   Mr. Williams that, you know, since Nigerians are

12   criminals, on my part, that he will conduct an

13   investigative audit relative to my SIDA badge.

14   And that whatever -- if anything -- any reason

15   that he find out, will lead to the dismissal of my

16   employment.  And that was exactly what he did over

17   two weeks later.

18        Q    Okay.  Now, you might have already

19   answered the question.  But why do you believe

20   that Mr. Taylor was the one to make the decision

21   to terminate your employment?

22        A    Because he said that on the 14th of

23   June again.  And he said that in that meeting.

24   You know, that he told Mr. Forts specifically,

25   make sure you're collect his SIDA badge and his



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 248

1    corporate ID.

2            When you conduct an investigation -- it

3    doesn't matter which company -- unless you already

4    decided to separate that person or end that

5    person's employment, that's when you collect all

6    those things.  You collect all those things

7    afterwards.  But he did that right there, you

8    know, instantly.

9       Q    Slow down just a little bit because I'm

10   having a hard -- slow down, and say it slowly,

11   please.

12      A    Okay.  So during our meeting on the 2nd

13   of July, he had told Mr. Forts specifically, make

14   sure that he collects the Delta badge, the

15   corporate ID and the SIDA badge in my possession.

16   But the reason he really wanted to do that -- he

17   flex the decision for me to be terminated is

18   because --

19      Q    You're talking too fast.  We can't

20   understand.

21      A    He said it on the 14th of June that he

22   would make sure that my employment with Delta Air

23   Lines is terminated based on because I refused to

24   obey an order that is discriminatory in nature.

25      Q    And you're certain that you heard him



GeorgiaReporting.com/Schedule
404.389.1155

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 249

 1    say --

 2         A     Yes.

 3         Q     -- the statement -- let me finish my

 4    question.

 5               You're certain that you heard him say,

 6    all Nigerians are criminals?

 7         A     Yes.

 8         Q     You were asked several questions about

 9    your not being promoted at Delta.  Do you remember

10    that?

11         A     Yes.

12         Q     Okay.  And you were asked -- you stated

13    that you applied for a number of positions there;

14    correct?

15         A     That's correct, ma'am.

16         Q     Okay.  But you don't have documents in

17    front of you showing the positions that you

18    applied for, do you?

19         A     No.  I don't have anything, you know,

20    here to show.

21         Q     So I do have documents in front of me.

22    So I want to -- I'm going to start by asking you

23    about positions, and I am going to ask that you

24    confirm that you were denied these positions on

25    the dates that Delta has noted on the documents

Page 250

1    they sent to us.  Okay?

2        A    Okay.

3        Q    And according to Delta's documents that

4    they provided to us, Oniha-Delta 000704 through

5    705 -- we're going to start here.

6             Supply Attendant.  Do you recall

7    applying for a supply attendant position at Delta

8    and being informed on July 6th, 2018 that you did

9    not receive that position?

10       A    Yes.

11       Q    Do you recall applying for a

12   maintenance utility employee position and being

13   notified on September 27th, 2017 that you did not

14   get the job?

15       A    Yes.

16       Q    Do you recall applying for a special

17   agent aviation safety action program, frontline

18   position, and being told on February 14th, 2019

19   that you did not get the job?

20       A    Yes, ma'am.

21       Q    Do you recall applying for a

22   coordinator/EPA and safety position and being

23   notified -- Delta does not include a date here,

24   but they notified you that you did not get the

25   position?

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 251

```
 1        A      Yes, ma'am.
 2        Q      Do you recall applying for an analyst
 3   position and being notified by Delta that you did
 4   not get the job?
 5        A      Yes, ma'am.
 6        Q      You applied for supply attendant
 7   position again.  And do you recall being notified
 8   on April 19th, 2018 that you did not get the job?
 9        A      Yes, ma'am.
10        Q      You applied for a logistics attendant
11   position and were notified on March 23rd, 2018
12   that you did not get the job.  Do you recall that?
13        A      Yes, ma'am.
14        Q      Okay.  You applied for a supply
15   attendant job and were notified on April 20th,
16   2018 that you did not get the job.  Do you recall
17   that?
18        A      Yes, ma'am.
19        Q      You applied for a supply attendant job
20   again and were told on February 14th, 2018 that
21   you did not get the job.  Do you recall that?
22        A      Yes, ma'am.
23        Q      You applied for a Central 2 attendant
24   position and were notified on March 22nd, 2018
25   that you did not get the job.  Do you recall that?
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 252

```
 1        A     Yes, ma'am.
 2        Q     You applied for a performance leader
 3   position and were notified on May 5th, 2018 that
 4   you did not get the job.  Do you recall that?
 5        A     Yes, ma'am.
 6        Q     You applied for an analyst inventory
 7   position and were notified that you did not get
 8   the job.  Do you recall that?
 9        A     Yes, ma'am.
10        Q     You applied for a specialist position
11   and were notified on April 7th, 2018 that you did
12   not get the job.  Do you recall?
13        A     Yes, ma'am.
14        Q     You applied for a performance leader
15   job and were notified of June 10th, 2018 by Delta
16   that you did not get the job.  Do you recall that?
17        A     Yes.  Yes, ma'am.
18        Q     You applied for a performance legal
19   position, hyphen, ramp position and were notified
20   on June 10th, 2018 that you did not get the job.
21   Do you recall that?
22        A     Yes.  That's my recollection.  Yes,
23   ma'am.
24        Q     You applied for a BW production control
25   AUD.  I'm not sure what that stands for.  But you
```

Page 253

1    were notified on March 4th, 2019 that you did not

2    get the job.  Do you recall that?

3         A     Yes, ma'am.

4         Q     You applied for a specialist, hyphen,

5    sales planning position and were told on

6    January 30th, 2019 that you did not get the job.

7    Do you recall that?

8         A     Yes.

9         Q     You applied for a coordinator safety

10   position and were told on February 14th, 2019 that

11   you did not get the job.  Do you recall that?

12        A     I do, ma'am.  Yes, ma'am.

13        Q     You applied for a senior analyst

14   position and were told on May 22nd, 2019 that you

15   did not get the job.  Do you recall that?

16        A     Yes.

17        Q     You applied for a senior analyst

18   position and were notified on April 10th, 2019

19   that you did not get the job.  Do you recall that?

20        A     Yes.

21        Q     You applied for a specialist position.

22   On April 5th, 2019, you were notified that you

23   didn't get that position.  Do you recall that?

24        A     Yes, ma'am.

25        Q     You applied for a marketing specialist

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                              August 27, 2020

Page 254

1    position and were notified on April 28th, 2019

2    that you did not get the job.  Do you recall that?

3         A    Yes.

4         Q    You applied for a station manager

5    position and were told on June 20, 2019 that you

6    did not get the job.  Do you recall that?

7         A    Yes.

8         Q    You applied for a performance leader

9    ramp operations position and were notified on

10   July 24th, 2019 that you did not get the job.  Do

11   you recall that?

12        A    Yes, ma'am.

13        Q    Would you agree with me that every job

14   that I have mentioned was in the 2018-2019 time

15   period?

16        A    Yes.

17        Q    Did you receive an interview for even

18   one of those positions?

19        A    No, ma'am.  No.

20        Q    Let's look at the people who actually

21   got the job.

22             Mr. Oniha, you have stated an age

23   discrimination claim.  Do you recall that?

24        A    Yes, ma'am.

25        Q    Okay.  And why did you raise an age

Page 255

1    discrimination claim with regard to these

2    promotions?

3         A     Yeah.  Based on the jobs that you have

4    listed, you know, I was not even granted an

5    interview because of my age.  And it was --

6         Q     Okay.

7         A     Okay.  Go ahead, ma'am.

8         Q     Okay.  So I'm going to give you the

9    people -- the names of people who did get the job,

10   and I will give you the date of birth for all of

11   these people.  And you can tell me if you have any

12   reason to disagree that these people who are

13   significantly younger than you actually got the

14   job.  Okay?

15             MR. STONE:  Object to form and the

16   characterization of "significantly younger."

17        Q     (By Ms. Molden)  I'm going to give the

18   dates of birth, and you'll tell me if you have any

19   reason to disagree that these are the people who

20   got the job.  Okay?

21        A     All right.

22        Q     So as opposed to having you answer to

23   each one, I will give you a list, the position

24   that they applied for, and I'll ask you that

25   question at the end.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 256

1                        With regard to the BW supply attendant

2         position that was in 2018, the following

3         individuals were awarded the position: Aubrey

4         Forbes born in 1981, Cara Shaw born in 1985,

5         Josh Roberts born in 1991, Tyler Schofield born

6         in 1993, Rick Dilorenzo born in 1965, Zachary L.

7         Crawford born in 1988, Willis Popilachonda born

8         in 1976, Timothy Kingsley born in 1990, Kevin

9         Pressley born in 1992, Glenda Mallamaci -- don't

10        have a date for her -- Kendra Pope born in 1989,

11        Tevin Burke born in 1994, Myles Smith born in

12        1997, Carter Asha born in 1990, Corri Curtis

13        born in 1993, Kornegay Tquasia born in 1993,

14        Michael Mathis Johnson born in 1994, Melissa

15        Pacheco born in 1992, Haven Murphy born in 2000,

16        Ennassiry Houda born in 1992, Justin Doerr born

17        in 1991.

18                       Do you have any reason to believe that

19        these people didn't get the job -- this job for

20        the BW supply attendant as Delta has listed here?

21        A       No.  It didn't surprise me because, you

22        know, age was a factor in here.

23        Q       What year were you born?

24        A       I was born November 23rd, 1963.

25        Q       I'm sorry.  Say again.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 257

1       A       November 23rd, 1963.

2       Q       1963?

3       A       Yes, ma'am.

4       Q       There was an operation service manager

5       position that you applied for in July of 2019.

6       And I will tell you about the applicants who got

7       this job.  I'll do the same thing.

8               Katherine Coaster born in 1990, Felipe

9       Castillo born in 1989, Justin Jordan born in 1981,

10      Jordan Larson born in 1990, Johnnie Sikes born in

11      1974.

12              Any reason to believe that this

13      information that Delta had provided with regard to

14      the individuals who got this position is

15      incorrect?

16      A       No.  There's no reason.

17      Q       With regard to the inventory analyst

18      position, Genevieve -- and I'll just butcher this

19      name, so I'll spell it, A-k-i-n-w-u-m-i-j-u, born

20      in 1989.

21              This person got -- it looks like she's

22      the only one who received that job.  Any reason to

23      dispute that?

24      A       No, ma'am.

25      Q       You applied for a DMS position, but

Page 258

1    there's Sophia Awan born in 1995 who got the

2    job.

3              Any reason to dispute that?

4        A    No.

5        Q    The BW production control position.

6    Josh Conte born in 1993, hired by Delta in 2017

7    was a successful applicant.  Alexander Hughes born

8    in 1994, hired by Delta in 2018.  Scott Lusk born

9    in 1998.  Will McBroom or Thomas McBroom born in

10   1996.

11             Any reason to challenge the fact that

12   these were the people who actually got the job?

13       A    No, ma'am.

14       Q    Okay.  With regard to Josh Conte, I

15   just mentioned Mr. Conte as being born in 1995 and

16   hired in 2017.  Mr. Conte's -- I have Mr. Conte's

17   resumé.  And I won't go through all of it.

18             But any reason to challenge the fact

19   that he only had a high school education?

20       A    No, ma'am.  No.

21       Q    And no previous experience, any reason

22   to challenge that?

23       A    No, ma'am.  No.

24       Q    Will McBroom, another name that I

25   mentioned for this particular job.  Mr. McBroom

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 259

1    was born in 1996, and we're still looking at the

2    BW protection control job.

3              Mr. McBroom has a bachelor of science

4    in economics from the University of West Georgia

5    that he just received in 2018.  So he had just

6    graduated college in 2018.  He received this

7    job.

8              Any reason that you have to disagree

9    with this information that Delta has provided?

10        A    No.  I have no reason.  Age, again, was

11   a factor.

12        Q    And, again, you didn't even get an

13   interview, did you?

14        A    No.  For all the jobs that I applied

15   for, no interview.

16        Q    You have never gotten an interview for

17   a promotion with Delta?

18        A    From 2017 coming down to '19, no, I

19   never had an interview.

20        Q    Okay.

21        A    It probably had to be about five total

22   interviews.  Three here and then two out of state.

23   That's about it.

24        Q    Okay.  But in all these jobs that you

25   applied for that we are mentioning here from 2018,

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                    August 27, 2020

Page 260

1    2019, I think we had one or two in 2017, you never

2    even received an interview?

3         A    No.

4         Q    I'm also looking at Scott Lusk's

5    application or his resumé.  He started with Delta

6    in May 2018.

7              MR. STONE:  Are you testifying about

8    that, Regina?

9              MS. MOLDEN:  No.  I'm asking him if he

10   knows -- I'm telling him the information that

11   Delta has provided and asking him if he has any

12   reason to refute it or to disagree with it.

13             MR. STONE:  Okay.

14        A    I'm going to say no.

15        Q    (By Ms. Molden)  So any reason to

16   challenge that?

17        A    No, ma'am.

18        Q    Okay.

19             MR. STONE:  I think you've

20   mischaracterized a number of those resumés, but

21   obviously they'll speak for themselves, Regina.

22             MS. MOLDEN:  I'm sorry.  You think I've

23   done what?

24             MR. STONE:  I think you've not

25   accurately summarized the resumés and the

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 261

1   experience of those individuals.

2          MS. MOLDEN:  Oh, I can go into more

3   details.

4          MR. STONE:  I mean, you feel free.  The

5   resumés speak for themselves.

6          MS. MOLDEN:  Yeah.  I'm asking very

7   specific questions from the resumés.  And I could

8   ask additional questions, but my questions are

9   highly relevant: college graduates, high school

10  graduates, who not only got an interview but the

11  job.

12       Q     (By Ms. Molden) So let's see.  So

13  Alexander Hughes, another person who got the job,

14  the BW protection control job.  Any reason to

15  challenge the fact that Mr. Alexander Hughes who

16  was born in 1994 had nothing beyond a high school

17  diploma?  Any reason to challenge that?

18       A     No, ma'am.

19       Q     Okay.  Is this what you were seeing

20  at Delta?  That you were applying for these jobs,

21  and people who were born in the 1990s and just

22  graduating high school were getting interviews

23  and ultimately being hired?

24       A     Yes.

25       Q     You applied for a pricing analyst



Page 262

1    position, but Eric Cortelyou was awarded the job.

2    Mr. Cortelyou was born in 1991 and joined Delta in

3    2013.

4              Any reason to challenge that?

5         A    No, ma'am.  No.

6         Q    The analyst job position that you

7    applied for, job number 020310, was awarded to

8    James Coughlin born in 1993, joined Delta in

9    2015.

10             Any reason to challenge that?

11        A    No, ma'am.  No.

12        Q    Rodrick Dewey was the successful

13   applicant for the BW MUE position that you applied

14   for.  That's 057040 job number.  He was born in

15   1988 and had no record of experience at Delta till

16   he was hired in 2016 as a forklift operator.

17             Any reason to challenge that

18   information?

19        A    No, ma'am.  No.

20        Q    Logan Sparks, also awarded the BW MUE

21   position, born in 1996, newly hired by Delta.

22             Any reason to challenge that

23   information?

24        A    No, ma'am.  No.

25        Q    So for all of these jobs -- and just to

1    be clear -- you were not even interviewed;

2    correct?

3        A    Never happened.  No.

4        Q    Did anybody tell you why you were not

5    getting interviews?

6        A    No.  No, I wasn't.  No.  No.

7             MS. MOLDEN:  Okay.  I think that I have

8    no further questions for now.  Obviously, if, in

9    fact, we resume this deposition, I'm sure I'll

10   have more then.

11            MR. STONE:  Okay.  That's fine.

12            I've got a couple just follow-up

13   questions.

14                 RECROSS-EXAMINATION

15   BY MR. STONE:

16       Q    Mr. Oniha, this list of employees who

17   received jobs that Ms. Molden just read to you, do

18   you know any of those individuals?

19       A    Some of them I do.  Yes.

20       Q    Okay.  You've never met them or talked

21   to them?

22       A    No.  Not at all.  No.

23       Q    You don't know anything about them

24   aside from what Ms. Molden just told you?

25       A    No.  What she just said now, you know.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 264

1    I just see them.  You know, we don't communicate

2    at the airport or outside the airport.

3         **Q     I'm sorry.  I didn't hear what you**

4    **said.  I didn't understand what you said.**

5         A     I don't know them, like, you know, we

6    communicate at the airport or outside the airport.

7    No.

8         **Q     You don't know anything about their**

9    **performance or their performance evaluations?**

10        A     No.

11        **Q     Okay.  Don't know who made the decision**

12   **to hire these people or interview them?**

13        A     No, I don't.

14        **Q     Okay.  Do you know what a BW production**

15   **control job is?**

16        A     Yes.

17        **Q     What is it?**

18        A     Yeah.  Pretty much what you do, you are

19   tele-controlling all the parts that come in.  And,

20   of course, you enter them into the eBoot system

21   that is set up.

22             And whatever part that you issued out,

23   of course, you take it to whatever department.

24   You know, and, of course, you have to give reports

25   of the end of the day or at the end of the shift

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 265

```
1    and end of the month.
2         Q    What division or department is it in?
3         A    They're under TOC.
4         Q    Maintenance; correct?
5         A    Yeah.  TOC.  Yes.
6         Q    Okay.  TOC is the maintenance
7    department; correct?
8         A    Yes.  Yes.
9         Q    Did you ever work in the maintenance
10   department?
11        A    No.  I have not, but that job
12   description just fits under, you know, some of the
13   things I have done in the past.
14        Q    Do you know whether any of the
15   successful candidates worked in the maintenance
16   department?
17        A    Some of them have, but not all of them.
18   No.
19        Q    Okay.  Which ones did not?
20        A    No.  I wouldn't -- I can't -- you see
21   the list of the names that she gave you.  So I
22   can't -- you have that information.
23             MR. STONE:  All right.  I don't have
24   any further questions.
25             Again, at this time, I'm going to leave
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 266

 1   the deposition open for the reasons we talked

 2   about.

 3              MS. MOLDEN:  Well, I want to make sure

 4   that I know exactly what it is that you're looking

 5   for.

 6              MR. STONE:  Sure.

 7              MS. MOLDEN:  So we don't have to talk

 8   about that online, but I want to make sure.

 9              MR. STONE:  I'm happy to put it on the

10   record if you want.

11              MS. MOLDEN:  Yeah.  That works.  Go

12   right ahead.

13              MR. STONE:  Okay.  Mr. Oniha has

14   testified at length about documents that are

15   on his computer including the original statements

16   that were not produced and that were

17   represented -- when it was represented that

18   all documents were produced.

19              It was represented to us by counsel

20   that there were no electronic documents available,

21   no electronic materials available.  And, in fact,

22   Mr. Oniha has testified at length regarding the

23   documents that are on his computer that have not

24   been provided.

25              MS. MOLDEN:  I have to correct that



Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 267

1   because that's a misstatement then.  How do you

2   think you got the documents from us?

3              So you received documents from us that

4   we received from him electronically.  So we would

5   not have told you that there were no electronic

6   documents.

7              MR. STONE:  Well, we can discuss that,

8   and obviously we can look at the letter and look

9   at the transcript of what was presented to the

10  judge and go from there.

11             MS. MOLDEN:  Yeah.  Sure.

12             So your original statement -- and I'm

13  sure -- I heard the testimony about that, and I

14  can tell you right now I still stand by the exact

15  same thing I said the first time.

16             MR. STONE:  Well, we'll sort that --

17  obviously, we're going to have to have some

18  conversations with the court, and we can sort that

19  out.

20             Why don't we plan on talking, Regina.

21  We, of course, got your deposition notice as well.

22  I have not had a chance to talk to my client about

23  it.

24             But we should probably talk about the

25  appropriate course of the remainder of this



Page 268

1    litigation here.  But why don't we talk about that

2    by phone maybe tomorrow.

3             MS. MOLDEN:  Well, I will actually be

4    doing this all day tomorrow.  So I will not be

5    available tomorrow.

6             MR. STONE:  All right.  Will Orlando be

7    available?

8             I mean, y'all have noticed the

9    deposition on three business days' notice for

10   Monday.

11            MS. MOLDEN:  Right.  Which is why we

12   said to you, Ben, realizing that.  But, again, I

13   told you if you need to change the date, that's

14   perfectly fine with us.

15            MR. STONE:  Well, yeah.  We need to

16   talk about it.  We think the notice is improper to

17   begin with.  I think we may just need to talk

18   about all the --

19            MS. MOLDEN:  It's a deposition notice.

20   I'm entitled --

21            MR. STONE:  Yeah.  On three days'

22   notice without conferring with us, with absolutely

23   no reason for noticing it at the

24   end.

25            MS. MOLDEN:  That's not a requirement.

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 269

```
 1                    Well, let me say this since you're

 2     putting that on the record.  We noticed the

 3     deposition and made it a point to say, we realize

 4     this is short notice -- not that we can't notice

 5     it on short notice.

 6                    But we made it a point to say that we

 7     realize it's short notice, and, therefore, we're

 8     willing to work with you on the date.

 9                    MR. STONE:  That's not the way it's

10     supposed to work, Regina.  You know that.  And

11     you're not supposed to wait for an eight-month

12     discovery period and notice the deposition three

13     days before the end of discovery, on the last day

14     of discovery.

15                    And Judge Fuller says in his order

16     you're not supposed to notice depositions without

17     conferring with opposing counsel.  That's clearly

18     in his order.

19                    MS. MOLDEN:  So we're talking about it.

20     We're conferring.  And I fully plan to take his

21     deposition.  So we can talk about it.

22                    MR. STONE:  All right.  Well, we can

23     sort of talk about it next -- obviously, since

24     you're not available tomorrow, I assume you're not

25     going to insist on the notice for Monday?
```



Page 270

```
 1                MS. MOLDEN:  I'm available Monday if
 2   he's available.
 3                MR. STONE:  Yeah.  I'm not available on
 4   Monday.
 5                MS. MOLDEN:  Okay.  Then we can do a
 6   different day.  I told you we were flexible with
 7   that.
 8                MR. STONE:  We'll talk about next steps
 9   here.  I'll send you a letter.  I'll give you a
10   call, and we can talk about it.
11                MS. MOLDEN:  All right.  Sounds good.
12                MR. STONE:  All right.  Nothing further
13   at this time.
14                THE COURT REPORTER:  Regina, I need
15   signature on the record, please.  Is he reading
16   and signing or waiving?
17                MS. MOLDEN:  We'll reserve.
18                THE COURT REPORTER:  Okay.  Thank you.
19                And then are you ordering a copy?
20                MR. STONE:  Yes.  We'd like an
21   expedited, Libby.  So if we can get this quickly.
22                MS. MOLDEN:  I'll take electronic.
23                THE COURT REPORTER:  Same for you, Ben?
24   Electronic?
25                MR. STONE:  .PDF would be great.
```

Page 271

```
 1    (Deposition adjourned, 4:35 p.m.)

 2    (Pursuant to Rule 30(e) of the Federal Rules

 3    of Civil Procedure and/or O.C.G.A.

 4    9-11-30(e), signature of the witness has

 5    been reserved.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:19-cv-05272-LMM   Document 45   Filed 12/01/20   Page 272 of 277
Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 272

1              DISCLOSURE OF NO CONTRACT

2

3            I, Elizabeth R. Hollingsworth, CCR, do
hereby disclose, pursuant to Article 10.B of the
4  Rules and Regulations of the Board of Court
Reporting of the Judicial Council of Georgia, that
5  Elizabeth Gallo Court Reporting, LLC, was
contacted by the party taking the deposition to
6  provide court reporting services for this
deposition and there is no contract that is
7  prohibited by O.C.G.A. 15-14-37(a) and (b) or
Article 7.C. of the Rules and Regulations of the
8  Board for the taking of this deposition.

9            There is no contract to provide court
reporting services between Elizabeth Gallo Court
10  Reporting, LLC, or any person with whom Elizabeth
Gallo Court Reporting, LLC, has a principal and
11  agency relationship nor any attorney at law in
this action, party to this action, party having a
12  financial interest in this action, or agent for an
attorney at law in this action, party to this
13  action, or party having a financial interest in
this action.  Any and all financial arrangements
14  beyond our usual and customary rates have been
disclosed and offered to all parties.

15

16            This 1st day of September, 2020.

17

18

19        _____   ____
         Elizabeth R. Hollingsworth, B-1319
20        Elizabeth Gallo Court Reporting, LLC

21

22

23

24

25



Page 273

```
 1              COURT REPORTER CERTIFICATE

 2    STATE OF GEORGIA:

 3    COUNTY OF DEKALB:

 4

 5         I hereby certify that the foregoing

 6         transcript was taken down, as stated in the

 7         caption, and the proceedings were reduced to

 8         typewriting under my direction and control;

 9         that the foregoing pages represent a true,

10         complete, and correct transcript of the

11         evidence given upon said deposition; and I

12         further certify that I am not of kin or

13         counsel to the parties in the case; am not

14         in the employ of counsel for any of said

15         parties; nor am I in any way interested in

16         the result of said case.

17              This, the 1st day of September, 2020.

18

19

20

21         _____

22         Elizabeth R. Hollingsworth, CCR B-1319

23

24

25
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                          August 27, 2020

Page 274

1   CASE:  Elias E. Oniha vs Delta Airlines, Inc.

2   NAME OF WITNESS:    Elias Effuoria Oniha

3       The preceding deposition was taken

4   in the matter, on the date and at the time and

5   place set out on the title page hereof.

6       It was requested that the deposition

7   be taken by the reporter and that same be

8   reduced to typewritten form.

9       It was agreed by and between counsel

10  and the parties that the deponent will read and

11  sign the transcript of said deposition. Said jurat

12  is to be returned, within 30 days after the transcript

13  is made available, to the following address:

14          Elizabeth Gallo Court Reporting, LLC

15          2900 Chamblee Tucker Road

16          Building 13, First Floor

17          Atlanta, Georgia 30341

18  If an errata is executed and returned

19  to EGCR within the 30 days allocated by law,

20  the executed errata will be sent to the taking

21  attorney for filing with the original transcript.

22  Should an executed errata not be forwarded from

23  EGCR to the taking attorney for filing, the

24  deposition was not reviewed and signed by the

25  deponent within 30 days.

**Elizabeth Gallo**
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 275

```
 1   NAME OF CASE:       Elias E. Oniha vs Delta Airlines, Inc.
     DATE OF DEPOSITION: 08/27/2020
 2   NAME OF WITNESS:    Elias Effuoria Oniha

 3   EGCR JOB NO.:       70001

 4                  CERTIFICATE

 5        Before me this day personally
     appeared ELIAS EFFUORIA ONIHA, who, being duly
 6   sworn, states that the foregoing transcript of
     his/her deposition, taken in the matter, on
 7   the date and at the time and place set out on
     the title page hereof, constitutes a true and
 8   accurate transcript of said deposition.

 9                  _____

10                  ELIAS EFFUORIA ONIHA

11        SUBSCRIBED and SWORN to before me

12   this _____ day of _____ 20____.

13   in the jurisdiction aforesaid.

14   _____     _____
15   My Commission Expires       Notary Public

16     STATE OF _____

17     COUNTY/CITY OF _____

18

19     []   No changes made to the Errata Sheet;

20   therefore, I am returning only this signed,

21   notarized certificate.

22     []   I am returning this signed,

23   notarized certificate and Errata Sheet with

24   changes noted.

25
```

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha

August 27, 2020

Page 276

```
1                    Errata Sheet

2    NAME OF CASE:      Elias E. Oniha vs Delta Airlines, Inc.

3    DATE OF DEPOSITION: 08/27/2020

4    NAME OF WITNESS:   Elias Effuoria Oniha

5    Reason Codes:  1. To clarify the record

6                   2. To correct transcription errors

7                   3. Other
     _____
8    _____

9     Page _____ Line _____ Reason _____

10    From _____ to _____

11    Page _____ Line _____ Reason _____

12    From _____ to _____

13    Page _____ Line _____ Reason _____

14    From _____ to _____

15    Page _____ Line _____ Reason _____

16    From _____ to _____

17    Page _____ Line _____ Reason _____

18    From _____ to _____

19    Page _____ Line _____ Reason _____

20    From _____ to _____

21    Page _____ Line _____ Reason _____

22    From _____ to _____

23

24     SIGNATURE:_____DATE:_____

25                Elias Effuoria Oniha
```

Elizabeth Gallo
COURT REPORTING, LLC

Elias E. Oniha vs Delta Airlines, Inc.
Elias Effuoria Oniha                                                    August 27, 2020

Page 277

1                   Errata Sheet

2    NAME OF CASE:       Elias E. Oniha vs Delta Airlines, Inc.

3    DATE OF DEPOSITION: 08/27/2020

4    NAME OF WITNESS:    Elias Effuoria Oniha

5    Reason Codes:  1. To clarify the record

6                   2. To correct transcription errors

7                   3. Other

8    _____

9     Page _____ Line _____ Reason _____

10    From _____ to _____

11    Page _____ Line _____ Reason _____

12    From _____ to _____

13    Page _____ Line _____ Reason _____

14    From _____ to _____

15    Page _____ Line _____ Reason _____

16    From _____ to _____

17    Page _____ Line _____ Reason _____

18    From _____ to _____

19    Page _____ Line _____ Reason _____

20    From _____ to _____

21    Page _____ Line _____ Reason _____

22    From _____ to _____

23

24    SIGNATURE:_____DATE:_____

25             Elias Effuoria Oniha